**Nos. 2023-1006 and 2023-1008**

IN THE

# United States Court of Appeals
# for the Federal Circuit

—————————

SOFTVIEW LLC,

*Appellant,*

*v.*

APPLE INC. and MOTOROLA MOBILITY LLC

*Appellees*

APPEAL FROM
THE UNITED STATES PATENT AND TRADEMARK OFFICE,
PATENT TRIAL AND APPEAL BOARD
IN REEXAMINATION CONTROL NOS. 95/000,635 AND 95/002,126

**BRIEF OF APPELLANT SOFTVIEW LLC**

R. ALAN BURNETT

**LAW OFFICE OF R. ALAN BURNETT**

4108 131st Ave SE
Bellevue WA 98006
(425) 417-4729
*Attorneys for Appellant*
SOFTVIEW LLC

January 27, 2023

Representative Claim 29:

    1.  A mobile device, comprising:

    a processor,

    a wireless communications device operatively coupled to the processor, to facilitate communication with a network via which Web content may be accessed;

    a touch-sensitive display;

    a memory, operatively coupled to the processor; and

    storage means, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile phone to perform operations including,

    enabling a user to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

    retrieving HTML-based Web content associated with the Web page;

    translating the HTML-based Web content to produce scalable vector-based page layout information;

    employing the scalable vector-based page layout information and/or data derived therefrom to,

        render a view of at least a portion of the Web page on the touch-sensitive display using a first scale factor; and

        re-render the Web page in response to associated user inputs to enable a user to iteratively zoom in and out views of the Web page on the display while preserving the original page layout, functionality, and design of the content on the Web page defined by the HTML-based Web content,

    wherein preservation of the functionality defined by the HTML-based content includes preservation of hyperlink functionality.

    29. The mobile device of claim 1, wherein the HTML-based Web content includes cascading style sheet content defining layout and presentation attributes for the Web page.

# CERTIFICATE OF INTEREST

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF INTEREST

**Case Number**   2023-1006 and 2023-1008

**Short Case Caption**   SoftView LLC v. Apple Inc.

**Filing Party/Entity**   SoftView LLC

---

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box.** Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/27/2023

Signature: /s/ R. Alan Burnett

Name: R. Alan Burnett

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| ☐ None/Not Applicable | ☑ None/Not Applicable | ☑ None/Not Applicable |
| SoftView LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑     None/Not Applicable            ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☑     None/Not Applicable            ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable            ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ........................................................................... i

TABLE OF AUTHORITIES ............................................................................ vi

STATEMENT OF RELATED CASES ................................................................. 1

JURISDICTIONAL STATEMENT ...................................................................... 2

INTRODUCTION .......................................................................................... 3

STATEMENT OF THE ISSUES.......................................................................... 4

STATEMENT OF THE CASE ........................................................................... 5

    I.     PROCEDURAL BACKGROUND ................................................... 5

    II.    THE SOFTVIEW PATENTS .......................................................... 6

    III.   THE PRIOR ART .................................................................... 11

        A.   The Pad++ References ......................................................... 11

            1.   The Pad++ ZUI.......................................................... 11

        B.   HTML 4.0 Specification ....................................................... 12

SUMMARY OF THE ARGUMENT .................................................................. 13

ARGUMENT .............................................................................................. 14

    I.     STANDARD OF REVIEW ........................................................... 14

    II.    NEW GROUND 1 PATENTABILITY OF CLAIMS 29
         AND 78 IN VIEW OF PAD++ TOUR AND AAPA ....................... 14

        A.   AAPA Cannot Be the Basis for a Ground in an
           *Inter Partes* Reexamination ................................................... 14

            1.   The Mozilla Rendering Engine is the Basis
               for the New Ground ..................................................... 19

**Page**

B.   The Board Failed to Establish a *Prima Facie* Case
of Obviousness. ....................................................................... 20

C.   PHOSITA and Enablement.................................................... 28

D.   *In re Keller* Cannot Rescue the Defective
Combination............................................................................ 32

II.   NEW GROUND 2: PATENTABILITY OF CLAIMS 29
AND 78 IN VIEW OF PAD++ TOUR AND THE
HTML 4.0 STANDARD................................................................... 34

A.   Implementation of HTML 4 Would Not Meet the
Relevant CSS Claim Limitations............................................ 34

B.   Implementation of HTML 4 Would Not Have
Been Obvious.......................................................................... 42

1.   Enablement and Undue Experimentation................... 50

III.   New Grounds Improperly Adopted by Board................................. 53

A.   Examiner Correct to Not Adopt New Grounds ..................... 53

B.   New Grounds Unavailable Under 37 CFR § 41.77 .............. 55

IV.   AFFIRMATION OF EXAMINER'S REJECTION OF
CLAIMS 64 AND 66 IMPROPER .................................................. 58

A.   Claim Construction Under *Phillips*........................................ 58

V.   Violation of the Administrative Procedure Act (APA).................... 85

CONCLUSION .................................................................................................. 88

ADDENDUM ..................................................................................................... 90

## <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

### <u>Cases</u>

*Application of Hoeksema,*
   399 F.2d 269 (C.C.P.A. 1968) ........................................................50

*Beckman Instruments, Inc. v. LKB Produkter AB,*
   892 F.2d 1547 (Fed. Cir. 1989) ...................................................50

*Cohesive Techs., Inc. v. Waters Corp.,*
   543 F.3d 1351 (Fed. Cir. 2008) ...................................................83

*Cutsforth v. MotivePower,*
   636 F. App'x 575 (Fed. Cir. 2016)................................................27

*Environment Designs, Ltd. v. Union Oil Co. of Cal.,*
   713 F.2d 693 (Fed. Cir. 1983) .....................................................21

*Ethicon, Inc. v. Quigg,*
   849 F.2d 1422 (Fed. Cir. 1988) ...................................................26

*Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. de C.V.,*
   865 F.3d 1348 (Fed. Cir. 2017) ...................................................26

*In re Affinity Labs of Tex., LLC,*
   856 F.3d 902 (Fed. Cir. 2017) .....................................................70

*In re Antor Media Corp.,*
   689 F.3d 1282 (Fed. Cir. 2012) ...................................................48

*In re Brandstadter,*
   484 F.2d 1395, 1404, 179 USPQ 286, 294 (CCPA 1973) ...........51

*In re Freeman,*
   30 F.3d 1459 (Fed. Cir. 1994) .....................................................17

*In re ICON Health & Fitness, Inc.,*
   496 F.3d 1374, 1382 (Fed. Cir. 2007) .........................................34

*In re Jung,*
   637 F.3d 1356 (Fed. Cir. 2011) ....................................... 25, 26, 62

*In re Kahn*,
    441 F.3d 977 (Fed. Cir. 2006) ....................................................27

*In re Keller*,
    642 F.2d 413 (CCPA 1981) ............................................... 33, 53

*In re Kumar*,
    418 F.3d 1361 (Fed. Cir. 2005) ..................................................50

*In re Lonardo*,
    119 F.3d 960 (Fed. Cir. 1997) ....................................................17

*In re NTP, Inc.*,
    654 F.3d 1268 (Fed. Cir. 2011) ..................................................18

*In Re Nuvasive, Inc.*
    842 F.3d 1376 (Fed. Cir. 2016) ............................................. 27, 85

*In re Payne*,
    606 F.2d 303, 314 (CCPA 1979) ................................................50

*In re Rambus, Inc.*,
    753 F.3d 1253 (Fed. Cir. 2014) ..................................................58

*In re Urbanski*,
    809 F.3d 1237, (Fed. Cir. 2016) .................................................34

*In re Vivint, Inc.*,
    2020-1992 (Fed. Cir. Sep. 29, 2021) ..........................................86

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*,
    821 F.3d 1359 (Fed. Cir. 2016) ..................................................42

*KSR Int 'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)............................................... 20, 27, 43, 53

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996)..................................................................58

*Mikkelsen Graphic Eng'g, Inc. v. Zund Am., Inc.*,
    541 F. App'x 964 (Fed. Cir. 2013) .............................................17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..........................................................................86

*Motorola, Inc. v. Interdigital Tech. Corp.*,
    121 F.3d 1461, 1471 (Fed. Cir. 1997) ...........................................50

*Personal Web Technologies, LLC v. Apple, Inc.*
    848 F.3d 987 (Fed. Cir. 2017) .......................................................28

*PPC Broadband, Inc. v. Corning Optical Communications RF, LLC*,
    815 F.3d 734 (Fed. Cir. 2016) .......................................................58

*Qualcomm Inc. v. Apple Inc.*,
    24 F.4th 1367 (Fed. Cir. 2022) .....................................................16

*Rambus Inc. v. Rea*,
    731 F.3d 1248 (Fed. Cir. 2013) .............................................. 26, 56

*Randall Mfg. v. Rea*,
    733 F.3d 1355, 1362 (Fed. Cir. 2013) ...........................................14

*Redline Detection, LLC v. Star Envirotech, Inc.*,
    811 F.3d 435 (Fed. Cir. 2015) .......................................................26

*Return Mail, Inc. v. Postal Service*,
    139 S. Ct. 1853 (2019).................................................................17

*See In re Merck & Co., Inc.*,
    800 F.2d 1091 (Fed. Cir. 1986) .....................................................44

*Softview LLC v. Kyocera Corp.*,
    592 F. App'x 947 (Fed. Cir. 2015)..................................................5

*Softview LLC v. Kyocera Corp.*,
    592 F. App'x 949 (Fed. Cir. 2015)..................................................5

*SRI International v. Matsushita Electric Corp.*,
    775 F.2d 1107 (Fed. Cir. 1985) .....................................................83

*Standard Oil Co. v. American Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985) .......................................................21

*Tecsec, Inc. v. Int'l Bus. Machs. Corp.*,
   731 F.3d 1336 (Fed. Cir. 2013) ....................................................32

*TQ Delta, LLC v. Cisco Sys.*,
   942 F.3d 1352 (Fed. Cir. 2019) ....................................................27

*White Consol. Indus. v. Vega Servo-Control*,
   713 F.2d 788 (Fed. Cir. 1983) ......................................................51

*Yeda Research v. Mylan Pharm. Inc.*,
   906 F.3d 1031, 1040 (Fed. Cir. 2018) ..........................................14

## Statutes

28 U.S.C. § 1295(a)(4)(A) ......................................................................2

35 U.S.C. § 103(a) ...............................................................................14

35 U.S.C. § 132 ....................................................................................25

35 U.S.C. § 141 ......................................................................................2

35 U.S.C. § 301 ............................................................................. passim

35 U.S.C. § 301 (AIA) ................................................................... 17, 55

35 U.S.C. § 303 ....................................................................................18

35 U.S.C. § 311 ....................................................................................16

35 U.S.C. § 311 (Pre-AIA) .......................................................... 4, 13, 15

5 U.S.C. § 706 .............................................................................. 14, 86

## Rules

37 C.F.R. § 1.501 .................................................................................54

37 C.F.R. § 1.906 ........................................................... 4, 13, 15, 16

37 C.F.R. § 1.915 ......................................................................... passim

37 C.F.R. § 1.948 .................................................................................54

37 C.F.R. § 41.50 ......................................................................... 34, 55

37 C.F.R. § 41.67 ................................................................. 13, 57

37 C.F.R. § 41.77 ............................................................. 13, 56, 57

37 C.F.R. § l.104(c)(3) ...............................................................14

**Patent Procedures**

M.P.E.P. § 2617 ......................................................................55

**Law Journal Papers**

Burk, Dan L., and Mark A. Lemley. "Is patent law technology-
        specific." Berkeley Tech. LJ 17 (2002): 1155..............................................47

All emphasis herein shown in **bold,** ***bold italics***, and ***bold italics underlined*** added unless otherwise noted.

## STATEMENT OF RELATED CASES

No other appeal in or from the same proceeding was previously before this or any other appellate court.

This is consolidated appeal combining Appeal Nos. 2023-1006 and 2023-1008.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141 as an appeal from a final decision of the Patent Trial and Appeal Board (the "Board") of the United States Patent Office (the "PTO") in an *Inter Partes* Reexamination (the Rehearing Decision ("Reh'g Dec.")).

**INTRODUCTION**

This case presents issues of first impression, including consideration of Applicant's Admitted Prior Art (AAPA) in an *inter partes* reexamination, and whether a Board, in effectively substituting itself on behalf of a third party requester (3PR), may enter/adopt a new ground of rejection under 37 CFR § 41.77 comprising a repackaged version of a ground proposed by the 3PR that was properly not adopted by the Examiner and is barred under 37 C.F.R. § 41.67(c)(1)(vi).  This case also presents claim construction issues (which now must be construed under *Phillips*) and what evidentiary requirements must be met to find claims on appeal obvious in an *inter partes* reexamination.  Additionally, Administrative Procedure Act issues are presented with respect to rejection of a claim that was found patentable in a parallel *ex parte* reexamination under which obviousness issues in this proceeding were previously addressed.

## STATEMENT OF THE ISSUES

1.  Whether the Mozilla rendering engine alleged to be Applicant's Admitted Prior Art (AAPA) qualifies as a basis for a ground of rejection as prior art under 35 U.S.C. §§ 301(a)(1) and 311 (pre-AIA)  and 37 C.F.R. §§ 1.906(a) and 1.915?

2.  Whether claims 29 and 78 are obvious over the Pad++ references and the Mozilla rendering engine?

3.  Whether claims 29 and 78 are obvious over the Pad++ references and the HTML 4.0 specification?

4.  Whether the Board's new grounds are permitted under 37 CFR §§ 41.77 and 41.67(c)(1)(vi).

5.  Whether claims 64 and 66 are obvious over the Pad++ references?

6.  Whether the Board's rejections for 2. and 3. violate the Administrative Procedure Act.

## STATEMENT OF THE CASE

## I.   PROCEDURAL BACKGROUND

On May 23, 2011, 3PR Apple Inc. filed a Request for *Inter Partes* Reexamination of SoftView's '926 Patent (7,831,926) (95/000,635), which was granted on August 8, 2011. On August 31, 2012, 3PR Motorola Mobility LLC filed a Request for *Inter Partes* Reexamination of the '926 Patent (90/002,126), which was granted on November 26, 2012. The '926 Patent has undergone parallel proceedings including *Ex Parte* Reexamination 90,009,995 (Apple Inc.).

On October 2, 2012, a Petition for *Inter Partes Review* of the '926 Patent and sibling 7,461,353 ('353 Patent) was filed by Kyocera. The Board entered a Decision to Institute IPR of the '353 and '926 patent on March 29, 2013 (IPR2013-00007) (IPR2013-00004), which were subsequently joined by Motorola Mobility LLC (IPR2013-00256) (IPR2013-00257).

In Final Written Decisions (March 27, 2014), the Board found all challenged claims in the'353 and'926 patents unpatentable under 35 U.S.C. § 103 and cancelled. The Federal Circuit issued Rule 36 Judgments affirming unpatentability of the challenged claims in *Softview LLC v. Kyocera Corp.*, 592 F. App'x 947 (Fed. Cir. 2015) and *Softview LLC v. Kyocera Corp.*, 592 F. App'x 949 (Fed. Cir. 2015)

## II.     THE SOFTVIEW PATENTS

The '926 Patent, entitled "Scalable Display of Internet Content on Mobile Devices," relates to the display of Web content on mobile devices.  Appx0109 (Abstract).  The lead inventor is Gary Rohrabaugh (now deceased), who was the principal owner of SoftView.  The '926 and '353 Patents are siblings, with similar disclosures.

The SoftView Patents disclose processes for translating HTML code – including "elements such as tables, column definitions, graphic images, paragraphs" and the like – into a scalable resolution-independent representation (also called a vector representation) for display on a mobile device.  '926 Patent, 15:43-18:32.  For example, FIGs. 4A-4G show translation and scaling processes for a Web page (4A) that is processed to generate HTML objects (4B) that are translated into a scalable representation (4C), and FIG. 5 sets forth an exemplary translation process.



FIG. 4A

FIG. 4B

FIG. 4C

**FIG. 5**

| | |
|---|---|
| PARSE HTML CONTENT TO IDENTIFY LAYOUT INFORMATION TAGS | 150 |
| SEPARATE CONTENT INTO OBJECTS AND DEFINE BOUNDING BOX FOR EACH OBJECT | 152 |
| DEFINE PAGE LAYOUT BASED ON BOUNDING BOXES | 154 |
| DEFINE DATUM POINT FOR PAGE AND FOR EACH OBJECT BOUNDING BOX | 156 |
| GENERATE VECTOR FROM PRIMARY DATUM TO BOUNDING BOX DATUM FOR EACH OBJECT | 158 |
| CREATING A REFERENCE THAT LINKS EACH OBJECT TO ITS VECTOR AND BOUNDING BOX | 160 |

FIGs. 4D and 4G show scaling of two HTML objects, FIG. 4E shows a scaled page, and FIG. 4F shows scaled bounding boxes for the scaled page.



FIG. 4D

FIG. 4G

FIG. 4E

FIG. 4F

A Web page's HTML-based content (HTML, CSS, XML, JavaScript) is retrieved and processed using an HTML- and CSS-compliant rendering engine (*e.g.*, Mozilla "Gecko") to perform the functions in blocks 150, 152, and 154 of FIG. 5. *Id.*, at 17:31-41. The various object layout data is used to generate a scalable vector representation of the original page content. '926 Patent, 15:43-18:32.

A critical aspect of the SoftView Patents is these translation processes preserve the original page layout, functionality, and design of the Web content as defined by the HTML-based Web content (*i.e.*, HTML Code and CSS code). Such preservation enables "users of . . . handheld devices with small screens . . . to view and interact with Web pages in a manner independent of the screen resolution of such device's built-in or associated display, while maintaining the look and feel of browsing such pages with a conventional desktop browser." '353 Patent, 2:50-56 (Appx2006) (emphasis added). This enables "users to easily navigate to selected content and features of familiar Web pages." *Id.*, at 2:33-34.

An overall end-to-end view illustrating an implementation using the SoftView™ browser client is shown in FIG. 1 below (Appx1964, Appx2124). Non-limiting examples of mobile and hand-held devices include PDAs, Pocket PCs, and mobile phones. *Id.*, at 20:49-51. A detailed discussion of limitations recited in the appealed claims is provided *infra*.



*FIG. 1*

## III.    THE PRIOR ART

### A.    The Pad++ References

The Pad++ references (also referred to as the "Bederson references") are a collection of eight publications describing a desktop Zoomable User Interface (ZUI).  The Board collectively refers to these publications as "Pad++" and "Pad++ Tour".[1]

### 1.    The Pad++ ZUI

The Pad++ ZUI is designed to enable users to view different information and/or different levels of detail of content by zooming. Central to the Pad++ ZUI was its use of "a large information surface" on a large, high-resolution display. Appx0432.  "[U]sers are presented with a zooming view of a huge planar information space," which could be populated with many types of graphical objects that could be displayed, such objects including web pages.  *Id.*  Users could zoom on the information surface via interactive animation.

A fundamental requirement of Pad++ was the ability to perform zooming with smooth real-time interactive animation:

> Maintaining smooth real-time interaction is crucial. The entire metaphor is based on animation. If the system becomes slow and jerky, the metaphor dies. Frame rates of anything less than 10 frames

---

[1] The Appeal Decision only lists Bederson references 1-5.

per second are <u>unacceptable</u>. Bederson-4 Appx0435.

Pad++ used a three-button mouse, where the middle button was held down to zoom in, the right button held down to zoom out, and the left button is mode dependent.  Appx0472.  Optionally, for a two-button mouse, the right button was used to zoom in and holding down the shift key + the right button was used to zoom out.  Appx1843-1844.

As the user held down the middle/right button, the Pad++ view (the entire screen) would zoom in by dynamically generating and displaying new frames in an interactive, animated manner.  Each frame requires redrawing all displayed content and determining content to be excluded. The interactive animation of the zoom provided the necessary feedback to enable users to navigate the content drawn on the Pad++ substrate ("... it is essential that interactive frame rates be maintained.") Appx0471.

Further details of the implementation of Pad++ and browser are discussed *infra*.

### B.    HTML 4.0 Specification

The HTML 4.0 Specification was a W3C Recommendation published on December 18, 1997[2] that defines the HyperText Markup Language (HTML), version 4.0, the publishing language of the World Wide Web.  Appx2522

---

[2] https://www.w3.org/TR/REC-html40-971218/

## SUMMARY OF THE ARGUMENT

This Court should reverse the Board's decision that the appealed claims are invalid under the new grounds of rejection for claims 29 and 78 and reverse confirmation of the rejections of claims 64 and 66:

- First, the Board erred by applying a new ground of rejection under § 103 using AAPA that is neither a printed publication nor qualifies as prior art under 35 U.S.C. §§ 301(a)(1) and 311 (pre-AIA) and 37 C.F.R. §§ 1.906(a) and 1.915).

- Second, the Board erred by finding claims 29 and 78 obvious over Pad++ and AAPA.

- Third, the Board erred by finding claims 29 and 78 obvious over Pad++ and the HTML 4.0 specification.

- Fourth, the Board errored by adopting new grounds barred under 37 CFR §§ 41.77) and 41.67(c)(1)(vi).

- Fifth, the Board errored by confirming the rejection of claims 64 and 66 as obvious over Pad++.

- Sixth, the Board errored by violating the APA in rejecting a claim (29) that was confirmed in an *ex-parte* reexamination in which identical obviousness issues were addressed.

Thus, the Board's decision should be reversed outright.

# ARGUMENT

## I.    STANDARD OF REVIEW

SoftView's challenge of the Board's conclusions of obviousness is reviewed *de novo* with respect to legal conclusions and for substantial evidence with respect to factual findings.  *See Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). The Board's decision is reviewed under the standards set forth in 5 U.S.C. § 706 of the Administrative Procedure Act. *Yeda Research v. Mylan Pharm. Inc.*, 906 F.3d 1031, 1040 (Fed. Cir. 2018).

## II.    NEW GROUND 1 PATENTABILITY OF CLAIMS 29 AND 78 IN VIEW OF PAD++ TOUR AND AAPA

Under the Board's first new ground of rejection, claims 29 and 78 are unpatentable under 35 U.S.C. § 103(a) over Pad++ Tour and the Mozilla rendering engine, Applicant's (Patent Owner's) Admitted Prior Art (AAPA).  Appx0014. This new ground is improper because 1) AAPA cannot be the basis for a ground in an *inter partes* reexamination; and 2) The Board failed to establish a *prima facie* case of obviousness and dismisses irrefutable factual evidence in support of patentability.

### A.    AAPA Cannot Be the Basis for a Ground in an *Inter Partes* Reexamination

The Board asserts (Appx0032),

Contrary to Patent Owner's arguments, 37 C.F.R. § l.104(c)(3), states that "[i]n rejecting claims *the examiner may rely upon admissions by*

the applicant, or *the patent owner in a reexamination proceeding*, as to any matter affecting patentability and, insofar as rejections in applications are concerned" (emphasis added). Accordingly, Patent Owner's argument that Patent Owner's admissions cannot be used ***as a basis*** for an obviousness rejection is legally incorrect.

However, the Board's assertion is the one that is contrary to law.

The grounds for *Inter Partes* Reexamination are prescribed in (a) 35 U.S.C. §§ 301(a)(1) and 311 (Pre-AIA), and 37 C.F.R. §§ 1.906(a) and 1.915, which recite,

## 35 U.S.C. 311 (PRE-AIA) REQUEST FOR INTER PARTES REEXAMINATION.

- (a) IN GENERAL.— Any third-party requester at any time may file a request for inter partes reexamination by the Office of a patent ***on the basis of any prior art cited under the provisions of section 301***.
- (b) REQUIREMENTS.— The request shall—
    - ◦ …
    - ◦ (2) ***set forth the pertinency and manner of applying cited prior art to every claim for which reexamination is requested***.

## 35 U.S.C. 301 CITATION OF PRIOR ART.

Any person at any time may cite to the Office in writing ***prior art consisting of patents or printed publications*** which that person believes to have a bearing on the patentability of any claim of a particular patent. If the person explains in writing the pertinency and manner of applying such prior art to at least one claim of the patent, the citation of such prior art and the explanation thereof will become a part of the official file of the patent. …

37 CFR 1.906: SCOPE OF REEXAMINATION IN INTER PARTES REEXAMINATION PROCEEDING

> (a) Claims in an inter partes reexamination proceeding will be examined ***on the basis of patents or printed publications*** and, with respect to subject matter added or deleted in the reexamination proceeding, on the basis of the requirements of 35 U.S.C. 112.
>
> …

37 CFR § 1.915 - Content of request for inter partes reexamination.

> [*see* Appx2441]

As with the post-AIA version of § 311 – Inter partes review, the basis for a ground of rejection in an *inter partes* reexamination is limited to ***prior art consisting of patents or printed publications***.

While this is a case of first impression (as applied to *inter partes* reexamination), a substantially identical issue was addressed in *Qualcomm Inc. v. Apple Inc.*, 24 F.4th 1367 (Fed. Cir. 2022), where this court held AAPA cannot be "the basis" of a ground in an *inter partes* review:

> The parties' main argument on appeal focuses on whether AAPA constitutes "prior art consisting of patents or printed publications" under § 311(b) such that it may form "the basis" of a ground in *inter partes* review. We hold that it does not.
>
> …
>
> The language of § 311(b) limits "the basis" of any "ground" in an inter partes review to "prior art consisting of patents or printed publications."

We agree with Qualcomm and the PTO that the "patents or printed publications" that form the "basis" of a ground for inter partes review must themselves be prior art to the challenged patent. ***That conclusion excludes any descriptions of the prior art contained in the challenged patent***. …

*Id.* 24 F.4th at 1374

This Court considered both Supreme Court precedent as applied to § 311(b) (*Return Mail, Inc. v. Postal Service*, 139 S. Ct. 1853 (2019)) and Court holdings applied to pre-AIA § 301 (*e.g.*, *In re Lonardo*, 119 F.3d 960 (Fed. Cir. 1997) [3], *In re Freeman*, 30 F.3d 1459 (Fed. Cir. 1994)) and AIA § 301(a) (which recites language substantially identical to the first sentence in § 301) (*Mikkelsen Graphic Eng'g, Inc. v. Zund Am., Inc.*, 541 F. App'x 964 (Fed. Cir. 2013). A comparison between § 311(b) and pre-AIA §§ 311 + 301 is presented below.

---

[3] In *In re Lonardo*, a pre-AIA case, § 301 was applied rather than § 301(a) indicated in the *Qualcomm* Opinion.

| § 311(b) | §§ 311 + 301 (pre-AIA) |
|---|---|
| (b) SCOPE.— A petitioner in an inter partes review may request to cancel as unpatentable 1 or more claims of a patent only on a ground that could be raised under section 102 or 103 and *only on the basis of prior art consisting of patents or printed publications*. | (a) IN GENERAL.— Any third-party requester at any time may file a request for inter partes reexamination by the Office of a patent *on the basis of* [(§ 301) … *prior art consisting of patents or printed publications* which that person believes to have a bearing on the patentability of any claim of a particular patent]. |

"[I]dentical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007).  Considering substantially identical language in the applicable statutes for *inter partes* reviews and *inter partes* reexaminations, Appellant asserts a new ground in an *inter partes* reexamination cannot be based on AAPA.  Also, as this Court stated in *In re NTP, Inc.*, 654 F.3d 1268, 1275 (Fed. Cir. 2011) [4],

> … The scope of reexamination proceedings is limited to "substantial new question[s] of patentability," 35 U.S.C. § 303(a), which are questions that have not previously been considered by the PTO, *Swanson*, 540 F.3d at 1379. These new considerations must be based only on "prior art consisting of patents or printed publications." 35 U.S.C. § 301).

---

[4] The Opinion addressed merged *ex parte* reexamination 90/006,495 and *inter partes* reexamination 95/000,020. *Id*. at 1272

### 1.    The Mozilla Rendering Engine is the Basis for the New Ground

Under the Board's new ground, Mozilla *is* the basis (or at least a basis) for the rejection.  The Board states,

> Accordingly, we reverse the Examiner's decision not to reject claims 29 and 78 under 35 U.S.C. § 103(a) over ***Patent Owner's admitted prior art*** and Pad++ Tour and we enter a new ground of rejection ***based*** thereon.  Appx0014

In section 4. of their respective responses (Appx1202-1205 and Appx4330-4333) the 3PRs propose a new ground of rejection based on the Mozilla rendering engine:

- **Admitted Prior Art**
  - o  Mozilla rendering engine, www.mozilla.org ('926 Patent, 17:31-41).

In the "Admitted Prior Art" section (Appx1204 and Appx4332), the 3PRs state,

> … Patent Owner thus admits that the prior art Mozilla rendering engine could be used by a person of ordinary skill in the art to perform the conventional processing of HTML content.  *See* '926 Patent, Fig. 5 (blocks 150, 152, 154).

The section concludes,

> Requester submits that the combination of the Admitted Prior Art with the Bederson references, JP 169, SVF, and/or VML renders the pending claims obvious, even if, as Patent Owner asserts, the claims

"require preservation of the entire HTML-based Web content." …
Requester submits that the Examiner should enter new grounds of
rejection based on the instituted combinations in further view of the
Admitted Prior Art.

The proposal also includes a conclusory assertion by requester's alleged

expert Dr. Jack Grimes, "that it would have been within the capabilities of one of

ordinary skill in the art at the time of the invention to modify a pre-existing

browser to incorporate the teachings of Pad++ and that a person of ordinary skill in

the art would have been motivated to do so" that is premised on AAPA being a

primary reference that would be modified by the teachings of Pad++ (secondary

references).

Under both the 3PR proposal and the Board's new ground *supra* (rejection

of claims 29 and 78 ***based on Patent Owner's admitted prior art*** and Pad++ Tour),

the Mozilla rendering engine, which is not a prior art patent or printed publication,

is the basis for the new ground and thus the new ground cannot stand.

### B.    The Board Failed to Establish a *Prima Facie* Case of Obviousness.

The Board alleges it has established a *prima facie* case of obviousness based

on statements in Pad++ Tour:

… As recognized by the Supreme Court, "[a] person of ordinary skill
[in the art] is also a person of ordinary creativity, not an automaton."
*KSR Int 'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). Accordingly,

one of ordinary skill in demonstrating "ordinary creativity" would have reason to consider using or modifying the technical features of commercially available products or develop prototypical products, particularly in view of Pad++ Tour's explicit suggestion that it "seems especially attractive for systems which have small screens" (p. 19). Appx0035-0036.

As stated in *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985) (original emphasis),

> … The statutory emphasis is on a person of *ordinary* skill. …  A person of ordinary skill in the art is also presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights, it makes no difference which.

See also, *Environment Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 698 (Fed. Cir. 1983) (noting the statutory requirement that obviousness be evaluated with respect to a person having ordinary skill in the art, "not to the judge, or to a layman, or to those skilled in remote arts, or to geniuses in the art at hand").

The Board does not identify any teaching in Pad++ that would enable a PHOSITA to implement the inventions of claims 29 and 78 by modifying the Mozilla source code with Pad++, as there are none.

Under the 3PR's proposed new ground (a revised version of which was

effectively adopted by the Board), the ground is premised on the (actual) Mozilla source code being modified using the teachings of Pad++ to meet the claim limitations of claims 29 and 78, not some theoretical exercise.  It is irrefutable that engineers/developers at Mozilla failed to implement full-page zooming in a desktop Web browser that preserved the original page layout, functionality, and design of HTML-based Web Content until 2007, even though this desired functionality was identified as a feature (to be implemented) ***in 1999***, at which point work on the feature began.  As stated by Wolf (Appx1773),

> 36.    Mozilla originally attempted to provide support for full zooming (*i.e.*, zooming the full page content, including text and images) in 1999, but was unable to successfully implement full zooming on the desktop version Firefox until 2007. We were motivated to do so, as this would have been a desirable feature to have, particularly for users with poor vision. As identified by Mozilla Bug 4821[5], "(pagezoom) Full zooming not functional (images, objects as well as text) (page zoom like opera)," the developers at Mozilla attempted a number of different approaches, all of which failed. One of several problems was that the Mozilla browser's "chrome" (the user-interface portion of the browser) was rendered using XUL, as was the Web page display content, including widgets. XUL, which stands for XML User Interface Language, was designed to provide

---

[5] https://bugzilla.mozilla.org/show_bug.cgi?id=4821. I am "SCC" in the bug thread.

cross-platform support for the user interface used by Mozilla's browser (which eventually become the Firefox browser). As the inventor of XUL, and I am intimately familiar with its use in Mozilla.

Howard provides similar evidence (¶93 Appx1839), plus the following additional evidence:

94.    The following screen shot of the www.cnn.com Web page demonstrates some problems Mozilla had with implementing full zooming in 2005.[6] ....



---

95.    Several comments in the Mozilla Bug 4821 are presented below.  They indicate in 2007 that IE7 (Internet Explorer 7) had successfully implemented full-page zoom and that the next release of Firefox (1.9 at the time) should be blocked until it was supported.



Eli Friedman    2007-07-20 16:48:35 PDT                              Comment 217

Created attachment 273186 [details] [diff] [review]
Updated patch

Okay, here's a fixed-up version of the hack.  This patch makes Get/SetTextZoom forward to
Get/SetFullZoom; that's obviously not going to be checked in, but it makes testing easier because no
front-end hacking is required.  I'll leave adding front-end support to another bug.

The nsThebesImage change is a bugfix for an issue with rendering background images which becomes
painfully obvious using page zoom.

Outside of that, my basic testing shows it to work reasonably well; no serious issues.  If anyone wants
to test it, comments would be appreciated.

Known issues are that plugins might not scale the way you expect and there's a minor rounding issue with
background image rendering.

Performance for changing page zoom should be approximately the same as that for text zoom.  The style re-
resolve step can probably be sped up if it turns out to be an issue, especially after the fix for Bug
386640 goes in.

This is a little late in the 1.9 cycle to check in a change like this, but it's extremely low-risk,
because the effect on the non-zoomed case is basically none.



Eli Friedman    2007-07-20 17:55:43 PDT                              Comment 220

I have a fix for this that basically works, but I'm not very satisfied with it.  The issue is that we're
using GetScreenX/Y to figure out the coordinates of an event, and the number returned is in scaled
coordinates.  So my fix is to just make GetScreenX/Y return unscaled coordinates.  The reason this isn't
really satisfactory is that it's a content-visible change, which I'm trying to avoid.

Another solution would be to add another method onto events that allows chrome to retrieve the
appropriate coordinates.  That probably wouldn't be too hard, but I don't really want to make a new API
unless we're sure there's no alternative.  roc, any thoughts?

(Note that this issue is inherent to any implementation of page zoom, not just an artifact of this hacky
approach.)

Mozilla's highly skilled engineers/developers who worked on this and related bugs, including expert Wolf (Scott Collins) knew how to scale/zoom content, yet, due to Mozilla's source code architecture they failed to implement on a desktop what the Board asserts a PHOSITA could successfully have implemented on a mobile device by modifying that same source code based on a

mere suggestion in the Pad++ Tour.  Any assertion that Mozilla's engineers/developers could have implemented full page zooming if they would have used Pad++ (or its teachings) is ludicrous, and there is no evidence of record to support such absurdity.  As argued by Howard, "After reviewing the Bederson References and/or testing the Pad++ browser, a PHOSITA in 2001 would not attempt to combine the teachings of Pad++ with the Mozilla Gecko rendering engine."  ¶90 (Appx1838).  (*See* ¶¶90-93 for detailed explanation in support of Howard's argument).

The Board dismisses the foregoing evidence, along with evidence that the proposed combinations would be physically impossible to implement using the art of record (Appx1841-1853).  The Board asserts,

> [A]ll that is required of the [Patent] [O]ffice to meet its prima facie burden of production is to set forth the statutory basis of the rejection and the reference or references relied upon in a sufficiently articulate and informative manner as to meet the notice requirement of [35 U.S.C.] § 132." *In re Jung*, 637 F.3d 1356, 1363 (Fed. Cir. 2011) Appx0036

Unlike in *Jung*, the Board does not provide sufficient articulation to meet the requirements to maintain a *prima facie* case of obviousness based on a preponderance of the evidence.

In an *inter partes* reexamination involving obviousness, the standard

is not whether the patent owner can persuasively show that one of ordinary skill would have expected *failure*. Rather, the burden is on the Examiner to show that one of ordinary skill would have had a motivation to combine the references with a *reasonable expectation of success*. *See, e.g.*, *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 449 (Fed. Cir. 2015) (quotation omitted) ...; *Rambus Inc. v. Rea*, 731 F.3d 1248, 1255 (Fed. Cir. 2013) (reversing the Board's obviousness determination where "[t]he Board erroneously placed the burden on [the Patent Owner] to prove that its claims were not obvious" and emphasizing that "[i]n reexamination proceedings, 'a preponderance of the evidence must show nonpatentability before the PTO may reject the claims of a patent application' " (citing *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1427 (Fed. Cir. 1988)); *In re Jung* , 637 F.3d 1356, 1365–66 (Fed. Cir. 2011) (explaining that while "the applicant must identify to the Board what the examiner did wrong, ... the examiner retains the burden to show invalidity")).

*Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. de C.V.*, 865 F.3d 1348, 1355-56 (Fed. Cir. 2017) (original emphasis)

The Board did not meet any of the three prongs requires to support a *prima facie* case of obviousness, much less all three.  First, the Board does not show where all the claim elements in claims 29 and 78 are taught or suggested by the Mozilla rendering engine and Pad++ Tour (or any other art of record).  Second, the Board provides no explanation to how the Mozilla rendering engine would be

modified by the teachings in Pad++ Tour to obtain the inventions of claims 29 and 78. Third, the Board's obviousness determination is conclusory without citing to sufficient supporting evidence on the record, including not providing a scintilla of evidence supporting a PHOSITA would have a reasonable expectation of success in obtaining the inventions of claims 29 and 78.

As this Court stated in *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352 (Fed. Cir. 2019)*,*

> "Rejections on obviousness grounds," in particular, "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006). "This requirement is as much rooted in the Administrative Procedure Act, which ensures due process and non-arbitrary decision making, as it is in § 103." *Kahn*, 441 F.3d at 988 (citing *Lee*, 277 F.3d at 1344–45). *Id.* at 1361

In *In Re Nuvasive, Inc*. 842 F.3d 1376, 1382 (Fed. Cir. 2016), this Court ruled that the PTAB must (1) "articulate a reason why a PHOSITA would combine the prior art references"; (2) have an adequate evidentiary basis for that finding; and (3) provide a "satisfactory explanation" for the motivation finding that includes an express and "rational" connection with the evidence presented; *see also Cutsforth v. MotivePower,* 636 F. App'x 575, 578 (Fed. Cir. 2016) (must positively explain motivation – not just reject arguments against motivation); and *Personal*

*Web Technologies, LLC v. Apple, Inc.* 848 F.3d 987 (Fed. Cir. 2017) (the Board

must "make findings, supported by evidence and explanation.").

As a baseline, a combination obviousness rejection must identify what art

would be combined, and even then, **that would not be enough**. *Id.* 848 F.3d at

997-98. The Appeal Decision does not address all the limitations of claims 29 and

78, including not identifying any PDA or mobile phone that a PHOSITA could

implement Pad++ (and/or the teachings and principles of the Bederson references)

in combination with the Mozilla rendering engine on in a useable manner (or at

all). The Board also fails to address how the Pad++ ZUI would be implemented

using a touch-sensitive display (*see* discussion *infra*). This is clear legal error.

### C.    PHOSITA and Enablement

The Board cites '926 patent 17:31-41 as Patent Owner's admission

(Appx0033),

> As will be recognized by those skilled in the art, *the functions*
> *performed in blocks 150, 152, and 154* [of Figure 5] *are commonly*
> *performed by conventional browsers during a pre-rendering process.*
> In some browsers, *these functions are performed by the Mozilla*
> *rendering engine, which comprises open source software that is*
> *readily available for use by developers.* At present, the software for
> the Mozilla rendering engine may be accessed via the Internet at
> www.mozilla.org. Accordingly, in one embodiment, the present
> invention uses core functionality provided by the Mozilla rendering

engine source code to perform the functions of block 150, 152, and 154.

The relevant art for the skilled artisans is Web browser arts including HTML- and CSS-compliant rendering engines and browsers. As discussed throughout this reexamination, the conventional browsers being referred to are versions of Microsoft Internet Explorer (IE) (5, 5.5) and Netscape (6.x) *at the time of the invention* that implemented CSS, which includes the CSS box model. As explained by experts Wolf (Appx1763 ¶¶16-20, 62) and Howard (Appx1785 ¶¶22, 127), a PHOSITA would recognize the bounding boxes referred to in the '926 patent are CSS (bounding) boxes.

To qualify as a PHOSITA at the time of the invention, the person would need to have significant experience working with an HTML- and CSS-compliant rendering engine/browser. A person without such experience would not recognize *the functions performed in blocks 150, 152, and 154* are performed by the Mozilla rendering engine, IE 5 and 5.5, and Netscape (6.x). In addition, a person without such experience would not recognize the bounding boxes in the '926 patent are CSS (bounding) boxes.

Wolf declares (Appx1764),

7. It is my opinion that a person having ordinary skill in the art (PHOSITA) at the time of the inventions of the '926 and '353 patents would have a bachelor's degree in Computer Science (or similar

discipline) and at least two years' industry or educational experience with creating and testing HTML-based and CSS content. A person with 5 years programming experience without a bachelor's degree with at least two years' industry or educational experience with creating and testing HTML-based and CSS content would also qualify as a PHOSITA.

Dr. Grimes declares (Appx1311),

11. I disagree with Wolf that experience developing and testing HTML-based and CSS content alone would qualify a person as a PHOSITA. It is my opinion that a person of ordinary skill in the art would have the experience, skill and ability ***to develop*** not only Web content but also a Web <u>browser</u> that parses and renders standard HTML content, for example, as defined by the HTML specifications issued by the W3C.

Grimes' PHOSITA does not require any industry experience with creating and testing HTML-based and CSS content at the time of the invention – experience or knowledge that is clearly presumed by the paragraph quoted *supra*.

The Board states (Appx12),

… the '926 patent admits that the limitation "wherein the HTML-based Web content includes cascading style sheet content defining layout and presentation attributes for the Web page" was well-known to one of ordinary skill in the art.

It's not clear where the Board is going with this. Appellant acknowledges

there were Web pages that included CSS, which was the purpose of claims 29 and 78.  However, these claims require that the "cascading style sheet [CSS] content defining [the page layout and design] of the portion of the HTML-based Web content comprising cascaded style sheet data be preserved (Claim 29) and presentation attributes for the Web page be preserved (Claim 78).  As argued throughout prosecution and in Req. Reh'g, the statements concerning Mozilla do not provide evidence that implementing CSS in a rendering engine or Web browser was within the ordinary skill in that art.  The publicly documented evidence of the great difficulties both Microsoft and Netscape/Mozilla had in implementing CSS in a rendering engine/Web browser refutes any assertion that implementing CSS in a rendering engine or Web browser was within the ordinary skill in that art.  Moreover, none of the Examiner, 3PRs, nor the Board has provided any substantial fact-based evidence to refute this.

Additionally, neither Mozilla, Netscape, nor Microsoft used the page layout information generated in blocks 150, 152, and 154 in the manner disclosed in the '926 patent.  The patent states, "At this point, the present invention deviates substantially from the prior art by using the various object layout data generated during the pre-rendering process to generate a scalable vector representation of the original page content." 17:42-45.

With respect to enablement, claims 29 and 78 (and claims 64 and 66) are

enabled via the teachings of the '926 patent combined with the open-source

Mozilla source code – without the source code (or source code for an HTML- and

CSS-compliant rendering engine), claims 29 and 78 would not be enabled.

Arguments by the Board or 3PRs that the'926 presumes a PHOSITA could

implement CSS is wrong.  For example, Apple asserts (Appx2513),

> … For the claims to be enabled under Patent Owner's reading,
> implementing all HTML tags within a zoomable browser necessarily
> must have been within the skill of a person of ordinary skill in the art.

In addition to never asserting any claims require implementing "all HTML

tags," CSS is separate from HTML.  Again, the claims are enabled by the Mozilla

rendering engine source code in combination with the novel approaches disclosed

in the patent, which are described and illustrated in substantial detail.  "Short of

providing source code, it is difficult to envision a more detailed

disclosure." *Tecsec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1349 (Fed. Cir.

2013) (noting the location for accessing the Mozilla source code is provided in the

patent).

### D.    *In re Keller* Cannot Rescue the Defective Combination

In addressing Appellant's evidence concerning (Appx0034-0035),

(i) "[i]t is irrefutable that Mozilla failed to implement a full-page

zooming Web browser on a desktop browser that preserved the

original page layout, functionality, and design of HTML-based Web

Content until 2007, even though this desired functionality was identified as a feature (to be implemented) in 1999" (Req. Reh'g 8); (ii) "[t]he [Pad++] Tour suggestion provides no evidence a POSITA at the time of the invention would be motivated to even attempt to implement Pad++ on a PDA [personal digital assistant] and would have had a reasonable expectation of success in doing so without undue experimentation" and "Bederson et al. abandoned development of the Pad++web browser in 1998 in view of 'great advancements in HTML'" *(id.* at 12); (iii) "[a]t the time of the invention, there were no open-source browsers that ran on mobile devices with touch-sensitive displays" *(id.* at 16); (iv) [t]his isolated and conclusory statement [from page 141 of Pad++ Tour, which states "[t]his seems especially attractive for systems which have small screens, such as handheld computers (i.e. PDA's)"] is a mere suggestion of a conceptual use of Pad++ that is insufficient to constitute a motivation to combine Pad++ with a PDA or any mobile device for that matter for the purpose of implementing a zoomable browser *(id.* at 19); and (v) "Pad++ was not designed to run on a PDA" *(id.)*

The Board states (Appx0040),

Again, "the test [for obviousness] is what the combined teachings of the references would have suggested to those of ordinary skill in the art," and not "whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference." *In re Keller,* 642 F.2d 413,425 (CCPA 1981). Although Patent Owner's evidence may demonstrate that specific combinations of commercially available products-HTML, Web browsers (e.g., Netscape Navigator or

Microsoft Internet Explorer), and PDAs (e.g., Nokia, Palm, or Apple Newton devices) – ***were not physically compatible in 2000-2001***, such evidence does not overcome the prima facie case of obviousness.

A PHOSITA would determine the combined teachings would lead to an inoperative device. *See, e.g.,* Req. Reh'g Section IV.C. (Appx4995-4997), Wolf '126 Decl. Section VII (Appx4801-4807) including table at Appx4806. The Board and 3PRs have presented no factual evidence to refute this. Thus, the reliance on *Keller* is misplaced, because "if references taken in combination would produce a seemingly inoperative device, such references teach away from the combination and thus cannot serve as predicates for a *prima facie* case of obviousness." *In re Urbanski*, 809 F.3d 1237, (Fed. Cir. 2016); *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1382 (Fed. Cir. 2007) ("[A] reference teaches away from a combination when using it in that combination would produce an inoperative result.").

## II.    NEW GROUND 2: PATENTABILITY OF CLAIMS 29 AND 78 IN VIEW OF PAD++ TOUR AND THE HTML 4.0 STANDARD

At Appx0022, the Board entered a new ground of rejection under 37 C.F.R. § 41.50(b) rejecting Claims 29 and 78 under 35 U.S.C. § 103(a) as unpatentable over Pad Tour++ and HTML 4.0 Standard (Appx2522). These rejections cannot stand for the following reasons in this section and Section III *infra*.

### A.    Implementation of HTML 4 Would Not Meet the Relevant CSS Claim Limitations

The Board states (Appx0038),

Page 23 of our Decision states the following:

HTML 4.0 Standard further explains that "[s]tyle sheets simplify
HTML markup and largely relieve HTML of the responsibilities of
presentation" and "give both authors and users control over the
presentation of documents - font information, alignment, colors, etc."
(§ 2.3.5.) Moreover, with respect to style sheets, HTML 4.0 Standard
explains that "[s]tyle sheets represent a major breakthrough for Web
page designers, expanding their ability to improve the appearance of
their pages." (§ 14.1.) In particular, HTML Standards explains that a
"cascading" style sheet "is the capability provided by some style sheet
languages such as CSS to allow style information from several
sources to be blended together." *(Id.)* (Dec. 23.) Thus, in a single
printed publication, HTML 4.0 Standard provides information with
respect to both: (i) HTML documents; and (ii) the improvement of
HTML document appearance using cascading style sheets.

The Board also asserts that the CSS limitations of claims 29 and 78 could be
met by modifying the Pad++ browser to implement the HTML 4.0 specification:

Alternatively, the combination of HTML 4.0 Standard and Pad++
Tour is nothing more than adding the known cascading style sheet of
HTML 4.0 Standard with the known HTML browser of Pad++ Tour,
to yield predictable results.

Accordingly, the combination of Pad++ Tour and HTML 4.0 Standard
teaches the limitation "wherein the HTML-based Web content
includes cascading style sheet content defining layout and
presentation attributes for the Web page." Appx0024

The limitations of claims 29 and 78 could not be met, as the HTML 4.0 specification does not provide any details regarding how to implement the CSS Formatting Model (CSS 1), which includes the (CSS) Box Model.

Claim 1 recites, in part,

> enabling a user to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;
>
> > …re-render the Web page in response to associated user inputs to enable a user to iteratively zoom in and out views of the Web page on the display *while preserving the original page layout, functionality, and design of the content on the Web page defined by the HTML-based Web content*,

Claim 29 recites,

> 29. The mobile device of claim 1, wherein the HTML-based Web content includes cascading style sheet content defining layout and presentation attributes for the Web page.

The plain meaning of the claim limitations requires *preserving the original page layout, functionality, and design of the content on the Web page defined by the HTML-based Web content, which includes cascading style sheet content defining layout and presentation attributes for the Web page*.

For claim 29, both layout *and* presentation attributes defined by the cascading style sheet content must be preserved. The Board has failed to identify anywhere in the HTML 4.0 specification where layout attributes (defined by CSS) are addressed. There are none. Notably, Section 14 Style Sheets in the HTML 4.0

specification (Appx2692-2702) does not include any description of how layout is implemented under CSS 1 or CSS 2.

Section 4 of CSS 1 (Appx2899) specifies a Formatting Model[7] used to format all HTML elements except for elements with a 'display' value of 'none'.

> CSS1 assumes a simple box-oriented formatting model where each formatted element results in one or more rectangular boxes. … All boxes have a core content area with optional surrounding padding, border and margin areas.



CSS2 box model (Appx3029)

---

[7] In CSS2, the Visual Formatting Model (Appx3042) and Box Model (Appx3028) are in separate sections.



- 38 -

Section 4.1 Block-level elements includes the following example and

diagrams (Appx2900).

```
<STYLE TYPE="text/css">
  UL {
    background: red;
    margin: A B C D;
    padding: E F G H;
  }
  LI {
    color: white;
    background: blue;      /* so text is white on blue */
    margin: a b c d;
    padding: e f g h;
  }
</STYLE>
..
<UL>
  <LI>1st element of list
  <LI>2nd element of list
</UL>
```



Under the HTML 4.0 specification, style sheets are required for

implementing divs (divisions) and spans and styling tables, all of which are fundamental to page layout.  *See* 7.5.4 Grouping elements: the DIV and SPAN elements ("Thus, authors may use these [DIV and SPAN] elements in conjunction with style sheets"). Appx2588.

As further identified by Mozilla.org[8]

> The <div> HTML element is the generic container for flow content. ***It has no effect on the content or layout until styled in some way using CSS*** ...

To comply with the CSS standards, the user agent needs to implement the rules defined in the CSS specification(s).  Appendix B: CSS1 grammar (Appx2939) defines the syntax of CSS1, which is used to parse CSS code/content using a CSS Parser that is not included in the HTML 4.0 Specification.  As specified under 7 CSS1 conformance (Appx2933-2934):

> A User Agent that uses CSS1 to display documents conforms to the CSS1 specification if it:
>
> - attempts to fetch all referenced style sheets ***and parse them according to this specification***
>
> - sorts the declarations according to the cascading order
>
> - implements the CSS1 functionality within the constraints of the presentation medium (see explanation below).

---

[8] https://developer.mozilla.org/en-US/docs/Web/HTML/Element/div

The CSS parser is separate from the HTML parser. For example, the Basic Data Flow and Key Event Loop used by Mozilla "Gecko" is shown in the following diagrams. Both diagrams include a CSS parser that parses CSS code/content and extracts style rules that are used by the frame constructor to build the Frame Tree.

(Wolf, Appx1768)







While the claims are not limited to using the Mozilla rendering engine, any browser supporting any level of CSS would need a CSS parser. Each of claims 29 and 78 require preserving the original page layout and design aspects of the CSS content/data. To meet this limitation, it would be necessary to implement at least CSS 1 in conformance with the CSS 1 specification (Appx2885, Appx2933-2934), which is separate and apart from the HTML 4.0 Standard. Moreover, as asserted by Wolf (¶26, Appx1770), "There would be no motivation to partially implement HTML 4 or to be able to render a limited set of HTML elements in a non-compliant manner."

### B. Implementation of HTML 4 Would Not Have Been Obvious

Obviousness requires "one must have a motivation to combine accompanied by a reasonable expectation of achieving *what is claimed in the patent-at-issue*." *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359 (Fed. Cir. 2016). The Board asserts (Appx0023-0024),

A person of ordinary skill in the art would have recognized that incorporating the cascading style sheets of HTML 4.0 Standard with the Pad++ HTML browser of Pad++ Tour would have improved Pad++ Tour by providing the advantage of improving the appearance of Web pages, including style information from several sources. See *KSR Int 'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007) ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."). Alternatively, the combination of HTML 4.0 Standard and Pad++ Tour is nothing more than adding the known cascading style sheet of HTML 4.0 Standard with the known HTML browser of Pad++ Tour, to yield predictable results. See id. at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."). Accordingly, the combination of Pad++ Tour and HTML 4.0 Standard teaches the limitation "wherein the HTML-based Web content includes cascading style sheet content defining layout and presentation attributes for the Web page."

The forgoing assertions are conclusory legal determinations without citing *any* supporting evidence.  First, as described *infra*, the "technique" would be anything but within the skill of a PHOSITA at the time of the invention.  Second, as discussed *supra*, the HTML 4.0 Standard does not specify how CSS is implemented, which is defined by separate CSS Standards (CSS 1 and CSS 2 at the

time of the invention), nor specify "methods" for implementing HTML 4.0 (Wolf ¶33, Appx1772).  Third, development of complex software, such as a rendering engine supporting HTML 4.0, is anything but predictable.  The only thing predictable is that it would involve an extraordinary level of experimentation and failure along the way, as would be recognized by a PHOSITA at the time of the invention. Wolf ¶32, Appx1771-1772.  Even without CSS support, the rendering engine would still have hundreds of classes and thousands of methods.  *Id*.

Reh'g Dec. states (Appx0039),

> … Pad++ discusses use of an HTML browser on a zooming user interface, and HTML 4.0 Standard discusses the features of the HTML publishing language, including a cascading style sheet. Because both references relate to HTML, the identical publishing language used by the World Wide Web, the proposed modification of Pad++ with HTML 4.0 Standard would result a reasonable expectation of success. *See In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (the teachings of the prior art provide a sufficient basis for a reasonable expectation of success).

The Board provides zero evidence in support of it position regarding reasonable expectation of success and intentionally disregards factual evidence based on actual experience indicating otherwise.

The Pad++ browser employs a simplistic single pass HTML parser comprising a single module (html.cpp, Appx2032) having approximately 5000

lines of code.  A rendering engine supporting HTML 4.0 (without CSS support) would have hundreds of thousands of lines of code and hundreds of modules.  The Pad++ browser, which allegedly supported HTML 1.0[9] and implemented a handful of HTML tags/elements failed to implement the paragraph element and image elements correctly, which was demonstrated during prosecution (Appx1464-1465), including the following rendering comparisons for a very simple HTML document (LISTING 2) comprising only HTML tags implemented by the Pad++ browser.

---

[9] There never was an HTML 1.0 specification; the first HTML specification was HTML 2.0.



Pad++

table, th, td {border: 1px solid black;}

# Simple HTML Table

Month Savings January $100 February $80



Example of a paragraph in a table cell.

Example of a paragraph external to table.

---

/C:/Pad++/pad-09p1/html/home-p   +

file:///C:/Pad++/pad-09p1/html/home-page_635_skip

Most Visited    Getting Started    PAIR    Sign In    1&1 Webmail 2.0    Mozilla Firefox Start P...

Firefox

table, th, td {border: 1px solid black;}

# Simple HTML Table

Month Savings January $100 February $80

Example of a paragraph in a table cell.



Example of a paragraph external to table.

---

home-page_635_skipped    ×

file:///C:/Pad++/pad-09p1/html/home-page_635_skipped_tags.html

Apps    Pad++: Zooming Us    Google Chrome: We    PAIR    Google Patents    Wir

Chrome

table, th, td {border: 1px solid black;}

# Simple HTML Table

Month Savings January $100 February $80

Example of a paragraph in a table cell.



Example of a paragraph external to table.

Pad++ had 24 contributors over approximately 4 years (Appx0464) who failed to implement a browser that came close to supporting even HTML 2.0. Bederson *et al*. abandoned development of the Pad++ web browser in 1998 in view of "the web [having] advanced greatly." Appx0739-0740, Appx2451. Yet the Board, undeterred by actual failure and abandonment, asserts a PHOSITA would have modified the Pad++ browser to support HTML 4.0 and do so with "predictable results" that would not involve undue experimentation.

Complex software, such as a Web browser rendering engine with hundreds of modules and thousands of methods is not a predictable art. In *Is Patent Law Technology-Specific?* (2002) Law Professors Dan Burk and Mark Lemley discuss historical treatment of computer science as a predictable art under this Court, arguing the Court had failed to recognize the increasing complexity, difficulty, and unpredictability of computer programming. Their observations include:

> It is simply unrealistic to think that one of ordinary skill in the programming field can necessarily reconstruct a computer program given no more than the purpose the program is to perform. Programming is a highly technical and difficult art. *Id*. at 1164.

> In short, the court thinks of programmers as people of astonishing skill, capable of implementing any idea in a computer program as a matter of course. … But as a matter of computer science, there is ample evidence that the court's assumptions are contrary to actual practice. Those who actually work in the industry know that coming

up with an idea for a computer program is rather less than half the
battle. Programs can take years to write even under the best
circumstances. Some will simply not work. Others will require
innovative programming techniques. … In many cases, the process of
writing the program changes the idea itself in a sort of iterative
feedback loop. *Id.* at 1192 (citations omitted).

… we believe the courts must take more care than they currently do to
ensure that their assessments of patent validity are rooted in
understandings of the technology that were accurate at the time the
invention was made. *Id.* at 1157.

Neither the Board nor 3PRs provide any explanation to how the "the known
cascading style sheet of the HTML 4.0 Standard" would be combined "with the
known HTML browser of Pad++ tour."  This conclusory assertion is clear legal
error.  No PHOSITA is going to modify the "known HTML browser of the Pad++
Tour" to support HTML 4.0 without undue experimentation, and even if this were
done with unlimited experimentation it wouldn't meet the CSS claim limitations.

The Board asserts (Appx0038), "HTML 4.0 Standard is presumptively
enabled and need not disclose what is well known in the art- implementation of
CSS in the HTML markup language," citing *In re Antor Media Corp.*, 689 F.3d
1282, 1288 (Fed. Cir. 2012).  But the Board ignores that Appellant's case is
exactly the kind of case where, *Antor* itself insists, that presumption must ***give way***.

"[A] prior art printed publication cited by an examiner is presumptively enabling ***barring any showing to the contrary*** by a patent applicant or patentee." *Id.* The "presumption," *Antor* explains, reflects no more than the fact that, compared to the examiner, the patentee "is in a better position to show, ***by experiment or argument***, why the disclosure in question is not enabling or operative." *Id.* That "showing to the contrary" by the patentee," by both "experiment" ***and*** "argument," is exactly what happened here. That is why the Board must contort and ignore the record evidence.

The HTML 4.0 Standard defines rules to be implemented by user agents to interpret and render documents containing HTML 4 content. Implementation of those rules is left up to the organization developing the user agent. Appx2535. Among other elements, HTML 4 includes tables and divs, both of which are fundamental to page layout, require CSS, and were notoriously difficult to implement. As stated by Wolf (Appx1770),

> 28.    Dr. Grimes doesn't identify what HTML tags would be added. Some would be easy to add, while others, such as HTML tables, divs, and CSS were notoriously difficult to implement, well beyond the capabilities of a PHOSITA. ***A PHOSITA in 2000-2001 could not have modified Pad++ to implement the numerous unsupported HTML elements to produce an HTML 3.2 browser, much less an HTML 4/4.01 browser.*** The Pad++ browser employed a simple single-pass HTML parser that generated Pad++ objects for a handful

of HTML tags, and did not implement dozens of HTML tags, including tags that are fundamental to page layout such as tables, divs, and spans. It also had no CSS support. A PHOSITA in 2000-2001 would also not attempt to write original code to support HTML 4, CSS 1, *or* CSS 2, and there would be *no chance such an attempt would have succeeded without undue experimentation*. As discussed above, it took a team of highly-skilled developers and software engineers 50+ man-years to develop the first version of Gecko that was released in a commercial Web browser (Netscape Navigator 6 in November, 2000). …

Wolf also states (Appx1766),

13.    *Implementing HTML 4/4.01 was exceedingly difficult and frustrating, and required an extraordinary level of experimentation*.

### 1.    Enablement and Undue Experimentation

"[I]n order to render a claimed apparatus or method obvious, the prior art must enable one skilled in the art to make and use the apparatus or method." *In re Kumar*, 418 F.3d 1361 (Fed. Cir. 2005) citing *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547 (Fed. Cir. 1989).  *See also Motorola, Inc. v. Interdigital Tech. Corp.,* 121 F.3d 1461, 1471 (Fed. Cir. 1997); and *In re Payne,* 606 F.2d 303, 314 (CCPA 1979). The enablement requirement applies to obviousness rejections under 35 U.S.C. §103 in addition to anticipation under 35 U.S.C. §102. *In re Kumar; In re Payne; Application of Hoeksema,* 399 F.2d 269 (C.C.P.A. 1968). The combination of references must enable a PHOSITA to

practice the claimed invention without undue experimentation. The Board has

provided insufficient evidence to support enablement of claims 29 and 78, and

Patent Owner has provided substantial factual evidence that a PHOSITA could not

practice either claim 29 or 78 without undue experimentation (or at all).

The seminal case for undue experimentation as applied to software is *White*

*Consol. Indus. v. Vega Servo-Control*, 713 F.2d 788 (Fed. Cir. 1983). In this case,

the Court held experimentation was unreasonable, where one and a half to two

years' work was required to practice the patented invention:

> … The amount of required experimentation, however, must be
> reasonable. *In re Brandstadter,* 484 F.2d 1395, 1404, 179 USPQ 286,
> 294 (CCPA 1973). Richard Stitt, a skilled programmer in the NC
> field, testified in this case that development of a single pass language
> translator **would require from 1 1/2 to 2 man years of effort, a clearly**
> **unreasonable requirement.** … **White presented no evidence that one**
> **skilled in the art would be able to select or develop a suitable**
> **translator without undue experimentation and delay**.

Wolf testified (*supra*) it took highly-skilled developers and software

engineers 50+ man-years to develop the first version of Gecko, which supported

HTML 4.0, CSS 1, and parts of CSS 2. Considering implementation of HTML 4.0

alone (without CSS), there is no evidence a PHOSITA could have implemented

HTML 4.0 in anything remotely close to 1 1/2 to two man years. Even then, all

claim limitations would not be met (since implementation of CSS is separate from

HTML 4.0).

Implementation of HTML 4 in a compliant manner would include implementation of divs, spans, and tables, the latter of which requires implementation of CSS 2 (Appx3192), while divs and spans required implementation of at least CSS 1. Both CSS 1 and CSS 2 require implementation of the CSS box model, which was notoriously difficult to implement – irrefutable difficulties faced by both Mozilla and Microsoft.

As discussed on Wikipedia (Difficulty with Adoption[10], Appx1514),

Microsoft Internet Explorer 5. x for Windows …had a flawed implementation of the CSS box model, as compared with the CSS standards. … The IE Windows box model bugs were so serious that, when Internet Explorer 6 was released, Microsoft introduced a backward-compatible mode of CSS interpretation ("quirks mode") alongside an alternative, corrected "standards mode".

Microsoft failed to implement a Windows version of IE that was CSS 1-compliant until IE6 (August 2021), yet the Board would have this Court believe a PHOSITA could have done without undue experimentation what Microsoft failed to do with an extraordinary level of experimentation involving hundreds of developers over several years.

In addition to implementing a zoomable browser supporting HTML 4 and at

---

[10] https://en.wikipedia.org/wiki/Cascading_Style_Sheets

least CSS 1, the PHOSITA would need to implement the combination on a mobile device with a touch-sensitive display. Without considering the undue level of experimentation, there is a huge difference between implementing Pad++ on a mobile device and getting it to run (whether usable or not) and implementing Pad++ in combination with HTML 4 with at least CSS 1 on a mobile device. None of the PDAs and mobile phones of record have sufficient memory to implement a browser supporting HTML 4 and CSS 1 alone, much less with an operating system such as Linux with X Windows. See Howard (Appx1784, ¶¶84-88, 110-116, 124-126), Wolf (Appx1778-1780, ¶¶53-59).

Rather than address this fact-based evidence refuting enablement, the Board pulls out the *KSR* and *Keller* cards alleging it doesn't matter whether the combination would be inoperative or unusable (nor physically possible) or whether others had failed, a PHOSITA, using "ordinary creativity" would figure out how to make it work. The reasonable expectation of success requirement is not satisfied when the skilled artisan would have had no expectation of success ("***no chance such an attempt would have succeeded without undue experimentation***"). *Honeywell*, 865 F.3d 1348.

## III.    New Grounds Improperly Adopted by Board

### A.    Examiner Correct to Not Adopt New Grounds

The '635 RAN states (Appx1585),

3PR submits the HTML Standards pursuant to 37 CFR 1.948(a)(2) in order to rebut the response of the Patent Owner that claims requiring "preservation of the entire HTML-based Web content" would be patentable over the prior art. 37 CFR 1.948(a)(2) permits (see: MPEP 2666.05(11)) 3PR to provide a newly proposed rejection, where such new proposed rejection is necessitated by PO's amendment of the claims.

At RAN (Appx1587), a substantially identical statement is made beginning with "3PR appears to submit the AAPA pursuant to 37 CFR 1.948(a)(2) …"

Under § 1.948, prior art submissions on which new grounds are based are limited by prior art as defined under § 1.501 if it is filed as part of a comments submission under § 1.947 or § 1.951(b) and is limited to prior art:

(1) which is necessary to rebut a finding of fact by the examiner;

(2) which is necessary to rebut a response of the patent owner; or …

§ 1.501 recites (in part),

(a) …

(b) Explanation: A submission pursuant to paragraph (a) of this section:

> (1) Must include an explanation in writing of the pertinence and manner of applying any prior art submitted under paragraph (a)(1) of this section …, ***to at least one claim of the patent***, in order for the submission to become a part of the official file of the patent;

The statements accompanying the proposed new grounds failed to meet the explanation requirements under § 1.501(b)(1), in addition to not meeting the

guidelines set forth in MPEP § 2617[11] (see '635 RAN Appx1585-1588), which

begins by reciting the requirements of 35 U.S.C. §311(b)(2) and 37 CFR

§1.915(b)(3).  Specifically, the statements provided no explanation to how "the

combination of the Admitted Prior Art with the Bederson references, JP 169, SVF

and/or VML renders the pending claims obvious, …" nor provide any explanation

to how these prior art references would be combined and/or modified.  The

proposed new grounds also did not identify what specific claims they apply to

(Appx1586) and could not apply to claim 29 since it was "not necessitated by PO's

amendment to the claims."

### B.    New Grounds Unavailable Under 37 CFR § 41.77

The Board states (Appx0024-0025),

Pursuant to our authority under 37 C.F.R. § 41.50(b), we reject
claims 29 and 78 under 35 U.S.C. § 103(a) as unpatentable over
Pad++ and HTML 4.0 Standard.

We reverse the Examiner's decision not to adopt the rejection of
claims 29 and 78 under 35 U.S.C. § 103(a) as being unpatentable over
Pad++ Tour and Patent Owner's admitted prior art and enter a new
rejection [under § 41.50(b)] based thereon.

New grounds in an *inter partes* reexamination cannot be raised under

---

[11]

https://mpep.uspto.gov/RDMS/MPEP/print?version=E8r8&href=d0e251313.html

§ 41.50(b):

> The Board has a procedure for issuing a new ground of rejection in appeals of *inter partes* reexaminations. 37 C.F.R. § 41.77(b).
>
> *Rambus Inc. v. Rea*, 731 F.3d 1248, 1256 (Fed. Cir. 2013)
>
> 37 CFR § 41.77(a)[12] and (b) state,
>
> (a)… The reversal of the examiner's determination not to make a rejection proposed by the third party requester constitutes a decision adverse to the patentability of ***the claims which are subject to that proposed rejection*** which will be set forth in the decision of the Patent Trial and Appeal Board as a new ground of rejection under paragraph (b) of this section. …
>
> (b) Should the Board reverse the examiner's determination not to make a rejection proposed by a requester, the Board shall set forth in the opinion in support of its decision a new ground of rejection; or should the Board have knowledge of any grounds ***not raised in the appeal*** for rejecting any pending claim, it may include in its opinion a statement to that effect with its reasons for so holding, which statement shall constitute a new ground of rejection of the claim. …

The non-adopted proposed new grounds were clearly not directed at claims 29 and 78 (in fact, did not identify any claims).  At the time the non-adopted new grounds were proposed, the ground of rejection of claim 29 and 78 being obvious

---

[12] 77 FR 46615, August 6, 2012

over Pad++ in view of Bray in Apple's IPX Request (Appx0361-0062, Claim

Chart CC-E, Appx0797) had been adopted by the Examiner.  Appx1047-1048.

The 3PRs improperly raised new grounds over the instituted prior art of record in

further view of AAPA and the HTML Standards *applied to claims 29 and 78* in

their cross-appeal briefs (*e.g.*, Apple Issues 2 and 3, Appx2186-2190) – those

grounds, which cover prior art combinations that are identical to the Board's new

grounds, cannot be adopted by the Board under § 41.77(b).  Those proposed new

grounds are also barred under 37 C.F.R. § 41.67(c)(1)(vi):

> (vi) Issues to be reviewed on appeal. … No new ground of rejection
> can be proposed by a third party requester appellant, unless such
> ground was withdrawn by the examiner during the prosecution of the
> proceeding, and the third party requester has not yet had an
> opportunity to propose it as a third party requester proposed ground of
> rejection.

The new grounds were not withdrawn by the Examiner and were similar to

the grounds previously proposed during prosecution that were properly not

adopted.  Critically, the new grounds in the cross-appeal briefs are now directed to

claims 29 and 78 – claims that were not identified in the non-adopted grounds

proposed during prosecution and for which there is no explanation how the art of

record in the claim chart for 29 and 78 (CC-E, Appx0797) would be combined

with the HTML 4.0 Standard.

## IV.    AFFIRMATION OF EXAMINER'S REJECTION OF CLAIMS 64 AND 66 IMPROPER

### A.    Claim Construction Under *Phillips*

Claim construction is a question of law, and receives *de novo* review on appeal. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390–91 (1996). Since the '926 patent expired while on appeal before the Board, the claims must be construed under the *Phillips* standard. *In re Rambus, Inc.,* 753 F.3d 1253, 1256 (Fed. Cir. 2014). Moreover, the entirety of the claims, including independent claim 52 must be construed (all claim elements and limitations).

In *PPC Broadband, Inc. v. Corning Optical Communications RF, LLC*, 815 F.3d 734 (Fed. Cir. 2016) this Court stated,

> … District courts, by contrast, do not assign terms their broadest reasonable interpretation. Instead, district courts seek out the correct construction—the construction that most accurately delineates the scope of the claimed invention—under the framework laid out in *Phillips v. AWH Corp.,*415 F.3d 1303 (Fed.Cir.2005) (en banc). *Id.* at 740

> … [C]laim construction in IPRs is not governed by *Phillips.* Under *Cuozzo,* claims are given their broadest reasonable interpretation consistent with the specification, not necessarily the correct construction under the framework laid out in *Phillips. Cuozzo,* 793 F.3d at 1279.  *Id*. at 742.

As argued in the IDS transmittal letter of March 31, 2022 (Appx2403-2404), in view of *In re Rambus*, the Board should have considered the Claim Construction

Memorandum Opinion (Appx2404) and the Claim Construction Order (Appx2431) issued by Judge Leonard Stark in the District Court litigation.  While Judge Stark's *Phillips* construction is non-binding on the Court, it is informative and should be considered.

At Appx0036, the Board alleges the Board's construction in IPR2013-00004 and IPR2013-00257 "were based on Patent Owner's own explanation of the meaning of the claimed features during prosecution and on Patent Owner's proposed *Phillips* standard claim constructions submitted in connection with *SoftView LLC v. Apple Inc.,* No. 1:10-cv-00389 (D. Del. May 10, 2010)."  In reality, the construction used by the Board in the IPRs was based on the Board's construction used in the Decision to Institute (Appx5081-5082), with separate briefing for the "preserving" limitation (Appx0205-2011).  Significantly, the "preserving limitation" was construed in the '926 FWD (Appx0211) inapposite to the plain meaning construed by the district court.  Appx2434-2435.  Also, the IPR Board relied on demonstrably false statements in Dr. Grimes' reply declaration concerning the prosecution history. *See*, *e.g.*, ¶61 (Appx1243-1244) "Thus, the applicants specifically acknowledged that a browser unable to "implement many of the common HTML tags used on web pages" could still implement the alleged inventions of the '926 and '353 Patents."

Claim 52 is directed to a mobile device including a touch-sensitive display and requires a "rendering engine" as the term was known in the art at the time of the invention:

52. A mobile device, comprising:

… 

> re-render the Web page in response to associated user inputs to enable the user to iteratively zoom in and out views of the Web page while preserving an original page layout, functionality, and design defined by the HTML-based Web content ***as interpreted by a rendering engine***,

The Pad++ browser is not a rendering engine, also known as a "layout engine" or "browser engine." The Pad++ browser includes a single file (html.cpp, Appx2032) that parses HTML content and generates Pad++ objects using a single pass as the HTML is read (only for a handful of HTML tags). Wolf, ¶28, Appx1770. In comparison, the Mozilla rendering engine and all other rendering engines as known in the art employ many modules and sub-modules, such as shown below (only top-level modules are shown here). Each module and sub-module would typically include many files.



Examples of rendering engines at the time of the invention include Mozilla "Gecko", Trident (Microsoft Internet Explorer 4 to 11), Presto (Opera), Tasman (Microsoft Internet Explorer 5 for Macintosh) and KHTML (developed by the KDE project; WebKit is a fork of KHTML (in 2002).[1314]  Appx5007



As declared by Wolf (Appx1769),

25.    Pad++ also did not employ a "rendering engine," as the term would have been recognized by a PHOSITA in the Web browser arts in 2000-2001 and used in the '926 claims. No PHOSITA would consider the rudimentary single-pass parser, which couldn't process the vast majority of HTML, to be a rendering engine within the context of any of claims 21, 25, 51, 64, 66, and 78.

A declared by Howard (Appx1831),

77.    The Pad++ browser employed a simple HTML parser. A PHOSITA would not consider it to be a rendering engine as the term is known in the art (see, *e.g.*, [15]) and used in the '353 and '926 patents.

---

[13] https://en.wikipedia.org/wiki/Browser_engine

[14] https://en.wikipedia.org/wiki/List_of_web_browsers

[15] See, *e.g.*, https://en.wikipedia.org/wiki/Web_browser_engine

The Board did not address the "rendering engine" limitation in Reh'g Dec. Rather, the Board asserts, *supra*, that under *Jung* a *prima facie* case of obviousness can be established without addressing all claim limitations.  Appx0042-0043.

Claims 64 and 66 recite[16],

64.  The mobile device of original claim 52, wherein execution of the instructions performs further operations comprising enabling a user to view *__a column__ of the Web content* at a higher resolution than a current resolution *__by tapping on the column via the touch-sensitive display__, wherein in response thereto, the display is re-rendered such that content corresponding to* the selected column *is displayed* across the touch-sensitive display.

66.  The mobile device of original claim 52, wherein execution of the instructions performs further operations comprising enabling a user to view *__a paragraph__ of the Web content* at a higher resolution than a current resolution *__by tapping on the paragraph via the touch-sensitive display__, wherein in response thereto, the display is re-rendered such that __content corresponding to the selected paragraph is displayed across at least one of a width and height of a display area of the touch-sensitive display__*.

'926 Patent 20:56-67 state,

In addition to directly scaling and offsetting content, the client user-

---

[16] Returned to issued form as patent has expired.

interface software for PDA's provides additional functionality. For instance, a user may **select to view a column** (results represented in FIG. 7B **by tapping that column** with a stylus, a shown in FIG. 7A. Similarly, the user may **select to zoom in on an image by tapping the image** with the stylus, as shown in FIGS. 8A and 8B, or **select to view a paragraph in an article by tapping on the paragraph**, as shown in FIGS. 9A and 9B. It is noted that in some instances, the display of the paragraph may be reformatted to fit the characteristics of the display, **rather than following the original format in the zoom-out view**.[17]

---

[17] A POSITA would recognize "following the original format in the zoom out-view" would produce a similar result to that shown in FIG. 7B for zooming on a column, except the zoom would be on a paragraph.




*FIG. 7A*                    *FIG. 7B*

Wolf's '635 declaration addresses claims 64 and 66 in section XI. ZOOMS

ON COLUMNS, IMAGES AND PARAGRAPHS ARE PERFORMED

AUTOMATICALLY IN RESPONSE TO BEING TAPPED ON. (Appx1780-

1783).

62.     A PHOSITA, familiar with the HTML 4 CSS box model and in

view of the '926 specification and drawings would recognize the tap-

to-zoom operations a) identify the bounding box for the object being

zoomed on; b) zoom on that bounding box, centering its content to fit

across the screen; and c) automatically perform the zooming operation

via execution of software (instructions). The following shows a Firefox (53.0.2) rendering of www.yahoo.com as captured by archive.org (https://web.archive.org/web/20010301043713/http://www.yahoo.com:80/) on March 1, 2001, which is approximately the time when the yahoo.com screenshots in the '926 patent were captured.  As shown by the Firefox Element Inspector, the right-hand column is defined in the HTML source code as a nested table having a bounding box with a specified width of 200 pixels and an interpreted height of 490 pixels (200x490). As described in the patents, there is a bounding box that is generated for each logical grouping of content identified by Gecko, which includes table content. The formatting of the table is defined in-line.



63.    A PHOSITA who was familiar with HTML 4 and computer graphics at the time of the invention and in view of the patent specification and drawings would recognize that the bounding boxes generated by Gecko could be used for "hit testing" to detect what object the user has selected.  The bounding box that is selected (the bounding box for the nested table in this example) is then used to zoom on the column.  As shown in Figure 7B in the patents (at right below), the column is fit across the width of the display, or in the language of claim 64, "content corresponding to the selected column is displayed across the touch-sensitive display."



64.    A similar scheme is used to support tap-to-zoom on images and paragraphs.  In order to support tap-to-zoom on a column, you would need to have a bounding box for the column. …

65.    A PHOSITA would recognized [sic] the tap-to-zoom is being automatically performed via execution of the software on the mobile device.  In each of claims 12 and 64 the tap-to-zoom on the column is performed by execution of the instructions on the processor, which means it would be automatically performed in response to tapping on the column.

With respect to the "content corresponding to the selected column is displayed across the touch sensitive display" and "content corresponding to the selected paragraph is displayed across at least one of a width and height of a display area of the touch-sensitive display" limitations, substantially similar limitations were addressed in the '353 patent file history (Appx1952-1959) under sections titled, Scope of the terminology "the Web page is rendered to fit across the display", Scope of the terminology "the content corresponding to the selected column is rendered to fit across the display", and Scope of the terminology "the content corresponding to the selected paragraph is rendered to fit across the display", observing claims 64 and 66 include "displayed across …" vs. "fit across" terminology.  The discussion in these sections reference FIGs. 7B, 8B, and 9B and show the following images to address different types of scroll bars.







The correct construction of the "in response thereto" limitation does not permit any additional user input (*i.e.*, manual/dynamic zooming) following the tapping on the column or paragraph (*In re Affinity Labs of Tex., LLC*, 856 F.3d 902, 907 (Fed. Cir. 2017)). Nor is manual/dynamic zooming permitted at all (since such does not involve a tapping gesture). The zoom operation is also automatically performed via execution of the instructions. Wolf ¶62, Appx1780-1781. The Board states (Appx0041),

> However, our Decision did not articulate a claim construction that "permit[s] manual/dynamic zooming to be performed following tapping on a column or paragraph," as argued by Patent Owner. Pages 14-15 of our Decision states the following:
>
> > … In particular, the Examiner stated that "the Pad++ Tour reference meets the limitation by more specifically showing ***dynamically zooming in ... on a paragraph of text*** (see: Pad++ Tour, p. 89) of an initially displayed HTML document (see: Pad++ Tour, p. 87), wherein said paragraph of text is displayed across the display."
>
> … thus, Pad++ Tour teaches the limitations "enabling a user to view a column of the Web content at a higher resolution than a current resolution by tapping on the column" and "enabling a user to view a paragraph of the Web content at a higher resolution than a current resolution by tapping on the paragraph." Both of these statements from pages 14-15 of our Decision cite to page 49 of the Right of Appeal Notice and describe ***the same single zooming operation performed on the same HTML document***, and not two separate

zooming operations-(i) "tapping on a column or paragraph" followed by (ii) "manual/dynamic zooming" …

However, page 49 of the '635 RAN states (Appx1605),

For example, the Pad++ Tour reference meets the limitation by more specifically showing ***dynamically zooming*** in a on a paragraph of text (see: Pad++ Tour, p. 89) of an initially displayed HTML document (see: Pad++ Tour, p. 87), wherein said paragraph of text is displayed across the display. … Further, viewing the paragraph or column at a higher resolution is not necessarily done automatically in response to a single tap (input) on the touch sensitive display, ***but could merely be the result of a user choosing to zoom in or out of a user selected portion of a displayed HTML document***.

Manual/dynamic zooming on a user selected portion of a displayed HTML document clearly does not meet the tapping limitation.

At Appx0043-0044, the Board alleges the following annotated screen snapshot from Pad++ Tour (with an ellipse to indicate the "selected paragraph" and a double-sided arrow to indicate "width ... of a display area") demonstrates the "selected paragraph" being displayed across the "width ... of a display area".  Tour p.93.



*The above figure illustrates Pad++ displaying an HTML document.*

The Board further asserts (Appx0044),

As discussed on page 17 of our Decision (Dec. 17), Pad++ Tour explains that "[w]hen you *click on a piece of text,* Pad++ zooms in so that [the] *text fills the screen horizontally and appears near the top of the screen vertically"* (p. 54 (emphasis added).) This description from Pad++ Tour is illustrated in the above figure, in which the "piece of text ...appears near the top of the screen" is indicated by the ellipse (*e.g.*, "Abstract: Pad++: Advances to Multiscale Interfaces") and the "text [that] fills the screen horizontally" is indicated by the double-sided arrow. …

What is shown at p.54 is a screen snapshot of a demo Pad++ application called "An outline viewer," which is discussed beginning on p.49 (Appx0649):

# 1. An outline viewer

The Pan/Zoom space is a powerful visualisation for any kind of hierarchical data - nested details can be shown at a smaller scale, conveying the relations between objects very naturally.

For example, we have developed an interactive outline viewer which we use for giving presentations. The outline viewer shows the text of the whole presentation - you simply zoom in on the points you want to make.

Main topic headings are shown at a large scale, subheadings are shown at a smaller scale, and individual points are shown even smaller.



For example, here we see a distant view of an outline for a presentation about Pad++ itself.



When you zoom in, the major headings become legible.



When you click on a piece of text, Pad++ zooms in so that that text fills the screen horizontally and appears near the top of the screen vertically.

The outline viewer and the Web browser are separate Pad++ applications, and the zoom functionality in the preceding images is only provided by the outline viewer.  It is not supported in the Web browser, nor has the Board, Examiner, or 3PR identified anywhere in the description of the Web browser (in the Pad++ references and the Tour) where such functionality is provided.  It also fails to meet the across the display or display area limitations.

The section in the Tour addressing the Web browser (3. An HTML browser) begins on p.86 (Appx0686) and includes the following (captured from the Web pages for better quality, beginning at

http://www.cs.umd.edu/hcil/pad++/tour/html1.html#z4):



Here is a screen snapshot showing Pad++ displaying an HTML document.



Here is a zoomed in view of the document. Hotwords are shown in blue - positioning the pointer over a hotword changes its color to red. In this snapshot the pointer was over the 'Pad++: Multiscale interfaces' link.



When you follow a link, the relevant document is loaded into Pad++ and placed on the surface to the right of the original document, at a smaller scale. Here you can see the 'Pad++: Multiscale interfaces' document loaded beside the home page.

The Pad++ HTML browser will lay out sub-documents in two columns next to the parent document. Because Pad++ is zoomable, there is always enough space between those two columns for placing further documents reached from those sub-documents!



Simply zoom in on the sub-document to read it.



As shown in the annotated version of the zoomed in view of the sub-document above, the width of the paragraph alleged to be zoomed on is not displayed across the browser display area, nor (as applied as a column) remotely close to being displayed across the display.

Appellant has argued the view on p.93 (Appx0693) was obtained using manual/dynamic zooming **on a desktop computer**, and as explained *infra*, both the Pad++ documents and empirical testing of the Pad++ browser demonstrate this view could not be obtained by tapping on a paragraph (nor by any tapping

operation).

As described in *A Zooming Web Browser* (Appx0421),

Our dynamic Pad++ tree browser combines a basic focus-driven layout with automatic zooming and panning to support navigation. The software allows the user to select a focus page. That selection animates the page to occupy a larger section of the display. …

… Clicking on a link brings up a new page, adds it to the tree of pages, and causes the tree to restructure itself. …The new page becomes the current focus and is moved to the center of the screen, at a size suited for viewing. The user may designate any existing page to be the current focus by clicking on it.



Figure 1: Snapshot of Pad++ Web Browser.



Figure 2: Another view of same web pages.

Pad++ also can follow links across the internet. Figure 5 shows a snapshot where several hypertext links have been followed. Two views show the same tree focused on different nodes. Appx0477-0478, Appx1736.



**Figure 5.** Many different HTML documents loaded in Pad++. Their layout implicitly shows the history of the user's interaction. The two views show the same tree focused on different nodes

The following shows the browser behavior with a single Web page (Appx1736).



The bounding box for the entire page and bounding boxes for the HTML anchor tags are used to determine what is clicked on (*i.e.*, what is being selected).

Howard (Appx1853-1865) provides an example of a bounding box for a paragraph and describes in depth how Pad++ processed paragraphs. It is unrefuted that Pad++ did not create nor use a bounding box for paragraphs or columns. *Id.*



Pad++ could not render a Web page having content laid out in one or more columns and thus it would be impossible to meet the claim limitations of claim 64. It is undisputed that the Pad++ browser could not interpret any of the HTML tags used to layout content in columns (tables, divs, spans, and frames).  Reinman Decl., ¶¶25-33, Appx1881-1883.  In the Pad++ Web page renderings *supra* and in the following renderings, all page content is rendered using left-hand justification without columns.  The correct page renderings (right) for pages including content laid out in columns demonstrate this abysmal failure.



Appx1724



www.yahoo.com (April 18, 1997)

www.yahoo.com (April 4, 2001)



www.msn.com (April 3, 2001)

www. nytimes. com (Nov. 9, 2000)



www.aol.com (April 1, 2001)

www.about.com (April 1, 2001)

Appx1726

The Board does not separately address all claim 64 limitations, instead, apparently, asserting Tour p.93 shows both a zoom on a column *and* a zoom on a paragraph. Significantly, the p.93 screenshot does not show content corresponding to the selected column (nor any content) being displayed across the touch-sensitive display.

When construing a claim, every term in the claim is presumed to have meaning and, thus, constructions that would render a claim term superfluous are denounced. *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1368 (Fed. Cir. 2008) "[C]laims are interpreted with an eye toward giving effect to all terms in the claim." In the RAN (Appx1653), the Examiner refers to the limitation "fit *across* the display" as "non-limiting," disregarding what is shown in FIG. 7B and the discussion concerning the meaning of this limitation in the prosecution history of the '353 patent. Additionally, the Examiner's and Board's interpretation ignores "the *selected* column," and "the *selected* paragraph" limitations.

The Board asserts (Appx0046), "Patent Owner's arguments are not commensurate in scope with either claim 64 or claim 66, because the claims do not recite 'bounding box.'" As succinctly stated by this court, "Specifications teach. Claims claim." *SRI International v. Matsushita Electric Corp.*, 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985). The claims are not required to recite bounding boxes; however, bounding boxes would be necessary to enable the functionality claimed

in claims 64 and 66, as under a touchscreen graphical user interface (GUI), it is not

possible to select any object within a Web page, regardless of type, without a

bounding box for the object. *See* Req. Reh'g (Appx2483-2484), which includes

the screenshot below showing the bounding boxes for anchor tags used for

hyperlinks in Pad++.



HTML comprises structural elements, including paragraphs (<p>) and tags

that enable content to be logically grouped (and displayed) in columns (<table>,

<div>, <span>, <frame>).  How do you select content to zoom on by tapping on

the content and display the content across a display (or display area) without some

means for identifying the bounds of the content?  The Board has failed to explain

how this could be done using or modifying the teachings of Pad++, including how

Pad++'s ZUI would be implemented on a PDA.  *See Itsy*, Appx1151, Appx1167-

1168 addressing the difficulty of mapping a device with a large display and three-

button mouse to a device with a small display and stylus.  How would holding

down multiple mouse buttons be implemented using a stylus with a resistive

touchscreen?  Also *see* challenges faced by Apple in implementing a desktop

browser on a mobile phone.  Appx1943-1946.  As discussed *supra*, the enablement

requirement applies to obviousness rejections under 35 U.S.C. §103, where the

combination of references must enable a PHOSITA to practice the claimed

invention without undue experimentation.  The Board's rejection has no "rational"

connection with the evidence presented. *Nuvasive*, 842 F.3d at 1382.

## V.    Violation of the Administrative Procedure Act (APA)

Appealed claim 29 recites identical language as claim 29 in Reexamination

Request No. 90/009,995, which was determined to be patentable as indicated in the

*Ex Parte* Reexamination Certificate 11956[th] for 7,831,926 issued on December 6,

2021 (Appx0151).  In the '995 Appeal Decision, the Board reversed the

Examiner's rejection of claim 29 based on declaration evidence provided by Wolf

regarding the difficulties Mozilla, Microsoft, and Opera had in implementing

HTML 4/4.01 and CSS2.  Appx0263.  Wolf's statements included,

"**[i]mplementing HTML 4/4.01 was exceedingly difficult and frustrating, and required an extraordinary level of experimentation**" and "[i]t was made that much more difficult by the inclusion of CSS 2 and the CSS box model, **which is inherently tied to a proper implementation of HTML 4/4.01**."

In comparison, in the Appeal Decision the Board is asserting that implementing HTML 4.0 would be within the skill of a PHOSITA and (impliedly) could be done without undue experimentation. Notably, two of the same APJs are on the current Board and the '995 Appeal Decision (APJs Eric B. Chen and Brian J. McNamara), and APJ Chen authored the '995 Appeal Decision.

The Appeal Decision does not cite to any evidence to support this different outcome, which is arbitrary and capricious and a violation of 5 U.S.C. § 706(2)(A) . *See In re Vivint, Inc.*, 2020-1992 (Fed. Cir. Sep. 29, 2021) ("Under the APA, we must set aside an agency action that is either an abuse of discretion or arbitrary and capricious"); citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), ("A decision is arbitrary and capricious when the agency fails to articulate a "rational connection between the facts found and the choice made."").

In Reh'g Dec., the Board asserts the art between the two reexaminations is different, arguing AAPA and the HTML 4.0 Standard were not of record in the *ex parte* reexamination. Appx0049. However, the issues of whether a PHOSITA

would have any motivation to modify the Pad++ browser to support HTML 4 or have any reasonable expectation of success was addressed by both Wolf (*supra*) and Howard and considered during prosecution of the *ex parte* reexamination.  For example, Howard addresses HTML 4 and HTML (generally) in ¶¶77-83 (Appx1831-1835), including:

> 77. … A PHOSITA would not consider modifying the Pad++ parser to support HTML 4, CSS 1, *or* CSS 2.

> 80 … A PHOSITA reviewing the very simplistic Pad++ browser code and/or testing Pad++ would not have been motivated to modify Pad++ to support additional HTML tags, to write original code, and/or to modify a pre-existing browser to support zooming using the teachings of Pad++.

With respect to AAPA, Howard includes an entire section (VIII, Appx1838-1841) addressing this issue, beginning with:

> 90.    After reviewing the Bederson References and/or testing the Pad++ browser, a PHOSITA in 2001 would not attempt to combine the teachings of Pad++ with the Mozilla Gecko rendering engine.

A PHOSITA at the time of the invention would know how to access the Mozilla source code and how to access the published HTML standards, including HTML 4.  Whether the Mozilla source code or the HTML 4 standard was of record is irrelevant; the identical issues were addressed in the *ex parte* reexamination.

## CONCLUSION

In view of the arguments and evidence presented herein, the Court should reverse in full the Board's Decision as applied to each of claims 29, 64, 66, and 78 and instruct the PTO to issue a reexamination certificate confirming these claims.

Dated:  January 27, 2023          Respectfully submitted,

                                  By:____/s/ R. Alan Burnett____

                                  LAW OFFICE OF R. ALAN BURNETT, PS

                                  *ATTORNEYS FOR APPELLANT*
                                  *SOFTVIEW LLC*

**ADDENDUM**

# CONTENTS OF ADDENDUM

Page

DECISION ON APPEAL
     Appeal 2022-000716                                       Appx0001

DECISION ON REQUEST FOR REHEARING
     Appeal 2022-000716                                       Appx0030

DECISION ON APPEAL
     Appeal 2022-000154                                       Appx0052

DECISION ON REQUEST FOR REHEARING
     Appeal 2022-000154                                       Appx0081

U.S. 7,831,926 B2 Nov. 9, 2010              Appx0109

INTER PARTES REVIEW CERTIFICATE (119TH)
     U.S. 7,831,926 K1 Jan. 15, 2016         Appx0149

EX PARTE REEXAMINATION CERTIFICATE (11956TH)
     U.S. 7,831,926 C1 Dec. 6, 2021.          Appx0151

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.
Requester and Respondent

v.

SOFTVIEW L.L.C.
Patent Owner and Appellant

———————

Appeal 2022-000716
Reexamination Control 95/000,635
Technology Center 3900
Patent 7,831,926 B2

———————

Before ALLEN R. MacDONALD, ERIC B. CHEN, and
BRIAN J. McNAMARA, *Administrative Patent Judges*.

CHEN, *Administrative Patent Judge*.

DECISION ON APPEAL[1]

---

[1] Related Appeal No. 2022-000154 (Reexamination Control No. 95/002,126) is directed to a reexamination of the same patent as this appeal. (PO Appeal Br. 1.) This appeal and its related appeal are directed to the same issues. These appeals are decided concurrently.

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

Patent Owner SoftView, L.L.C. appeals under 35 U.S.C. § 134(b) and 35 U.S.C. § 315(a) (pre-AIA) the Examiner's final decision to reject independent claims 64 and 66. The Examiner confirmed the patentability of claims 29 and 78. Claims 30, 31, 40, 41, 43, 52, 55, 59, 72, and 75 were cancelled in a previous *inter partes* review proceeding. Claims 1–28, 32–39, 42, 44–51, and 69 were cancelled in a previous *ex parte* reexamination proceeding. Claim 70 was cancelled in the current proceeding. The rejections of claims 53–63, 65, 67, 68, 71, 73, 74, 76, 77, and 79–88 were not appealed.

Requester Apple appeals the Examiner's decision not to reject claims 29 and 78 under certain grounds proposed by Requester.

A video conference hearing was held on January 27, 2022, with both parties in attendance. The record includes a written transcript of the oral hearing.

We AFFIRM and enter new grounds of rejection.

## STATEMENT OF THE CASE

A request for *inter partes* reexamination of the '926 patent, assigned Reexamination Control No. 95/000,635, was filed on May 23, 2011, by Third-Party Requester Apple.

A subsequent request for *ex parte* reexamination of U.S. Patent No. 7,831,926 B2 (the '926 patent) was filed on May 29, 2012, and assigned Reexamination Control No. 90/009,995. The Examiner's decision to reject claims 1–28, 32–39, 42, 44–51, and 69 was affirmed, but the Examiner's decision to reject claim 29 was reversed. *Ex parte SoftView LLC*, No. 2019-

2

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

001127 (PTAB May 1, 2020), *aff'd*, 847 F. App'x 930 (Fed. Cir. 2021). The
reexamination proceeding resulted in the issuance of an *Ex parte*
Reexamination Certificate (11956th) on December 6, 2021, US 7,831,926
C1, in which claims 1–28, 32–39, 42, 44–51, and 69 were cancelled, but the
patentability of claim 29 was confirmed.

The '926 patent, entitled "Scalable Display of Internet Content on
Mobile Devices," issued November 9, 2010 to Gary B. Rohrabaugh and
Scott A. Sherman, based on Application No. 11/738,486, filed April 21,
2007.

The '926 patent is said to be a continuation of Application No.
09/878,097, filed June 8, 2001, now U.S. Patent No. 7,210,099, which is a
continuation-in-part of Application No. 09/828,511, filed April 7, 2001, now
abandoned. The '926 patent is also said to claim priority to U.S. Provisional
Application No. 60/211,019, filed June 12, 2000, and U.S. Provisional
Application No. 60/217,345, filed July 11, 2000.

The '926 patent is said to be assigned to SoftView, L.L.C., the real
party in interest. (Appeal Br. 1.)

*Patent Owner's Invention*

Patent Owner's invention relates to mobile devices that are enabled to
support resolution-independent scalable display of Internet (Web) content,
allowing Web pages to be scaled (zoomed) and panned for better viewing on
smaller screen sizes. (Abstract.)

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

*Related Litigation*

The '926 patent and related U.S. Patent 7,461,353 B2[2] has been
asserted in *SoftView LLC v. Apple Inc.*, No. 1:10-cv-00389 (D. Del. May 10,
2010) and *SoftView LLC v. HTC Corp.*, No. 1:12-cv-00984 (D. Del. July 26,
2012). (Appeal Br. 1–2.)

The '926 patent was also subject to *inter partes* review in *Softview*
*LLC v. Kyocera Corp. and Motorola Mobility LLC*, Nos. IPR2013-00004
and IPR2013-00257 (PTAB Mar. 27, 2014), *aff'd*, 592 F. App'x 949 (2015).
As a result of this *inter partes* review, claims 30, 31, 40, 41, 43, 52, 55, 59,
72 and 75 were cancelled.

*The Claims*

Claims 1 (cancelled), 29, 64, and 66 are illustrative of the claimed
subject matter, with disputed limitations in italics:

> 1.     (Cancelled) A mobile device, comprising:
>
> a processor,
>
> a wireless communications device operatively coupled to
> the processor, to facilitate communication with a network via
> which Web content may be accessed;
>
> a touch-sensitive display;
>
> a memory, operatively coupled to the processor; and
>
> storage means, operatively coupled to the processor, in
> which a plurality of instructions are stored that when executed

---

[2] Also subject to *inter partes* review in *SoftView LLC v. Kyocera Corp. and*
*Motorola Mobility LLC*, Nos. IPR2013-00007 and IPR2013-00256 (PTAB
Mar. 27, 2014), *aff'd*, 592 F. App'x 947 (Fed. Cir. 2015), and subject to
multiple *ex parte* and *inter partes* reexaminations (Application Nos.
90/009,994, 95/000,634, and 95/002,132).

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

by the processor enable the mobile phone to perform operations including,

enabling a user to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

retrieving HTML-based Web content associated with the Web page;

translating the HTML-based Web content to produce scalable vector-based page layout information;

employing the scalable vector-based page layout information and/or data derived therefrom to,

render a view of at least a portion of the Web page on the touch-sensitive display using a first scale factor; and

re-render the Web page in response to associated user inputs to enable a user to iteratively zoom in and out views of the Web page on the display while preserving the original page layout, functionality, and design of the content on the Web page defined by the HTML based Web content,

wherein preservation of the functionality defined by the HTML-based content includes preservation of hyperlink functionality.

29.    The mobile device of claim 1, *wherein the HTML-based Web content includes cascading style sheet content defining layout and presentation attributes for the Web page.*

64.    A mobile device, comprising:

a processor,

wireless communications means, to facilitate wireless communication with a network via which Web content may be accessed;

a touch-sensitive display;

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

flash memory, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile device to perform operations including,

rendering a browser interface via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

retrieving and processing the HTML-based Web content to produce scalable content; and

employing the scalable content and/or data derived therefrom to, render a view of the Web page on the touch-sensitive display; and

re-render the Web page in response to associated user inputs to enable the user to iteratively zoom in and out views of the Web page while preserving an original page layout, functionality, and design defined by the HTML-based Web content as interpreted by a rendering engine,

wherein preservation of the functionality defined by the HTML-based Web content includes preservation of hyperlink functionality, and wherein execution of the instructions performs further operations comprising enabling a user to view a paragraph of the Web content at a higher resolution than a current resolution by tapping on the paragraph via the touch-sensitive display, wherein in response thereto, *the display is re-rendered such that content corresponding to the selected paragraph is displayed across at least one of a width and height of a display area of the touch-sensitive display.*

66.    A mobile device, comprising:

a processor,

wireless communications means, to facilitate wireless communication with a network via which Web content may be accessed;

a touch-sensitive display;

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

> flash memory, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile device to perform operations including,

> rendering a browser interface via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

> retrieving and processing the HTML-based Web content to produce scalable content; and

> employing the scalable content and/or data derived therefrom to, render a view of the Web page on the touch-sensitive display; and

> re-render the Web page in response to associated user inputs to enable the user to iteratively zoom in and out views of the Web page while preserving an original page layout, functionality, and design defined by the HTML-based Web content as interpreted by a rendering engine,

> wherein preservation of the functionality defined by the HTML-based Web content includes preservation of hyperlink functionality, and wherein execution of the instructions performs further operations comprising enabling a user to view a paragraph of the Web content at a higher resolution than a current resolution by tapping on the paragraph via the touch-sensitive display, wherein in response thereto, *the display is re-rendered such that content corresponding to the selected paragraph is displayed across at least one of a width and height of a display area of the touch-sensitive display.*

REFERENCES

| Name | Reference | Date |
|------|-----------|------|
| Benjamin B. Bederson & James D. Hollan ("Bederson-1") | Pad++: *A Zoomable Graphical Interface System*, CHI '95 MOSAIC OF CREATIVITY | 1995 |

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

| Benjamin B. Bederson & George W. Furnas ("Bederson-2") | *Space-Scale Diagrams: Understanding Multiscale Interfaces*, CHI '95 Proceedings | 1995 |
|---|---|---|
| Benjamin B. Bederson et al. ("Bederson-3") | *A Zooming Web Browser*, 2667 SPIE 260–71 | 1995 |
| Ben Bederson & Jon Meyer ("Bederson-4") | *Implementing a Zooming User Interface: Experience Building Pad ++*, 28 SOFTWARE–PRACTICE & EXPERIENCE 1101–35 | 1998 |
| Benjamin B. Bederson et al. ("Bederson-5") | *Pad++: A Zoomable Graphical Sketchpad for Exploring Alternate Interface Physics*, 7 J. VISUAL LANGUAGES & COMPUTING 3–31 | 1996 |
| Jonathan Meyer ("Pad++ Tour") | A Brief Tour Through Pad++ | 1997 |
| Dave Raggett ("HTML 3.2 Standard") | HTML 3.2 Specification, World Wide Web Consortium (W3C) | Jan. 14, 1997 |
| Dave Raggett, Arnaud Le Hors, and Ian Jacobs, eds. ("HTML 4.0 Standard") | HTML 4.0 Specification, World Wide Web Consortium (W3C) | Dec. 18, 1997 |
| Tim Bray ("Bray") | *XML support in IE5*, XLM.com | Mar. 18, 1999 |
| Brian Matthews et al. ("VML") | *Vector Markup Language (VML)*, World Wide Web Consortium Note, Note-VML-19980513 | May 13, 1998 |
| SoftSource, LLC ("SVF") | Specification for the Simple Vector Format v. 1.1 | Jan. 15, 1995 |
| SoftSource, LLC ("SVF Press 1") | New CAD System Works With AutoCAD Drawings Without Translation | June 17, 1996 |

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

| SoftSource, LLC ("SVF Press 2") | Bring New CAD Viewing Power to the Internet | Mar. 4, 1996 |
|---|---|---|
| Hara et al. ("JP 169") | JP H10-326169 | Dec. 8, 1998 |

*The Non-Adopted Rejections*

Requester appeals the Examiner's decision not to adopt the following proposed rejections:

1. Claims 29 and 78 as unpatentable under 35 U.S.C. § 103(a) over Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, and Bray.

2. Claims 29 and 78 as unpatentable under 35 U.S.C. § 103(a) over various combinations of HTML 3.2 Standard, HTML 4.0 Standard, Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, JP 169, SVF, and VML.

3. Claims 29 and 78 as unpatentable under 35 U.S.C. § 103(a) over various combinations of Patent Owner's admitted prior art, Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, JP 169, SVF, and VML.

4. Claims 29 and 78 as unpatentable under 35 U.S.C. § 103(a) over JP 169, Bray, and either SVF or VML.

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

*The Rejections*

Patent Owner appeals the Examiner's decision to reject the following pending claims:

Claims 64 and 66 stand rejected under 35 U.S.C. § 103(a) over Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, and Pad++ Tour.[3]

Patent Owner also relied upon the following in rebuttal to the Examiner's rejections:

> Declaration under 37 C.F.R. § 1.132 of Wolf (formerly Scott Collins), dated July 15, 2017 (Patent Owner Ex. A).

> Declaration under 37 C.F.R. § 1.132 of Michael L. Howard, November 16, 2016 (Patent Owner Ex. B).

ANALYSIS

*Requester's Appeal—Claims 29 and 78*

The Examiner did not adopt Requester's proposed rejection of claims 29 and 78 as unpatentable under 35 U.S.C. § 103(a) over Pad++ Tour and Patent Owner's admitted prior art (RAN 31–32), in which Requester argued that "[t]he '926. . . Patent[] also admit[s] that the Mozilla rendering engine was in the prior art" and "the Mozilla (Gecko) rendering engine during pre-rendering processing operations to parse and process the HTML and CSS source code" (Requester Comments 25, filed Aug. 16, 2017). We do not agree with the Examiner's determination.

---

[3] The Examiner inadvertently omitted Pad++ Tour from the statement of the rejection. (RAN 47–49.)

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

The '926 patent discloses the following:

> As will be recognized by those skilled in the art, *the functions performed in blocks 150, 152, and 154* [of Figure 5] *are commonly performed by conventional browsers during a pre-rendering process.* In some browsers, *these functions are performed by the Mozilla rendering engine, which comprises open source software that is readily available for use by developers.* At present, the software for the Mozilla rendering engine may be accessed via the Internet at www.mozilla.org. Accordingly, in one embodiment, the present invention uses core functionality provided by the Mozilla rendering engine source code to perform the functions of block 150, 152, and 154.

(Col. 17, ll. 31–41 (emphases added).)

> The process is initiated when the proxy server receives the HTML corresponding to the parent document (and frame documents, if appropriate), whereupon *a pre-rendering parsing of the HTML is performed to determine where to place the various objects on the display page in a block 150.* For example, elements such as tables, column definitions, graphic images, paragraphs and line breaks are identified. If frames are included, each frame is examined in the sequential order it appears in the HTML document, or the order in which the HTML documents corresponding to the frames in a frameset are downloaded to the browser.

(Col. 15, ll. 45–55 (emphasis added).)

The Wolf Declaration further states the following:

> The '926 . . . patent[] disclose[s] using the Mozilla (Gecko) rendering engine during *prerendering processing operations* to parse and process the HTML and CSS source code and generate HTML objects and associated page layout information, including bounding boxes.

(¶ 16 (emphasis added).)

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

In view of Patent Owner's disclosure in the '926 patent that:
(i) "a pre-rendering parsing of the HTML is performed to determine
where to place the various objects on the display page in a block 150";
(ii) the function performed in block 150, pre-rendering parsing of HTML,
is "commonly performed by conventional browsers"; and (iii) Patent
Owner's declaration evidence that pre-rendering processing operations parse
and process the HTML and CSS source code, the '926 patent admits that the
limitation "wherein the HTML-based Web content includes cascading style
sheet content defining layout and presentation attributes for the Web page"
was well-known to one of ordinary skill in the art.

Patent Owner argues that "Wolf's quoted statements relate to the
minimum HTML and CSS support a PHOSITA would want to implement at
the time of the invention, but does not assert implementing a browser
supporting HTML 4/4.01 and CSS would be within the skill of a
PHOSITA." (PO Respondent Br. 32.) In particular, Patent Owner points to
paragraph 28 of the Wolf Declaration, which states the following:

> A PHOSITA in 2000-2001 could not have modified
> Pad++ to implement the numerous unsupported HTML
> elements to produce an HTML 3.2 browser, much less an
> HTML 4/4.01 browser. The Pad++ browser employed a simple
> single-pass HTML parser that generated PAD++ objects for a
> handful of HTML tags, and did not implement dozens of
> HTML tags, including tags that are fundamental to page layout
> such as tables, divs, and spans. It also had no CSS support. A
> PHOSITA in 2000-2001 would also not attempt to write
> original code to support HTML 4, CSS 1, or CSS 2, and there
> would be no chance such an attempt would have succeeded
> without undue experimentation. As discussed above, it took a
> team of highly-skilled developers and software engineers 50+
> man-years to develop the first version of Gecko that was

12

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

> released in a commercial Web browser (Netscape Navigator 6
> in November, 2000).

(¶ 28.)  However, Patent Owner's arguments are not commensurate in scope

with claim 29, because the claim neither recites a specific HTML version

nor a specific CSS version.  In addition, in direct contradiction to Patent

Owner's argument that "a PHOSITA could not modify Pad++ to support

existing HTML and CSS standards . . . [and] would have no motivation to

attempt to do so," Wolf also states that "[i]n the 2000-2001 timeframe,

anyone (or company) developing a Web browser would want to have the

browser comply with HTML 4/4.01 and relevant portions of CSS 1 and

CSS 2" (¶ 26).  Although we recognize Wolf's statement that "it took a team

of highly-skilled developers and software engineers 50+ man-years to

develop the first version of Gecko," such statement applies to the specific

situation of implementing HTML 4.0 with CCS 2.

> Patent Owner further argues the following:

> > Respondent [Patent Owner] has provided irrefutable
> > evidence that highly-skilled engineers at Mozilla were unable to
> > implement a desktop browser supporting full-page zooming
> > until 2007.  Mozilla's "Minimo" mobile browser did not
> > preserve the original page layout or design.  Appellant's
> > [Requester] assertions that a PHOSITA, at the time of the
> > invention, could have done on a mobile device what Mozilla
> > failed to do on a desktop until 2007 and did not do on a mobile
> > device is not supported by any factual evidence.

(PO Respondent Br. 34 (emphasis omitted).)  In particular, Patent Owner

points to paragraph 26 of the Howard Declaration, which states the

following:

> > Mozilla did not fully implement a browser on a PDA or
> > mobile phone until at least 2004, and this implementation did

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

> not preserve the original page layout or design. This
> development was under the Mini-Mozilla ("Minimo") project.

(¶ 87.)  However, Pad++ Tour expressly states that "[y]our whole desktop could be zoomable" and "[t]his seems especially attractive for systems which have small screens, such as handheld computers (i.e. PDA's)." (P. 141.)  Although we recognize that "Mozilla did not fully implement a browser on a PDA or mobile phone until at least 2004," such evidence does not necessarily mean that one of ordinary skill in the art would have excluded all web browsers from the implementation on a PDA or mobile phone.

Accordingly, we reverse the Examiner's decision not to reject claims 29 and 78 under 35 U.S.C. § 103(a) over Patent Owner's admitted prior art and Pad++ Tour and we enter a new ground of rejection based thereon.

We do not reach the cumulative rejections of claims 29 and 78 under 35 U.S.C. § 103(a) because it is unnecessary to reach the propriety of the Examiner's decision not to reject these claims on a different basis.  *Cf. In re Gleave*, 560 F.3d 1331, 1338 (Fed. Cir. 2009) (not reaching additional obviousness rejections).

*Patent Owner's Appeal—Claims 64 and 66*

The Examiner found that Pad++ Tour, which illustrates screen snapshots of both an HTML document and a zoomed-in view of the same HTML document, corresponds to the limitations:  (i) "enabling a user to view a column of the Web content at a higher resolution than a current resolution by tapping on the column . . . the display is re-rendered such that

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

content corresponding to the selected column is displayed across the touch-sensitive display," as recited in independent claim 64; and (ii)

> enabling a user to view a paragraph of the Web content at a
> higher resolution than a current resolution by tapping on the
> paragraph . . . the display is re-rendered such that content
> corresponding to the selected paragraph is displayed across at
> least one of a width and height of a display area of the touch-
> sensitive display.

(RAN 49.) In particular, the Examiner stated that "the Pad++ Tour reference meets the limitation by more specifically showing dynamically zooming in a on a paragraph of text (see: Pad++ Tour, p. 89) of an initially displayed HTML document (see: Pad++ Tour, p. 87), wherein said paragraph of text is displayed across the display." (RAN 49.) Requester agrees and argues that "[t]he Pad++ references teach that the Web browser could process HTML documents that include text, line segments, images, bullet items and horizontal rules" (Requester Respondent Br. 10), "Pad++ teaches clicking on an object and having it fill the screen," and "it was well known in the prior art that PDAs such as the Palm device included a touch-sensitive display that the user could tap using a stylus" (*id.* at 11). We agree with the Examiner's determination.

Pad++ Tour relates to a computer screen having a zoomable surface, "[f]or example, several million pages of text could be fit on the surface by reducing it sufficiently in scale, making any number of on-line information services, encyclopedias, etc., directly available." (P. 2.) In one example of zooming a user interface, entitled "An HTML browser," Pad++ Tour explains the following:

15

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

A zooming version of Mosaic and Netscape?  This is not such a strange idea.  The third example Pad++ application we will look at is a simple Pad++ web browser.

Although the web browser we show here is still fairly primitive, you could imagine a much more advanced version. Does the idea of using a zoomable Web browser excite you?

(P. 86.)

In two unreferenced figures, reproduced below, Pad++ Tour depicts screen snapshots of:  (i) "Pad++: Multiscale interfaces" HTML document (annotated with an arrow) loaded next to the regularly sized HTML document entitled "Ben Bederson's Home Page" (p. 91) and (ii) the zoomed-in view of the same HTML document, entitled "Abstract:  Pad++: Advances in Multiscale Interfaces" (p. 93):



Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2



In particular, Pad++ Tour explains the following:

> When you follow a link, the relevant document is loaded
> into Pad++ and placed on the surface to the right of the original
> document, at a smaller scale. Here you can see the 'Pad++:
> Multiscale interfaces' document loaded beside the home page.

> The Pad++ HTML browser will lay out sub-documents in
> two columns next to the parent document. Because Pad++ is
> zoomable, there is always enough space between those two
> columns for placing further documents reached from those sub-
> documents!

(P. 91.) Pad++ Tour also explains that "[w]hen you click on a piece of text,

Pad++ zooms in so that that text fills the screen horizontally and appears

near the top of the screen vertically." (P. 54.)

Moreover, Pad++ Tour explains the following:

> Pad++ could also be viewed as a way to implement an
> alternative windowing system based on zooming. Your whole
> desktop could be zoomable. This seems especially attractive
> for systems which have small screens, such as handheld
> computers (i.e. PDA's).

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

(P. 141.)  Moreover, one relevant definition of a "PDA" (personal digital
assistant) is "[a] lightweight palmtop computer designed to provide specific
functions like personal organization (calendar, note taking, database,
calculator, and so on) as well as communications," such that "[m]any PDA
devices rely on a pen or other pointing device for input instead of a keyboard
or mouse."[4]

Because Pad++ Tour explains that:  (i) clicking on the "Pad++:
Multiscale interfaces" link on "Ben Bederson's Home Page" lays out the
sub-document next to the parent document; (ii) the sub-document "Abstract:
Pad++:  Advances in Multiscale Interfaces" is zoomable, such that the text
fills the screen horizontally and displays a paragraph (e.g., title, authors, and
keywords of a technical publication); and (iii) Pad++ is attractive for
systems having small screens, such as PDA devices having a pen or pointing
device, Pad++ Tour teaches the limitations "enabling a user to view a
column of the Web content at a higher resolution than a current resolution by
tapping on the column . . . the display is re-rendered such that content
corresponding to the selected column is displayed across the touch-sensitive
display" and

> enabling a user to view a paragraph of the Web content at a
> higher resolution than a current resolution by tapping on the
> paragraph . . . the display is re-rendered such that content
> corresponding to the selected paragraph is displayed across at
> least one of a width and height of a display area of the touch-
> sensitive display.

First, Patent Owner argues that "Pad++ could support a very limited
set of HTML tags" and "[i]t is irrefutable that Pad++ could not interpret

---

[4]  MICROSOFT® COMPUTER DICTIONARY 396 (5th ed. 2002).

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

HTML used to lay out page content in columns (HTML tables, HTML
<div> tags, spans or any other structure used to lay out page content in
columns, notably CSS." (PO Appeal Br. 28; *see also id.* at 42, 48.)
However, Patent Owner's arguments are not commensurate in scope with
either claim 64 or claim 66, because the claims do not recite "HTML tags."

    Second, Patent Owner argues that "Pad++ does not disclose any
browser screenshots where the content of a paragraph is 'displayed across at
least one of a width and height of a display area of the [touch-sensitive]
display' when the page is clicked on." (PO Appeal Br. 35 (emphasis
omitted); *see also* PO Rebuttal Br. 14.) Similarly, Patent Owner argues that

> PHOSITA would not have considered this [a screen snapshot of
> "Ben Bederson's Home Page" with a truncated sentence "Click
> here for tundra ima" on page 89 of Pad Tour++] to be a zoom
> on a column or a paragraph within a Web page nor conclude
> that the content in this HTML document is re-rendered such
> that it is rendered across the width of a display or display area.

(PO Appeal Br. 43–44 (emphasis omitted).) However, as discussed
previously, the Examiner also cited to the figures on pages 91 and 93 of
Pad++ Tour.

    Third, Patent Owner argues that "Pad++ does not support zooming on
any HTML content within a web page, regardless of the selection method"
and "[t]he zoom was agnostic to the underlying content – it doesn't matter
whether it was a web page, or any other type of Pad++ content." (PO
Appeal Br. 38 (emphasis omitted); *see also* PO Rebuttal Br. 22.) Similarly,
Patent Owner argues that "Pad++'s browser [from Figure 5 of Bederson-5]
implemented two zoom behaviors for mouse clicks: Clicking anywhere
(other than a hyperlink) on an 'out of focus' page causes it to be enlarged,

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

but does not cause the page to be displayed to be rendered across the screen." (PO Appeal Br. 44–45.)  However, the Examiner also cited to pages 91 and 93 of Pad++ Tour for teaching the limitation "the display is re-rendered such that content corresponding to the selected paragraph is displayed across at least one of a width and height of a display area of the touch-sensitive display," and Patent Owner has not provided any persuasive arguments or evidence as to why the Examiner's findings with respect to Pad++ Tour are erroneous.

Fourth, Patent Owner argues that "Pad++ does not generate a bounding box for a paragraph" and "Pad++ does not teach or suggest zooming on any HTML object in a Web page (MSML is not HTML), much less an HTML paragraph that Pad++ never generates a bounding box for nor would benefit from generating such a bounding box." (PO Appeal Br. 49; *see also* PO Rebuttal Br. 14.)  However, Patent Owner's arguments are not commensurate in scope with either claim 64 or claim 66, because the claims do not recite "bounding box."

Fifth, Patent Owner argues that "Bederson's testimony provides no evidence that the (unknown) touchscreen was the only input device being used for the ZIB program, and it is irrefutable that the touchscreen was not for a PDA." (PO Appeal Br. 56.)  However, as discussed previously, Pad++ Tour explains that "Pad++ could also be viewed as a way to implement an alternative windowing system based on zooming" and "[t]his seems especially attractive for systems which have small screens, such as handheld computers (i.e. PDA's)." (P. 141.)

20

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

Sixth, Patent Owner argues that "[d]ynamically zooming in on a paragraph of text (see: Pad++Tour, p. 89) could not have been performed in response to a mouse-click input" and "[t]apping would be an analogous input to clicking an object with a mouse, not holding a (middle) mouse button down, which was required by Pad++ to dynamically zoom in." (PO Appeal Br. 56.) Similarly, Patent Owner argues that "[t]here is no disclosure in any Pad++ document nor the browser source code itself disclosing the ability to zoom on any HTML element within a Web page by tapping on the HTML element, much less zooming on column (which Pad++ could not interpret) or paragraph by tapping on it." (PO Rebuttal Br. 19–20.) Again, Pad++ Tour explains that "[y]our whole desktop could be zoomable" and "[t]his seems especially attractive for systems which have small screens, such as handheld computers (i.e. PDA's)." (P. 141.) Moreover, one of ordinary skill in the art would recognize that a PDA device would include a pen or pointing device for input.

Last, Patent Owner argues that "Pad++ taught and achieved real-time zooming on a 200 MHz Pentium Pro PC (desktop computer), which included a numeric co-processor" and "[t]he empirical test evidence simulating the zoom performance of Pad++ running on a PDA with a 206MHz Intel SA-1110 processor demonstrates it could not come remotely close to support real-time zooming." (PO Rebuttal Br. 15.) However, Patent Owner's arguments are not commensurate in scope with either claim 64 or claim 66, because the claims do not recite "real-time zooming."

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

Accordingly, we affirm the Examiner's decision to reject claims 64 and 66 under 35 U.S.C. § 103(a) as unpatentable over Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, and Pad++ Tour.

NEW GROUND OF REJECTION UNDER 37 C.F.R. § 41.50(b)

We enter the following new ground of rejection:

Claims 29 and 78 are rejected under 35 U.S.C. § 103(a) as unpatentable over Pad Tour++ and HTML 4.0 Standard.

As discussed previously, in one example of zooming a user interface, entitled "An HTML browser," Pad++ Tour explains the following:

> A zooming version of Mosaic and Netscape?  This is not such a strange idea.  The third example Pad++ application we will look at is a simple Pad++ web browser.
>
> Although the web browser we show here is still fairly primitive, you could imagine a much more advanced version.  Does the idea of using a zoomable Web browser excite you?

(P. 86.)  Pad++ Tour explains the following:

> When you follow a link, the relevant document is loaded into Pad++ and placed on the surface to the right of the original document, at a smaller scale.  Here you can see the 'Pad++: Multiscale interfaces' document loaded beside the home page.
>
> The Pad++ HTML browser will lay out sub-documents in two columns next to the parent document.  Because Pad++ is zoomable, there is always enough space between those two columns for placing further documents reached from those sub-documents!

(P. 93.)

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

HTML 4.0 Standard relates to "[t]he publishing language used by the
World Wide Web is HTML (from HyperText Markup Language)." (§ 2.2.)
In particular, HTML 4.0 Standard explains the following:

> Most people agree that HTML documents should work
> well across different browsers and platforms.  Achieving
> interoperability lowers costs to content providers since they
> must develop only one version of a document.  If the effort is
> not made, there is much greater risk that the Web will devolve
> into a proprietary world of incompatible formats, ultimately
> reducing the Web's commercial potential for all participants.
>
> . . . .
>
> HTML has been developed with the vision that all
> manner of devices should be able to use information on the
> Web: PCs with graphics displays of varying resolution and
> color depths, cellular telephones, hand held devices, devices for
> speech for output and input, computers with high or low
> bandwidth, and so on.

(§ 2.2.1.)  HTML 4.0 Standard further explains that "[s]tyle sheets simplify
HTML markup and largely relieve HTML of the responsibilities of
presentation" and "give both authors and users control over the presentation
of documents – font information, alignment, colors, etc." (§ 2.3.5.)
Moreover, with respect to style sheets, HTML 4.0 Standard explains that
"[s]tyle sheets represent a major breakthrough for Web page designers,
expanding their ability to improve the appearance of their pages." (§ 14.1.)
In particular, HTML Standards explains that a "cascading" style sheet "is the
capability provided by some style sheet languages such as CSS to allow
style information from several sources to be blended together." (*Id.*)

A person of ordinary skill in the art would have recognized that
incorporating the cascading style sheets of HTML 4.0 Standard with the

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

Pad++ HTML browser of Pad++ Tour would have improved Pad++ Tour by providing the advantage of improving the appearance of Web pages, including style information from several sources. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007) ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."). Alternatively, the combination of HTML 4.0 Standard and Pad++ Tour is nothing more than adding the known cascading style sheet of HTML 4.0 Standard with the known HTML browser of Pad++ Tour, to yield predictable results. *See id.* at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

Accordingly, the combination of Pad++ Tour and HTML 4.0 Standard teaches the limitation "wherein the HTML-based Web content includes cascading style sheet content defining layout and presentation attributes for the Web page."

Pursuant to our authority under 37 C.F.R. § 41.50(b), we reject claims 29 and 78 under 35 U.S.C. § 103(a) as unpatentable over Pad++ Tour and HTML 4.0 Standard.

DECISION

We affirm the Examiner's decision to reject claims 64 and 66 under 35 U.S.C. § 103(a) as unpatentable over Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, and Pad++ Tour.

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

We reverse the Examiner's decision not to adopt the rejection of claims 29 and 78 under 35 U.S.C. § 103(a) as being unpatentable over Pad++ Tour and Patent Owner's admitted prior art and enter a new rejection based thereon.

We reject claims 29 and 78 under 35 U.S.C. § 103(a) as unpatentable over Pad++ Tour and HTML 4.0 Standard.


DECISION SUMMARY

In summary:

| Claims Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 64, 66 | 103(a) | Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, and Pad++ Tour | 64, 66 | | |
| 29, 78 | 103(a) | Patent Owner's admitted prior art, Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, JP 169, SVF, VML | | | 29, 78 |
| 29, 78 | 103(a) | Pad++ Tour, HTML 4.0 Standards | | | 29, 78 |

25

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

| 29, 78 | 103(a) | Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, Bray[5] | | | |
|---|---|---|---|---|---|
| 29, 78 | 103(a) | HTML 3.2 Standards, HTML 4.0 Standards, Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, JP 169, SVF, VML[6] | | | |
| 29, 78 | 103(a) | JP 169, Bray, SVF, VML[7] | | | |
| **Overall Outcome** | | | 64, 66 | | 29, 78 |

Pursuant to 37 C.F.R. § 41.77(a), the above-noted reversal of the Examiner's decision not adopting the proposed rejection of claims 29 and 78 constitutes a new ground of rejection and is hereby designated as such. Section 41.77(b) provides that "[a] new ground of rejection . . . shall not be considered final for judicial review." That section also provides that Patent Owner, WITHIN ONE MONTH FROM THE DATE OF THE DECISION, must exercise one of the following two options with respect to the new grounds of rejection to avoid termination of the appeal proceeding as to the rejected claims:

---

[5] Cumulative rejection.
[6] Cumulative rejection.
[7] Cumulative rejection.

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

> (1) *Reopen prosecution.* The owner may file a response
> requesting reopening of prosecution before the examiner. Such
> a response must be either an amendment of the claims so
> rejected or new evidence relating to the claims so rejected, or
> both.

> (2) *Request rehearing.* The owner may request that the
> proceeding be reheard under § 41.79 by the Board upon the
> same record. The request for rehearing must address any new
> ground of rejection and state with particularity the points
> believed to have been misapprehended or overlooked in
> entering the new ground of rejection and also state all other
> grounds upon which rehearing is sought.

In accordance with 37 C.F.R. § 41.79(a)(1), the "[p]arties to the
appeal may file a request for rehearing of the decision within one month of
the date of: . . . [t]he original decision of the Board under § 41.77(a)." A
request for rehearing must be in compliance with 37 C.F.R. § 41.79(b).
Comments in opposition to the request and additional requests for rehearing
must be in accordance with 37 C.F.R. § 41.79(c) & (d), respectively. Under
37 C.F.R. § 41.79(e), the times for requesting rehearing under paragraph (a)
of this section, for requesting further rehearing under paragraph (d) of this
section, and for submitting comments under paragraph (c) of this section
may not be extended.

An appeal to the United States Court of Appeals for the Federal
Circuit under 35 U.S.C. §§ 141-144 and 315 and 37 C.F.R. § 1.983 for an
*inter partes* reexamination proceeding "commenced" on or after November
2, 2002 may not be taken "until all parties' rights to request rehearing have
been exhausted, at which time the decision of the Board is final and

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

appealable by any party to the appeal to the Board." 37 C.F.R. § 41.81.  *See also* MPEP § 2682 (8th ed., Rev. 8, July 2010).

Requests for extensions of time in this *inter partes* reexamination proceeding are governed by 37 C.F.R. § 1.956.  *See* 37 C.F.R. § 41.79.

## TIME PERIOD FOR RESPONSE

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a).  *See* 37 C.F.R. § 1.136(a)(1)(iv).

<u>AFFIRMED</u>
<u>37 C.F.R. § 41.77(b)</u>

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

PATENT OWNER:

LAW OFFICE OF R. ALAN BURNETT
4108 131ST AVE SE
BELLEVUE, WA 98006


THIRD PARTY REQUESTER:

POLSINELLI PC
1000 LOUISIANA STREET, 53rd FLOOR
HOUSTON, TX 77002

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.
Requester and Respondent

v.

SOFTVIEW L.L.C.
Patent Owner and Appellant

———————

Appeal 2022-000716
Reexamination Control 95/000,635
Technology Center 3900
Patent 7,831,926 B2

———————

Before ALLEN R. MacDONALD, ERIC B. CHEN, and
BRIAN J. McNAMARA, *Administrative Patent Judges*.

CHEN, *Administrative Patent Judge*.

DECISION ON REQUEST FOR REHEARING

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

On May 5, 2022, Patent Owner SoftView, L.L.C. requested rehearing under 37 C.F.R. § 41.77(a)(2) and 37 C.F.R. § 41.79(a)(2), of our Decision on Appeal entered April 6, 2022 ("Decision" or "Dec."), in which we affirmed of the Examiner's final decision to reject independent claims 64 and 66, reversed Examiner's decision not to reject dependent claims 29 and 78, and entered a new ground of rejection for claims 29 and 78 under 35 U.S.C. § 103(a).

In response to Patent Owner's request for rehearing, Requester Apple filed written comments, dated June 6, 2022.

The Request for Rehearing is *denied.*

## ANALYSIS

*Claims 29 and 78—Pad++ Tour and Admitted Prior Art*

First, Patent Owner argues "[u]nder 37 CFR 1.948(a)(2) and MPEP § 2617 the Examiner correctly did not adopt the [Requester's] new proposed ground." (Req. Reh'g 1.) However, a request for rehearing must "state with particularity the points believed to have been misapprehended or overlooked" by the Board. 37 C.F.R. § 41.79(b)(1). Patent Owner has not sufficiently explained how the panel's agreement with the Requester's arguments amounts to misapprehending or overlooking Patent Owner's previously presented arguments. Instead, Patent Owner is merely reiterating argument previously presented.

Second, Patent Owner argues "[t]he Mozilla rendering engine, Applicant's Admitted Prior Art (AAPA), cannot be the basis for a ground in an *Inter Partes* Reexamination." (Req. Reh'g. 4.) In particular, Patent

2

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

Owner argues "[t]he Mozilla rendering engine comprises a library of
software modules that are neither patents nor printed publications, and thus
cannot be used as a basis for a ground of rejection in an Inter Partes
Reexamination (whether in the initial request or a subsequent proposal under
a new ground)." (*Id.* at 5.)

Contrary to Patent Owner's arguments, 37 C.F.R. § 1.104(c)(3), states
that "[i]n rejecting claims *the examiner may rely upon admissions by* the
applicant, or *the patent owner in a reexamination proceeding*, as to any
matter affecting patentability and, insofar as rejections in applications are
concerned" (emphasis added). Accordingly, Patent Owner's argument that
Patent Owner's admissions cannot be used as a basis for an obviousness
rejection is legally incorrect.

Third, Patent Owner argues the following: (i) "[t]he publicly
documented evidence of the great difficulties both Microsoft and
Netscape/Mozilla had in implementing CSS in a rendering engine/Web
browser refutes any assertion that implementing CSS in a rendering engine
or Web browser was within the ordinary skill in that art" (Req. Reh'g 6);
(ii) "Wolf further states 'A PHOSITA [person having ordinary skill in the
art] in 2000-2001 would also not attempt to write original code to support
HTML 4, CSS 1, or CSS 2, and there would be no chance such an attempt
would have succeeded without undue experimentation'" (*id.* at 8 (emphasis
omitted)); and (iii) "it took 50+ man-years for highly skilled software
developers and software engineers at Mozilla to implement HTML 4, CSS 1
and parts of CSS 2" (*id.*).

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

With respect to Patent Owner's admissions, page 11 of our Decision states:

> The '926 patent discloses the following:

> > As will be recognized by those skilled in the art, *the functions performed in blocks 150, 152, and 154* [of Figure 5] *are commonly performed by conventional browsers during a pre-rendering process.* In some browsers, *these functions are performed by the Mozilla rendering engine, which comprises open source software that is readily available for use by developers.* At present, the software for the Mozilla rendering engine may be accessed via the Internet at www.mozilla.org. Accordingly, in one embodiment, the present invention uses core functionality provided by the Mozilla rendering engine source code to perform the functions of block 150, 152, and 154.

> (Col. 17, ll. 31–41 (emphases added).)

> > The process is initiated when the proxy server receives the HTML corresponding to the parent document (and frame documents, if appropriate), whereupon *a pre-rendering parsing of the HTML is performed to determine where to place the various objects on the display page in a block 150.* For example, elements such as tables, column definitions, graphic images, paragraphs and line breaks are identified. If frames are included, each frame is examined in the sequential order it appears in the HTML document, or the order in which the HTML documents corresponding to the frames in a frameset are downloaded to the browser.

> (Col. 16, ll. 45–55 (emphasis added).) The Wolf Declaration further states the following:

> > The '926 . . . patent[] disclose[s] using the Mozilla (Gecko) rendering engine during *prerendering processing operations* to parse and process the HTML and CSS source code and generate HTML objects and associated page layout information, including bounding boxes.

4

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

(¶ 17 (emphasis added).)

In general, to be enabling under 35 U.S.C. § 112, a patent application must sufficiently disclose an invention to enable those skilled in the art to make and use it and the Specification need not disclose what is well known in the art. *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1463 (Fed. Cir. 1984).  Moreover, although a prior art patent is presumed to be enabled, such presumption can be rebutted. *In re Sasse*, 629 F.2d 675, 681 (CCPA 1980).  Thus, the '926 patent is presumed to be enabled and need not disclose what is well known in the art by those skilled in the art, including parsing and processing the HTML CSS source code and generate HTML objects in the Mozilla rendering engine. However, Patent Owner's arguments:  (i) directly conflict with the admissions from column 16, lines 45–55 and column 17, lines 31–41 of the '926 patent; and (ii) apparently undermine the presumption of enablement for the '926 patent.

Fourth, Patent Owner argues the following:  (i) "[i]t is irrefutable that Mozilla failed to implement a full-page zooming Web browser on a desktop browser that preserved the original page layout, functionality, and design of HTML-based Web Content until 2007, even though this desired functionality was identified as a feature (to be implemented) in 1999" (Req. Reh'g 8); (ii) "[t]he [Pad++] Tour suggestion provides no evidence a POSITA at the time of the invention would be motivated to even attempt to implement Pad++ on a PDA [personal digital assistant] and would have had a reasonable expectation of success in doing so without undue experimentation" and "Bederson *et al.* abandoned development of the Pad++

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

web browser in 1998 in view of 'great advancements in HTML'" (*id.* at 12);
(iii) "[a]t the time of the invention, there were no open-source browsers that
ran on mobile devices with touch-sensitive displays" (*id.* at 16); (iv)

> [t]his isolated and conclusory statement [from page 141 of
> Pad++ Tour, which states "[t]his seems especially attractive for
> systems which have small screens, such as handheld computers
> (i.e. PDA's)"] is a mere suggestion of a conceptual use of
> Pad++ that is insufficient to constitute a motivation to combine
> Pad++ with a PDA or any mobile device for that matter for the
> purpose of implementing a zoomable browser

(*id.* at 19); and (v) "Pad++ was not designed to run on a PDA" (*id.*).

However, "the test [for obviousness] is what the combined teachings
of the references would have suggested to those of ordinary skill in the art,"
and not "whether the features of a secondary reference may be bodily
incorporated into the structure of the primary reference." *In re Keller*, 642
F.2d 413, 425 (CCPA 1981). Although Patent Owner's evidence may
demonstrate that specific combinations of commercially available
products—HTML, Web browsers (e.g., Netscape Navigator or Microsoft
Internet Explorer), and PDAs (e.g., Nokia, Palm, or Apple Newton devices)
—were not physically compatible in 2000–2001, such evidence does not
overcome the prima facie case of obviousness. As recognized by the
Supreme Court, "[a] person of ordinary skill [in the art] is also a person of
ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550
U.S. 398, 421 (2007). Accordingly, one of ordinary skill in demonstrating
"ordinary creativity" would have reason to consider using or modifying the
technical features of commercially available products or develop
prototypical products, particularly in view of Pad++ Tour's explicit

6

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

suggestion that it "seems especially attractive for systems which have small screens" (p. 19).

Last, Patent Owner argues that "[a]s the '926 patent is now expired, the Phillips standard must be applied in construing the claims for which all rejections are asserted" (Req. Reh'g 13) and "[t]o establish a *prima facie* case of obviousness all limitations must be addressed, and the entirety of the claim must be construed anew under the *Phillips* standard" (*id.* at 14). However, Patent Owner does not propose any constructions or demonstrate how applying any other constructions under the *Phillips* standard would change the outcome. In addition, the claim construction standard could not affect the outcome here because the Board's constructions in *Softview LLC v. Kyocera Corp. and Motorola Mobility LLC*, Nos. IPR2013-00004, Paper 53 (PTAB Mar. 27, 2014) and IPR2013-00257, Paper 12 (PTAB Mar. 27, 2014), both of which also involved the '926 patent, were based on Patent Owner's own explanation of the meaning of the claimed features during prosecution and on Patent Owner's proposed *Phillips* standard claim constructions submitted in connection with *SoftView LLC v. Apple Inc.*, No. l:10-cv-00389 (D. Del. May 10, 2010). Finally, "[t]here has never been a requirement for an examiner to make an on-the-record claim construction of every term in every rejected claim . . . . [A]ll that is required of the [Patent] [O]ffice to meet its prima facie burden of production is to set forth the statutory basis of the rejection and the reference or references relied upon in a sufficiently articulate and informative manner as to meet the notice requirement of [35 U.S.C.] § 132." *In re Jung*, 637 F.3d 1356, 1363 (Fed. Cir. 2011).

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

*Claims 29 and 78—Pad++ Tour and HTML 4.0 Standard*

First, Patent Owner argues that "the Examiner correctly did not adopt the proposed . . . new ground in the RAN [Right of Appeal Notice]." (Req. Reh'g 21.)  In particular, Patent Owner argues that "[t]he Appeal Decision does not address why the Examiner not adopting this proposed new ground was errant but rather just indicates the Examiner's decision is reversed without further explanation" and "[t]he Examiner's actions were proper under 37 CFR [§] 1.948(a)(2) and MPEP § 2617." (*Id.* at 22).  However, as stated on pages 22–24 of our Decision (Dec. 22–24), and as acknowledged by Patent Owner (Req. Reh'g 21), claims 29 and 78 were rejected under 35 U.S.C. § 103(a) pursuant to our authority to enter a new ground of rejection under 37 C.F.R. § 41.50(b).  As such, 37 C.F.R. § 1.948(a)(2) is not applicable.

Second, Patent Owner argues the following:

> [T]he HTML 4.0 Standard does not specify how CSS is implemented, which is defined by separate CSS Standards . . . nor specify "methods" for implementing HTML 4.0.  Third, development of complex software, such as a rendering engine supporting HTML 4.0, is anything but predictable.  The only thing predictable is that it would involve an extraordinary level of experimentation and failure along the way, as would be recognized by a POSITA at the time of the invention.

(Req. Reh'g 23.)  Similarly, Patent Owner argues that "Wolf testified (above) it took highly-skilled developers and software engineers 50+ man years to develop the first version of Gecko, which supported HTML 4.0, CSS 1, and parts of CSS 2" and "[c]onsidering implementation of HTML 4.0 alone (without CSS), there is no evidence a POSITA could have

8

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

implemented HTML 4.0 in anything remotely close to one and a half to two-man years." (*Id.* at 25.)

> Page 23 of our Decision states the following:

> HTML 4.0 Standard further explains that "[s]tyle sheets simplify HTML markup and largely relieve HTML of the responsibilities of presentation" and "give both authors and users control over the presentation of documents – font information, alignment, colors, etc." (§ 2.3.5.) Moreover, with respect to style sheets, HTML 4.0 Standard explains that "[s]tyle sheets represent a major breakthrough for Web page designers, expanding their ability to improve the appearance of their pages." (§ 14.1.) In particular, HTML Standards explains that a "cascading" style sheet "is the capability provided by some style sheet languages such as CSS to allow style information from several sources to be blended together." (*Id.*)

(Dec. 23.) Thus, in a single printed publication, HTML 4.0 Standard provides information with respect to both: (i) HTML documents; and (ii) the improvement of HTML document appearance using cascading style sheets.

In general, a prior art patent is presumed to be enabled, *Sasse*, 629 F.2d at 681, and such prior art patent need not disclose what is well known in the art, *Lindemann*, 730 F.2d at 1463. Similarly, prior art printed publications are presumptively enabling. *In re Antor Media Corp.*, 689 F.3d 1282, 1288 (Fed. Cir. 2012). Accordingly, HTML 4.0 Standard is presumptively enabled and need not disclose what is well known in the art— implementation of CSS in the HTML markup language.

Third, Patent Owner argues that "[the Board] provides no evidence of any consideration regarding the required 'reasonable expectation of success' prong." (Req. Reh'g 23.)

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

> Pages 22–23 of our Decision states:
>
> Pad++ Tour explains the following:
>
>> The Pad++ HTML browser will lay out sub-documents in two columns next to the parent document. Because Pad++ is zoomable, there is always enough space between those two columns for placing further documents reached from those sub-documents!
>>
>> HTML 4.0 Standard relates to "[t]he publishing language used by the World Wide Web is HTML (from HyperText Markup Language)."
>>
>> . . . .
>>
>> HTML 4.0 Standard further explains that "[s]tyle sheets simplify HTML markup and largely relieve HTML of the responsibilities of presentation" and "give both authors and users control over the presentation of documents – font information, alignment, colors, etc." . . . . HTML Standards explains that a "cascading" style sheet "is the capability provided by some style sheet languages such as CSS to allow style information from several sources to be blended together."

(Dec. 22–23 (citations omitted).)  Thus, Pad++ discusses use of an HTML browser on a zooming user interface, and HTML 4.0 Standard discusses the features of the HTML publishing language, including a cascading style sheet.  Because both references relate to HTML, the identical publishing language used by the World Wide Web, the proposed modification of Pad++ with HTML 4.0 Standard would result a reasonable expectation of success.  *See In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (the teachings of the prior art provide a sufficient basis for a reasonable expectation of success).

Last, Patent Owner argues that: (i) "[i]n addition to implementing a zoomable browser supporting HTML 4 and at least CSS 1, the POSITA would need to implement the combination on a mobile device with a touch-

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

sensitive display" and "[n]one of the PDAs and mobile phones of record have sufficient memory to implement a browser supporting HTML 4 and CSS 1 alone" (Req. Reh'g 27); and (ii) "Pad++ had 24 contributors over approximately 4 years" and "all these contributors failed to implement a browser that came close to supporting even HTML 2.0" (*id.* at 28).

Again, "the test [for obviousness] is what the combined teachings of the references would have suggested to those of ordinary skill in the art," and not "whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference." *Keller*, 642 F.2d at 425. Although Patent Owner's evidence may demonstrate that specific combinations of commercially available products—HTML, Web browsers (e.g., Netscape Navigator or Microsoft Internet Explorer), and PDAs (e.g., Nokia, Palm, or Apple Newton devices)—were not physically compatible, such evidence does not overcome the prima facie case of obviousness. As recognized by the Supreme Court, "[a] person of ordinary skill [in the art] is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421. Accordingly, one of ordinary skill in demonstrating "ordinary creativity" would have reason to consider using or modifying the technical features of commercially available products or develop prototypical products.

*Claims 64 and 66—Pad++ Tour*

First, Patent Owner argues the following:

The Examiner's rejection is based on a clearly errant assertion that claims 64 and 66 permit manual/dynamic zooming to be performed following tapping on a column or paragraph. In

11

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

> affirming the Examiner's rejection, the Appeal Decision affirms
> the Examiner's errant claim construction.  If this is not the case,
> Patent Owner respectfully request the Board draw a line in the
> sand and indicate whether any additional operations such as
> manual/dynamic zooming are permitted after the claimed
> tapping operations to obtain the resulting zoomed view on
> columns and paragraphs.

(Req. Reh'g 29; *see also id.* at 32–33.)

However, our Decision did not articulate a claim construction that
"permit[s] manual/dynamic zooming to be performed following tapping on a
column or paragraph," as argued by Patent Owner.  Pages 14–15 of our
Decision states the following:

> The Examiner found that Pad++ Tour, which illustrates
> screen snapshots of both an HTML document and a zoomed-in
> view of the same HTML document, corresponds to the
> limitations:  (i) "enabling a user to view a column of the Web
> content at a higher resolution than a current resolution by
> tapping on the column . . ." and (ii)
>
> > enabling a user to view a paragraph of the Web content at
> > a higher resolution than a current resolution by tapping
> > on the paragraph . . . ."
>
> In particular, the Examiner stated that "the Pad++ Tour
> reference meets the limitation by more specifically showing
> dynamically zooming in . . . on a paragraph of text (see: Pad++
> Tour, p. 89) of an initially displayed HTML document (see:
> Pad++ Tour, p. 87), wherein said paragraph of text is displayed
> across the display."

(Dec. 14–15.)  In other words, according to the Examiner, "zooming" is
performed on the "initially displayed HTML document" in Pad++ Tour to
obtain a "paragraph of text displayed across the display," and thus, Pad++
Tour teaches the limitations "enabling a user to view a column of the Web
content at a higher resolution than a current resolution by tapping on the

12

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

column" and "enabling a user to view a paragraph of the Web content at a higher resolution than a current resolution by tapping on the paragraph." Both of these statements from pages 14–15 of our Decision cite to page 49 of the Right of Appeal Notice and describe the same single zooming operation performed on the same HTML document, and not two separate zooming operations—(i) "tapping on a column or paragraph" followed by (ii) "manual/dynamic zooming"—as argued by Patent Owner.

Second, Patent Owner argues that "now that the '926 patent has expired, the claims must be construed under the *Phillips* standard" and "the entirety of the claims, including independent claim 52 must be construed (all claim elements and limitations)." (Req. Reh'g 29.) As discussed previously, Patent Owner does not propose any constructions or demonstrate how applying any other constructions under the *Phillips* standard would change the outcome. The claim construction standard could not affect the outcome here because the Board's constructions in two related *inter partes* reviews, both of which also involved the '926 patent, were based on Patent Owner's own explanation of the meaning of the claimed features during prosecution and on Patent Owner's proposed *Phillips* standard claim constructions submitted in connection with a previously litigated case district court. Also discussed previously, "[t]here has never been a requirement for an examiner to make an on-the-record claim construction of every term in every rejected claim . . . . [A]ll that is required of the [Patent] [O]ffice to meet its prima facie burden of production is to set forth the statutory basis of the rejection and the reference or references relied upon in

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

a sufficiently articulate and informative manner as to meet the notice

requirement of [35 U.S.C.] § 132." *Jung*, 637 F.3d at 1363.

> Third, Patent Owner argues the following:

> The display [illustrated on page 93 of Pad++ Tour] is NOT re-
> rendered such that content corresponding to the selected paragraph is
> displayed across the touch-sensitive display. Manual/dynamic
> zooming doesn't select anything. Rather, it zooms the entire Pad++
> substrate based on where the mouse cursor is. And the Web page
> content shown is clearly not displayed across the display.

(Req. Reh'g 35–36 (emphasis omitted); *see also id.* at 40–43.) Similarly,

Patent Owner argues that:

> This assertion [from page 18 of our Decision] is false:
> "the sub-document "Abstract: Pad++: Advances in Multiscale
> Interfaces" is zoomable, such that the text fills the screen
> horizontally and displays a paragraph (e.g., title, authors, and
> keywords of a technical publication);". First, in this example
> the text clearly does not fill the screen horizontally. It might fill
> approximately 80% of the Window used for the Pad++
> application, but it does not fill the screen horizontally.

(Req. Reh'g 36.)

> From Pad++ Tour, the HTML document, entitled "Abstract: Pad++:

Advances in Multiscale Interfaces" (p. 93), is reproduced below with

additional annotations—an ellipse to indicate the "selected paragraph" and a

double-sided arrow to indicate "width . . . of a display area":

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2



*The above figure illustrates Pad++ displaying an HTML document.*

As discussed on page 17 of our Decision (Dec. 17), Pad++ Tour explains that "[w]hen you *click on a piece of text*, Pad++ zooms in so that [the] *text fills the screen horizontally and appears near the top of the screen vertically*" (p. 54 (emphasis added).) This description from Pad++ Tour is illustrated in the above figure, in which the "piece of text . . . appears near the top of the screen" is indicated by the ellipse (e.g., "Abstract: Pad++: Advances to Multiscale Interfaces") and the "text [that] fills the screen horizontally" is indicated by the double-sided arrow. Accordingly, Patent Owner's arguments are contradicted by Pad++ Tour. Moreover, although Patent Owner argues that "[text] might fill approximately 80% of the Window used for the Pad++ application, but it does not fill the screen horizontally," independent claims 64 and 66 recite "displayed across at least one of a width . . . of a display area" and does not required filling the width of "the touch-sensitive display."

15

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

Fourth, Patent Owner argues that "[t]he Pad++ outline, which is referred to as 'An outline viewer,' is discussed and illustrated three times in the Tour document." (Req. Reh'g 36.) In particular, Patent Owner argues the following:

> The outline viewer is not the Web browser. This functionality (when you click on a piece of text, Pad++ zooms in so that that text fills the screen horizontally and appears near the top of the screen vertically) is provided by the outline viewer. It is not supported in the Web browser.

(*Id.* at 38.)

However, Pad++ Tour explains that "[o]nce you add zooming to a user interface, new kinds of interactions are possible" and "[t]he following sections introduce three sample applications that we have developed which use zooming" (p. 49): (1) "[a]n outline viewer" (*id.*); (2) "[a] file browser" (p. 73); and (3) "[a]n HTML browser" (p. 86). Our Decision relies upon the third application of zooming, the "HTML browser," rather than the "outline viewer," as argued by Patent Owner.

Fifth, Patent Owner argues that "under a touchscreen graphical user interface (GUI) such as implemented on a mobile device, it is not possible to select any object within a Web page, regardless of type, without a bounding box for the object" and "Pad++ used the anchor tag bounding boxes to enable selection of hyperlinks (as do all Web browsers) and the bounding box for the HTML object to enable selection of the entire page." (Req. Reh'g 44.)

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

However, Patent Owner previously presented the same argument in its Appeal Brief, arguing the following:

> Pad++ does not generate a bounding box for a paragraph. Pad++ does not teach or suggest zooming on any HTML object in a Web page (MSML is not HTML), much less an HTML paragraph that Pad++ never generates a bounding box for nor would benefit from generating such a bounding box.

(PO Appeal Br. 49.) Similarly, Patent Owner previously presented the same argument in its Rebuttal Brief, arguing the following:

> Also, Pad++ does not include a Pad++ paragraph object nor generate a bounding box for a paragraph. Rather, the Pad++ parser, upon encountering a paragraph start tag (<p>) generates individual lines of text comprising Pad++ text objects spanning the width of the browser window until encountering a subsequent tag.

(PO Rebuttal Br. 14.) Patent Owner's previously presented arguments were addressed on page 20 of our Decision—"Patent Owner's arguments are not commensurate in scope with either claim 64 or claim 66, because the claims do not recite 'bounding box.'" Again, Patent Owner is reiterating arguments previously presented, and accordingly, Patent Owner has failed to "state with particularity the points believed to have been misapprehended or overlooked" by the Board as required by 37 C.F.R. § 41.79(b)(1).

Sixth, Patent Owner argues the following:

> Pad++ teaches . . . holding down the middle mouse button zooms the Pad++ substrate such that all Pad++ objects are zoomed together – the zoom level of all content is changed as if you had a huge stretchable rubber-like sheet. . . . This is not using a mouse click input or something that could be equated to tapping. The user interactively controls the amount of zoom via use of real-time animation as the zoom is performed; when the

17

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

> desired zoom level is displayed, the user releases the mouse
> button, and the zoom stops.

(Req. Reh'g 46.)  However, Patent Owner previously presented the same

argument in its Appeal Brief, arguing the following:

> Dynamically zooming in on a paragraph of text (see:
> Pad++Tour, p. 89) could not have been performed in response
> to a mouse-click input.  Rather, to obtain this view, the user
> would have needed to hold down the middle mouse button.
> Tapping would be an analogous input to clicking an object with
> a mouse, not holding a (middle) mouse button down, which was
> required by Pad++ to dynamically zoom in.

(PO Appeal Br. 56.)  Patent Owner's previously presented arguments were

addressed on page 20 of our Decision:

> Pad++ Tour explains that "[y]our whole desktop could be
> zoomable" and "[t]his seems especially attractive for systems
> which have small screens, such as handheld computers (i.e.
> PDA's)." (P. 141.)  Moreover, one of ordinary skill in the art
> would recognize that a PDA device would include a pen or
> pointing device for input.

Again, Patent Owner is reiterating arguments previously presented, and

accordingly, Patent Owner has failed to "state with particularity the points

believed to have been misapprehended or overlooked" by the Board as

required by 37 C.F.R. § 41.79(b)(1).

> Seventh, Patent Owner argues the following:

> [T]his [real-time zooming] would require support for real-time
> interactive display of Web pages on a PDA; however even if
> Pad++ could be implemented on a PDA with the fastest
> processor available at the time of the invention the (Intel SA-
> 1110 processor) user could not control the zoom level using
> "manual" zooming.  Bederson himself failed to implement
> manual/dynamic zooming using "Piccolo" in 2002, deeming
> "the animations were so slow as to make it unusable."

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

(Req. Reh'g 46 (emphasis omitted).)

However, Patent Owner previously presented the same argument in its Rebuttal Brief, arguing the following:

> Pad++ taught and achieved real-time zooming on a 200 MHz Pentium Pro PC (desktop computer), which included a numeric co-processor (aka floating point unit (FPU)). The empirical test evidence simulating the zoom performance of Pad++ running on a PDA with a 206 MHz Intel SA-1110 processor demonstrates it could not come remotely close to support real time zooming.

(PO Rebuttal Br. 15.) Patent Owner's previously presented arguments were addressed on page 21 of our Decision—"Patent Owner's arguments are not commensurate in scope with either claim 64 or claim 66, because the claims do not recite 'real-time zooming.'" Again, Patent Owner is reiterating arguments previously presented, and accordingly, Patent Owner has failed to "state with particularity the points believed to have been misapprehended or overlooked" by the Board as required by 37 C.F.R. § 41.79(b)(1).

Last, Patent Owner argues that "[a]ppealed claim 29 recites identical language as claim 29 in Reexamination Request No. 90/009,995, which was determined to be patentable as indicated in the *Ex Parte* Reexamination Certificate 11956th for 7,831,926 issued on December 6, 2021." (Req. Reh'g 47.) Accordingly, Patent Owner argues that "rejecting claims that have already been confirmed by the PTO in parallel reexamination over substantially identical art and substantially identical rebuttal evidence is arbitrary and capricious and in violation of 5 U.S.C. § 706." (*Id.* at 48.)

In a previous *ex parte* reexamination, referenced by Patent Owner, *Ex parte Softview LLC*, No. 2019-001127, 2020 WL 2217051, at *15 (PTAB May 1, 2020), *aff'd*, 847 F. App'x 930 (Fed. Cir. 2021), we reversed the

19

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

Examiner's decision to reject dependent claim 29 under 35 U.S.C. § 103(a) over Pad++, SVF, and Bray. In particular, we concluded that although the Examiner established a prima facie case of obviousness, the Examiner did not consider Patent Owner's rebuttal evidence. (*Id.*)

In our current Decision, we reversed the Examiner's decision not to adopt the rejection of claim 29 under 35 U.S.C. § 103(a) as being unpatentable over Pad++ Tour and Patent Owner's admitted prior art, and pursuant to our authority under 37 C.F.R. § 41.50(b), we rejected claim 29 under 35 U.S.C. § 103(a) as unpatentable over Pad++ Tour and HTML 4.0 Standard. Patent Owner's admitted prior art and HTML 4.0 Standard were not of record in the previous *ex parte* reexamination and thus, Patent Owner's characterization of "parallel reexamination[s] over substantially identical art" is inaccurate. Accordingly, a patentability determination of claim 29 from the previous *ex parte* reexamination is not inconsistent with the rejections in the current *inter partes* reexamination of claim 29 over various combinations of Pad++ Tour, Pad Patent Owner's admitted prior art, and HTML 4.0 Standard because the two reexamination proceedings apply different prior art references and are based on different records. *Stevenson v. Sears Roebuck Co.*, 713 F.2d 705, 710 (Fed. Cir. 1983) ("[T]he prior holding of validity is not necessarily inconsistent with the subsequent holding of invalidity" due to "different prior art references or different records.").

CONCLUSIONS

The Request for Rehearing has been considered and is *denied*.

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

Outcome of Decision on Rehearing:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Denied | Granted |
|---|---|---|---|---|
| 64, 66 | 103(a) | Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, Pad++ Tour | 64, 66 | |
| 29, 78 | 103(a) | Patent Owner's admitted prior art, Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, Pad++ Tour, JP 169, SVF, VML | 29, 78 | |
| 29, 78 | 103(a) | Pad++ Tour, HTML 4.0 Standards | 29, 78 | |
| **Overall Outcome** | | | 29, 64, 66, 78 | |

Final Outcome of Appeal after Rehearing:

| Claim Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 64, 66 | 103(a) | Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, and Pad++ Tour | 64, 66 | | |
| 29, 78 | 103(a) | Patent Owner's admitted prior art, | | | 29, 78 |

21

Appeal 2022-000716
Reexamination Control 95/000,635
Patent 7,831,926 B2

| | | Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, Pad++ Tour, JP 169, SVF, VML | | | |
|---|---|---|---|---|---|
| 29, 78 | 103(a) | Pad++ Tour, HTML 4.0 Standards | | | 29, 78 |
| **Overall Outcome** | | | 64, 66 | | 29, 78 |

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a)(1)(iv).


## REHEARING DENIED


PATENT OWNER:

LAW OFFICE OF R. ALAN BURNETT
4108 131ST AVE SE
BELLEVUE, WA 98006


THIRD PARTY REQUESTER:

POLSINELLI PC
1000 LOUISIANA STREET, 53rd FLOOR
HOUSTON, TX 77002

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

MOTOROLA MOBILITY, L.L.C.
Requester and Respondent

v.

SOFTVIEW L.L.C.
Patent Owner and Appellant

————————

Appeal 2022-000154
Reexamination Control 95/002,126
Technology Center 3900
Patent 7,831,926 B2

————————

Before ALLEN R. MacDONALD, ERIC B. CHEN, and
BRIAN J. McNAMARA, *Administrative Patent Judges.*

CHEN, *Administrative Patent Judge.*

DECISION ON APPEAL[1]

---

[1] Related Appeal No. 2022-000716 (Reexamination Control No.
95/000,635) is directed to a reexamination of the same patent as this appeal.
(PO Appeal Br. 1.) This appeal and its related appeal are directed to the
same issues. These appeals are decided concurrently.

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

Patent Owner SoftView, L.L.C. appeals under 35 U.S.C. § 134(b) and 35 U.S.C. § 315(a) (pre-AIA) the Examiner's final decision to reject independent claims 64 and 66. The Examiner confirmed the patentability of claims 29 and 78. Claims 30, 31, 40, 41, 43, 52, 55, 59, 72 and 75 were cancelled in a previous *inter partes* review proceeding. Claims 1–28, 32–39, 42, 44–51, and 69 were cancelled in a previous *ex parte* reexamination proceeding. Claim 70 was cancelled in the current proceeding. The rejections of claims 53–63, 65, 67, 68, 71, 73, 74, 76, 77, and 79–88 were not appealed.

Requester Motorola Mobility appeals the Examiner's decision not to reject claims 29 and 78 under certain grounds proposed by Requester.

A video conference hearing was held on January 6, 2022, with both parties in attendance. The record includes a written transcript of the oral hearing.

We AFFIRM and enter new grounds of rejection.

## STATEMENT OF THE CASE

A previous request for *ex parte* reexamination of U.S. Patent No. 7,831,926 B2 (the '926 patent) was filed on May 29, 2012, and assigned Reexamination Control No. 90/009,995. The Examiner's decision to reject claims 1–28, 32–39, 42, 44–51, and 69 was affirmed, but the Examiner's decision to reject claim 29 was reversed. *Ex Parte Softview LLC*, No. 2019-001127 (PTAB May 1, 2020), *aff'd*, 847 F. App'x. 930 (Fed. Cir. 2021). The reexamination proceeding resulted in the issuance of an *Ex Parte* Reexamination Certificate (11956th) on December 6, 2021, US 7,831,926

2

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

C1, in which claims 1–28, 32–39, 42, 44–51, and 69 were cancelled, but the patentability of claim 29 was confirmed.

A subsequent request for *inter partes* reexamination of the '926 patent, assigned Reexamination Control No. 95/002,126, was filed on August 31, 2012, by Third-Party Requester Motorola Mobility.

The '926 patent, entitled "Scalable Display of Internet Content on Mobile Devices," issued November 9, 2010 to Gary B. Rohrabaugh and Scott A. Sherman, based on Application No. 11/738,486, filed April 21, 2007.

The '926 patent is said to be a continuation of Application No. 09/878,097, filed June 8, 2001, now U.S. Patent No. 7,210,099, which is a continuation-in-part of Application No. 09/828,511, filed April 7, 2001, now abandoned. The '926 patent is also said to claim priority to U.S. Provisional Application No. 60/211,019, filed June 12, 2000, and U.S. Provisional Application No. 60/217,345, filed July 11, 2000.

The '926 patent is said to be assigned to SoftView, L.L.C., the real party in interest. (Appeal Br. 1.)

## *Patent Owner's Invention*

Patent Owner's invention relates to mobile devices that are enabled to support resolution-independent scalable display of Internet (Web) content, allowing Web pages to be scaled (zoomed) and panned for better viewing on smaller screen sizes. (Abstract.)

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

*Related Litigation*

The '926 patent and related U.S. Patent 7,461,353 B2[2] has been asserted in *SoftView LLC v. Apple Inc.*, No. 1:10-cv-00389 (D. Del. May 10, 2010) and *SoftView LLC v. HTC Corp.*, No. 1:12-cv-00984 (D. Del. July 26, 2012). (Appeal Br. 1–2.)

The '926 patent was also subject to *inter partes* review in *Softview LLC v. Kyocera Corp. and Motorola Mobility LLC*, Nos. IPR2013-00004 and IPR2013-00257 (PTAB Mar. 27, 2014), *aff'd*, 592 F. App'x 949 (2015). As a result of this *inter partes* review, claims 30, 31, 40, 41, 43, 52, 55, 59, 72 and 75 were cancelled.

*The Claims*

Claims 1 (cancelled), 29, 64, and 66 are illustrative of the claimed subject matter, with disputed limitations in italics:

    1.    (Cancelled) A mobile device, comprising:

a processor,

a wireless communications device operatively coupled to the processor, to facilitate communication with a network via which Web content may be accessed;

a touch-sensitive display;

a memory, operatively coupled to the processor; and

storage means, operatively coupled to the processor, in which a plurality of instructions are stored that when executed

---

[2] Also subject to *inter partes* review in *Softview LLC v. Kyocera Corp. and Motorola Mobility LLC*, Nos. IPR2013-00007 and IPR2013-00256 (PTAB Mar. 27, 2014), *aff'd*, 592 F. App'x 947 (Fed. Cir. 2015), and subject to multiple *ex parte* and *inter partes* reexaminations (Application Nos. 90/009,994, 95/000,634, and 95/002,132).

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

by the processor enable the mobile phone to perform operations including,

enabling a user to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

retrieving HTML-based Web content associated with the Web page;

translating the HTML-based Web content to produce scalable vector-based page layout information;

employing the scalable vector-based page layout information and/or data derived therefrom to,

render a view of at least a portion of the Web page on the touch-sensitive display using a first scale factor; and

re-render the Web page in response to associated user inputs to enable a user to iteratively zoom in and out views of the Web page on the display while preserving the original page layout, functionality, and design of the content on the Web page defined by the HTML based Web content, wherein preservation of the functionality defined by the HTML-based content includes preservation of hyperlink functionality.

29.    The mobile device of claim 1, wherein the HTML-based Web content includes cascading style sheet content defining layout and presentation attributes for the Web page.

64.    A mobile device, comprising:

a processor,

wireless communications means, to facilitate wireless communication with a network via which Web content may be accessed;

a touch-sensitive display;

flash memory, operatively coupled to the processor, in which a plurality of instructions are stored that when executed

5

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

by the processor enable the mobile device to perform operations including,

rendering a browser interface via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

retrieving and processing the HTML-based Web content to produce scalable content; and

employing the scalable content and/or data derived therefrom to, render a view of the Web page on the touch-sensitive display; and

re-render the Web page in response to associated user inputs to enable the user to iteratively zoom in and out views of the Web page while preserving an original page layout, functionality, and design defined by the HTML-based Web content as interpreted by a rendering engine,

wherein preservation of the functionality defined by the HTML-based Web content includes preservation of hyperlink functionality, and wherein execution of the instructions performs further operations comprising enabling a user to view a paragraph of the Web content at a higher resolution than a current resolution by tapping on the paragraph via the touch-sensitive display, wherein in response thereto, *the display is re-rendered such that content corresponding to the selected paragraph is displayed across at least one of a width and height of a display area of the touch-sensitive display.*

66.    A mobile device, comprising:

a processor,

wireless communications means, to facilitate wireless communication with a network via which Web content may be accessed;

a touch-sensitive display;

flash memory, operatively coupled to the processor, in which a plurality of instructions are stored that when executed

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

by the processor enable the mobile device to perform operations including,

rendering a browser interface via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

retrieving and processing the HTML-based Web content to produce scalable content; and

employing the scalable content and/or data derived therefrom to, render a view of the Web page on the touch-sensitive display; and

re-render the Web page in response to associated user inputs to enable the user to iteratively zoom in and out views of the Web page while preserving an original page layout, functionality, and design defined by the HTML-based Web content as interpreted by a rendering engine,

wherein preservation of the functionality defined by the HTML-based Web content includes preservation of hyperlink functionality, and wherein execution of the instructions performs further operations comprising enabling a user to view a paragraph of the Web content at a higher resolution than a current resolution by tapping on the paragraph via the touch-sensitive display, wherein in response thereto, *the display is re-rendered such that content corresponding to the selected paragraph is displayed across at least one of a width and height of a display area of the touch-sensitive display.*

REFERENCES

| Name | Reference | Date |
|---|---|---|
| Benjamin B. Bederson & James D. Hollan ("Bederson-1") | Pad++: *A Zoomable Graphical Interface System*, CHI '95 MOSAIC OF CREATIVITY | 1995 |

7

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

| Benjamin B. Bederson & George W. Furnas ("Bederson-2") | *Space-Scale Diagrams: Understanding Multiscale Interfaces*, CHI '95 Proceedings | 1995 |
|---|---|---|
| Benjamin B. Bederson et al. ("Bederson-3") | *A Zooming Web Browser*, 2667 SPIE 260–71 | 1995 |
| Ben Bederson & Jon Meyer ("Bederson-4") | *Implementing a Zooming User Interface: Experience Building Pad ++*, 28 SOFTWARE–PRACTICE & EXPERIENCE 1101–35 | 1998 |
| Benjamin B. Bederson et al. ("Bederson-5") | *Pad++: A Zoomable Graphical Sketchpad for Exploring Alternate Interface Physics*, 7 J. VISUAL LANGUAGES & COMPUTING 3–31 | 1996 |
| Jonathan Meyer ("Pad++ Tour") | A Brief Tour Through Pad++ | 1997 |
| Dave Raggett ("HTML 3.2 Standard") | HTML 3.2 Specification, World Wide Web Consortium (W3C) | Jan. 14, 1997 |
| Dave Raggett, Arnaud Le Horn, and Ian Jacobs, eds. ("HTML 4.0 Standard") | HTML 4.0 Specification, World Wide Web Consortium (W3C) | Dec. 18, 1997 |
| Tim Bray ("Bray") | *XML support in IE5*, XLM.com | Mar. 18, 1999 |
| Brian Matthews et al. ("VML") | *Vector Markup Language (VML)*, World Wide Web Consortium Note, Note-VML-19980513 | May 13, 1998 |
| SoftSource, LLC ("SVF") | Specification for the Simple Vector Format v. 1.1 | Jan. 15, 1995 |
| SoftSource, LLC ("SVF Press 1") | New CAD System Works With AutoCAD Drawings Without Translation | June 17, 1996 |

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

| SoftSource, LLC ("SVF Press 2") | Bring New CAD Viewing Power to the Internet | Mar. 4, 1996 |
| Hara et al. ("JP 169") | JP H10-326169 | Dec. 8, 1998 |

*The Non-Adopted Rejections*

Requester appeals the Examiner's decision not to adopt the following proposed rejections:

1. Claims 29 and 78 as unpatentable under 35 U.S.C. § 103 over Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, Pad++ Tour, and Bray.

2. Claim 29 as unpatentable under 35 U.S.C. § 103 over Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, Pad++ Tour, Bray, and either SVF or VML.

3. Claim 29 as unpatentable under 35 U.S.C. § 103 over JP 169, Bray, and either SVF or VML.

4. Claims 29 and 78 as unpatentable under 35 U.S.C. § 103 over various combinations of HTML 3.2 Standards, HTML 4.0 Standards, Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-1, Pad++ Tour, JP 169, SVF, and VML.

5. Claims 29 and 78 as unpatentable under 35 U.S.C. § 103 over various combinations of Patent Owner's admitted prior art, Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, Pad++ Tour, JP 169, SVF, and VML.

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

6.  Claims 29 and 78 under 35 U.S.C. § 112, first paragraph as failing to comply with the written description and enablement requirements.[3]

*The Rejections*

Patent Owner appeals the Examiner's decision to reject the following pending claims:

Claims 64 and 66 stand rejected under 35 U.S.C. § 103 over Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, and Pad++ Tour.[4]

Patent Owner also relied upon the following in rebuttal to the Examiner's rejections:

Declaration under 37 C.F.R. § 1.132 of Wolf (formerly Scott Collins), dated June 7, 2017 (Patent Owner Ex. A).

Declaration under 37 C.F.R. § 1.132 of Michael L. Howard, November 16, 2016 (Patent Owner Ex. B).

ANALYSIS

*Requester's Appeal—Claims 29 and 78*

The Examiner did not adopt Requester's proposed rejection of claims 29 and 78 as unpatentable under 35 U.S.C. § 103(a) over Pad++ Tour

---

[3]  Claims 29, 64, 66, and 78 were not amended to include additional subject matter.  Accordingly, a rejection under 35 U.S.C. § 112, first paragraph is improper.  37 C.F.R. § 1.906 ("Claims in an *inter partes* reexamination proceeding will be examined on the basis of patents or printed publications and, with respect to subject matter added or deleted in the reexamination proceeding, on the basis of the requirements of 35 U.S.C. 112.").
[4]  The Examiner inadvertently omitted Pad++ Tour from the statement of the rejection.  (RAN 79–81.)

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

and Patent Owner's admitted prior art (RAN 35–36), in which Requester
argued that "[t]he '926. . . Patent[] also admit[s] that the Mozilla rendering
engine was in the prior art" and "the Mozilla (Gecko) rendering engine
during pre-rendering processing operations to parse and process the HTML
and CSS source code" (Requester Comments 19, filed July 28, 2017).  We
do not agree with the Examiner's determination.

     The '926 patent discloses the following:

> As will be recognized by those skilled in the art, *the
> functions performed in blocks 150, 152, and 154* [of Figure 5]
> *are commonly performed by conventional browsers during a
> pre-rendering process.*  In some browsers, *these functions are
> performed by the Mozilla rendering engine, which comprises
> open source software that is readily available for use by
> developers.*  At present, the software for the Mozilla rendering
> engine may be accessed via the Internet at www.mozilla.org.
> Accordingly, in one embodiment, the present invention uses
> core functionality provided by the Mozilla rendering engine
> source code to perform the functions of block 150, 152, and
> 154.

(Col. 17, ll. 31–41 (emphases added).)

>      The process is initiated when the proxy server receives
> the HTML corresponding to the parent document (and frame
> documents, if appropriate), whereupon *a pre-rendering parsing
> of the HTML is performed to determine where to place the
> various objects on the display page in a block 150.*  For
> example, elements such as tables, column definitions, graphic
> images, paragraphs and line breaks are identified. If frames
> are included, each frame is examined in the sequential order it
> appears in the HTML document, or the order in which the
> HTML documents corresponding to the frames in a frameset
> are downloaded to the browser.

(Col. 16, ll. 45–55 (emphasis added).)

     The Wolf Declaration further states the following:

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

> The '926 . . . patent[] disclose[s] using the Mozilla
> (Gecko) rendering engine during *prerendering processing*
> *operations* to parse and process the HTML and CSS source
> code and generate HTML objects and associated page layout
> information, including bounding boxes.

(¶ 17 (emphasis added).)

In view of Patent Owner's disclosure in the '926 patent that: (i) "a pre-rendering parsing of the HTML is performed to determine where to place the various objects on the display page in a block 150"; (ii) the function performed in block 150, pre-rendering parsing of HTML, is "commonly performed by conventional browsers"; and (iii) Patent Owner's declaration evidence that pre-rendering processing operations parse and process the HTML and CSS source code, the '926 patent admits that the limitation "wherein the HTML-based Web content includes cascading style sheet content defining layout and presentation attributes for the Web page" was well-known to one of ordinary skill in the art.

Patent Owner argues the following:

> Respondent [Patent Owner] has provided substantial
> evidence (both via declarations of Wolf and Howard and based
> on historical and published experience) that adding CSS
> support to an existing (at that time) browser would be well
> outside the skill of a PHOSITA. In . . . Section V, Wolf argues
> a PHOSITA could not modify Pad++ to support existing HTML
> and CSS standards without under experimentation, would have
> no motivation to attempt to do so, nor have any reasonable
> expectation of success.

(PO Respondent Br. 21.) In particular, Patent Owner points to paragraph 26 of the Wolf Declaration, which states the following:

> A PHOSITA in 2000-2001 could not have modified
> Pad++ to implement the numerous unsupported HTML

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

> elements to produce an HTML 3.2 browser, much less an
> HTML 4/4.01 browser. The Pad++ browser employed a simple
> single-pass HTML parser that generated PAD++ objects for a
> handful of HTML tags, and did not implement dozens of
> HTML tags, including tags that are fundamental to page layout
> such as tables, divs, and spans. It also had no CSS support. A
> PHOSITA in 2000-2001 would also not attempt to write
> original code to support HTML 4, CSS 1, or CSS 2, and there
> would be no chance such an attempt would have succeeded
> without undue experimentation. As discussed above, it took a
> team of highly-skilled developers and software engineers 50+
> man-years to develop the first version of Gecko that was
> released in a commercial Web browser (Netscape Navigator 6
> in November, 2000).

(¶ 26.)  However, Patent Owner's arguments are not commensurate in scope with claim 29, because the claim neither recites a specific HTML version nor a specific CSS version. In addition, in direct contradiction to Patent Owner's argument that "a PHOSITA could not modify Pad++ to support existing HTML and CSS standards . . . [and] would have no motivation to attempt to do so," Wolf also states that "[i]n the 2000-2001 timeframe, anyone (or company) developing a Web browser would want to have the browser comply with HTML 4/4.01 and relevant portions of CSS 1 and CSS 2" (¶ 15). Although we recognize Wolf's statement that "it took a team of highly-skilled developers and software engineers 50+ man-years to develop the first version of Gecko," such statement applies to the specific situation of implementing HTML 4.0 with CCS 2.

Patent Owner further argues the following:

> Respondent [Patent Owner] has provided irrefutable
> evidence that highly-skilled engineers at Mozilla were unable to
> implement a desktop browser supporting full-page zooming
> until 2007. Mozilla's "Minimo" mobile browser did not

13

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

> preserve the original page layout or design. Appellant's
> [Requester] assertions that a PHOSITA, at the time of the
> invention, could have done on a mobile device what Mozilla
> failed to do on a desktop until 2007 and did not do on a mobile
> device is not supported by any factual evidence.

(PO Respondent Br. 29.) In particular, Patent Owner points to paragraph 26

of the Howard Declaration, which states the following:

> Mozilla did not fully implement a browser on a PDA or
> mobile phone until at least 2004, and this implementation did
> not preserve the original page layout or design. This
> development was under the Mini-Mozilla ("Minimo") project.

(¶ 87.) However, Pad++ Tour expressly states that "[y]our whole desktop

could be zoomable" and "[t]his seems especially attractive for systems

which have small screens, such as handheld computers (i.e. PDA's)."

(P. 141.) Although we recognize that "Mozilla did not fully implement a

browser on a PDA or mobile phone until at least 2004," such evidence does

not necessarily mean that one of ordinary skill in the art would have

excluded all web browsers from the implementation on a PDA or mobile

phone.

Accordingly, we reverse the Examiner's decision not to reject claims

29 and 78 under 35 U.S.C. § 103(a) over Patent Owner's admitted prior art

and Pad++ Tour and we enter a new ground of rejection based thereon.

We do not reach the cumulative rejections of claims 29 and 78 under

35 U.S.C. § 103(a) because it is unnecessary to reach the propriety of the

Examiner's decision not to reject these claims on a different basis. *Cf. In re

Gleave*, 560 F.3d 1331, 1338 (Fed. Cir. 2009) (not reaching additional

obviousness rejections).

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

*Patent Owner's Appeal—Claims 64 and 66*

The Examiner found that Pad++ Tour, which illustrates screen snapshots of both an HTML document and a zoomed-in view of the same HTML document, corresponds to the limitations:  (i) "enabling a user to view a column of the Web content at a higher resolution than a current resolution by tapping on the column . . . the display is re-rendered such that content corresponding to the selected column is displayed across the touch-sensitive display," as recited in independent claim 64; and (ii) "enabling a user to view a paragraph of the Web content at a higher resolution than a current resolution by tapping on the paragraph . . . the display is re-rendered such that content corresponding to the selected paragraph is displayed across at least one of a width and height of a display area of the touch-sensitive display."  (RAN 80.)  In particular, the Examiner stated that "the Pad++ Tour reference meets the limitation by more specifically showing dynamically zooming in  . . . on a paragraph of text (see: Pad++ Tour, p. 89) of an initially displayed HTML document (see: Pad++ Tour, p. 87), wherein said paragraph of text is displayed across the display."  (*Id.*)  Requester agrees and argues that "[c]olumns and paragraphs were HTML elements well-known to those of ordinary skill in the art" (Requester Respondent Br. 23) and "Pad++ teaches clicking on an object and having it fill the screen" (*id.* at 24).  We agree with the Examiner's determination.

Pad++ Tour relates to a computer screen having a zoomable surface, "[f]or example, several million pages of text could be fit on the surface by reducing it sufficiently in scale, making any number of on-line information services, encyclopedias, etc., directly available."  (P. 2.)  In one example of

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

zooming a user interface, entitled "An HTML browser," Pad++ Tour

explains the following:

> A zooming version of Mosaic and Netscape?  This is not
> such a strange idea.  The third example Pad++ application we
> will look at is a simple Pad++ web browser.

> Although the web browser we show here is still fairly
> primitive, you could imagine a much more advanced version.
> Does the idea of using a zoomable Web browser excite you?

(P. 86.)

In two unreferenced figures, reproduced below, Pad++ Tour depicts

screen snapshots of:  (i) "Pad++: Multiscale interfaces" HTML document

(annotated with an arrow) loaded next to the regularly sized HTML

document entitled "Ben Bederson's Home Page" (p. 91) and (ii) the

zoomed-in view of the same HTML document, entitled "Abstract:  Pad++:

Advances in Multiscale Interfaces" (p. 93):



Appx0067

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2



In particular, Pad++ Tour explains the following:

> When you follow a link, the relevant document is loaded
> into Pad++ and placed on the surface to the right of the original
> document, at a smaller scale. Here you can see the 'Pad++:
> Multiscale interfaces' document loaded beside the home page.
>
> The Pad++ HTML browser will lay out sub-documents in
> two columns next to the parent document. Because Pad++ is
> zoomable, there is always enough space between those two
> columns for placing further documents reached from those sub-
> documents!

(P. 91.) Pad++ Tour also explains that "[w]hen you click on a piece of text,

Pad++ zooms in so that that text fills the screen horizontally and appears

near the top of the screen vertically." (P. 54.)

Moreover, Pad++ Tour explains the following:

> Pad++ could also be viewed as a way to implement an
> alternative windowing system based on zooming. Your whole
> desktop could be zoomable. This seems especially attractive
> for systems which have small screens, such as handheld
> computers (i.e. PDA's).

17

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

(P. 141.) Moreover, one relevant definition of a "PDA" (personal digital assistant) is "[a] lightweight palmtop computer designed to provide specific functions like personal organization (calendar, note taking, database, calculator, and so on) as well as communications," such that "[m]any PDA devices rely on a pen or other pointing device for input instead of a keyboard or mouse."[5]

Because Pad++ Tour explains that: (i) clicking on the "Pad++: Multiscale interfaces" link on "Ben Bederson's Home Page" lays out the sub-document next to the parent document; (ii) the sub-document "Abstract: Pad++: Advances in Multiscale Interfaces" is zoomable, such that the text fills the screen horizontally and displays a paragraph (e.g., title, authors, and keywords of a technical publication); and (iii) Pad++ is attractive for systems having small screens, such as PDA devices having a pen or pointing device, Pad++ Tour teaches the limitations "enabling a user to view a column of the Web content at a higher resolution than a current resolution by tapping on the column . . . the display is re-rendered such that content corresponding to the selected column is displayed across the touch-sensitive display" and "enabling a user to view a paragraph of the Web content at a higher resolution than a current resolution by tapping on the paragraph . . . the display is re-rendered such that content corresponding to the selected paragraph is displayed across at least one of a width and height of a display area of the touch-sensitive display."

---

[5] MICROSOFT® COMPUTER DICTIONARY 396 (5th ed. 2002).

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

First, Patent Owner argues that:

> A PHOSITA would not have considered [the figure from
> page 89 of Pad++ Tour, which is a zoomed in view of "Ben
> Bederson's Home Page" with truncated text] to be a zoom on a
> column or a paragraph within a Web page nor conclude that the
> content in this HTML document is re-rendered such that it fits
> across the width of a display or display area. With respect to
> zooming on a paragraph, there is no evidence to what alleged
> paragraph is being zoomed on; in fact, there is no evidence the
> HTML document contains any paragraphs.

(PO Appeal Br. 64–65 (emphasis omitted).) However, as discussed
previously, the Examiner also cited to the figures on pages 91 and 93 of
Pad++ Tour.

Second, Patent Owner argues that:

> Pad++'s browser [from Figure 5 of Bederson-5] implemented
> two zoom behaviors for mouse clicks: Clicking on an "out of
> focus' page causes it to be enlarged, but does not cause the page
> to be displayed to fit across the screen. Clicking on an "in
> focus" page returns it to its previous size.

(Appeal Br. 66.) However, the Examiner also cited to Pad++ Tour for
teaching the limitation "the display is re-rendered such that content
corresponding to the selected paragraph is displayed across at least one of a
width and height of a display area of the touch-sensitive display," and Patent
Owner has not provided any persuasive arguments or evidence as to why the
Examiner's findings with respect to Pad++ Tour are erroneous.

Third, Patent Owner argues that "Pad++ already processes paragraph
tags and Respondent has presented no evidence nor argument why a
POSITA would modify how Pad++ processes paragraph tags, such as by
adding a Pad++ object for a paragraph with an associated bounding box."
(PO Rebuttal Br. 17; *see also id.* at 22–23.) However, Patent Owner's

19

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

arguments are not commensurate in scope with claims 64 or 66, because the claims do not recite "paragraph tags" or a "bounding box."

Fourth, Patent Owner argues that "Pad++ does not include any column object (or any type of container object other than for the entire page) or paragraph object." (PO Rebuttal Br. 17.) However, Patent Owner's arguments are not commensurate in scope with claims 64 or 66, because the claims do not recite a "column object" or a "paragraph object."

Fifth, Patent Owner argues that "even if Pad++ could be implemented on a PDA with the fastest processor available at the time of the invention the user could not control the zoom level using 'manual' zooming" and "[t]he empirical test evidence simulating the zoom performance of Pad++ running on a PDA with the fastest processor available demonstrates the changes in zoom levels were large and unpredictable and continued after the mouse button was released" and points to the Howard Declaration for support. (PO Rebuttal Br. 18.) The Howard Declaration (Patent Owner Ex. B) states the following:

> Once the page was loaded and ready for interaction, zooming in was tested by placing the cursor over the page and holding down the right mouse button. In response, multiple stepped zooms were performed with large time lags between each step, as opposed to smooth animation. When zooming in, the first zoom step took approximately 40 seconds, the second step 25 seconds, the third step 19 seconds and the fourth step 11 seconds. As soon as the fourth step was reached I released the mouse button. However, Pad++ continued to perform another zoom step approximately 11 seconds later.

(¶ 103.) However, Patent Owner's arguments are not commensurate in scope with claims 64 or 66, because the claims do not recite "smooth

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

zooming." Moreover, Patent Owner has not adequately explained why such results in the Howard Declaration were characterized as "unpredictable."

Last, Patent Owner argues that "[z]ooming in and out views on Pad++ is performed by continually holding down (a) mouse button(s)" and "[t]his is not equivalent to a tapping gesture on a mobile device with a touch-sensitive display." (PO Rebuttal Br. 20.) Similarly, Patent Owner argues that "[t]here is no disclosure in any Pad++ document nor the browser source code itself disclosing the ability to zoom on any HTML element within a Web page by tapping on the HTML element, much less zooming on column (which Pad++ could not interpret) or paragraph by tapping on it" (*id.* at 23) and "[n]either the Examiner nor Respondent has provided any evidence to suggest a POSITA would have been motivated to replace Pad++'s use of mouse clicks (alleged to be analogous to tapping on a touch-sensitive display) to zoom in and out the focus page to instead select HTML content within a web page to zoom on by clicking (tapping) on the HTML content" (*id.* at 26). However, Pad++ Tour explains that "[y]our whole desktop could be zoomable" and "[t]his seems especially attractive for systems which have small screens, such as handheld computers (i.e. PDA's)." (P. 141.) Moreover, one of ordinary skill in the art would recognize that a PDA device would include a pen or pointing device for input.

Accordingly, we affirm the Examiner's decision to reject claims 64 and 66 under 35 U.S.C. § 103(a) as unpatentable over Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, and Pad++ Tour.

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

### NEW GROUND OF REJECTION UNDER 37 C.F.R. § 41.50(b)

We enter the following new ground of rejection:

Claims 29 and 78 are rejected under 35 U.S.C. § 103(a) as unpatentable over Pad Tour++ and HTML 4.0 Standard.

As discussed previously, in one example of zooming a user interface, entitled "An HTML browser," Pad++ Tour explains the following:

> A zooming version of Mosaic and Netscape? This is not such a strange idea. The third example Pad++ application we will look at is a simple Pad++ web browser.

> Although the web browser we show here is still fairly primitive, you could imagine a much more advanced version. Does the idea of using a zoomable Web browser excite you?

(P. 86.) Pad++ Tour explains the following:

> When you follow a link, the relevant document is loaded into Pad++ and placed on the surface to the right of the original document, at a smaller scale. Here you can see the 'Pad++: Multiscale interfaces' document loaded beside the home page.

> The Pad++ HTML browser will lay out sub-documents in two columns next to the parent document. Because Pad++ is zoomable, there is always enough space between those two columns for placing further documents reached from those sub-documents!

(P. 93.)

HTML 4.0 Standard relates to "[t]he publishing language used by the World Wide Web is HTML (from HyperText Markup Language)." (§ 2.2.) In particular, HTML 4.0 Standard explains the following:

> Most people agree that HTML documents should work well across different browsers and platforms. Achieving interoperability lowers costs to content providers since they must develop only one version of a document. If the effort is not made, there is much greater risk that the Web will devolve

22

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

> into a proprietary world of incompatible formats, ultimately
> reducing the Web's commercial potential for all participants.
>
>        . . . .
>
>        HTML has been developed with the vision that all
> manner of devices should be able to use information on the
> Web: PCs with graphics displays of varying resolution and
> color depths, cellular telephones, hand held devices, devices for
> speech for output and input, computers with high or low
> bandwidth, and so on.

(§ 2.2.1.)  HTML 4.0 Standard further explains that "[s]tyle sheets simplify
HTML markup and largely relieve HTML of the responsibilities of
presentation" and "give both authors and users control over the presentation
of documents – font information, alignment, colors, etc."  (§ 2.3.5.)
Moreover, with respect to style sheets, HTML 4.0 Standard explains that
"[s]tyle sheets represent a major breakthrough for Web page designers,
expanding their ability to improve the appearance of their pages."  (§ 14.1.)
In particular, HTML Standards explains that a "cascading" style sheet "is the
capability provided by some style sheet languages such as CSS to allow
style information from several sources to be blended together."  (*Id.*)

A person of ordinary skill in the art would have recognized that
incorporating the cascading style sheets of HTML 4.0 Standard with the
Pad++ HTML browser of Pad++ Tour would have improved Pad++ Tour by
providing the advantage of improving the appearance of Web pages,
including style information from several sources.  *See KSR Int'l Co. v.
Teleflex Inc.*, 550 U.S. 398, 417 (2007) ("[I]f a technique has been used to
improve one device, and a person of ordinary skill in the art would recognize
that it would improve similar devices in the same way, using the technique is
obvious unless its actual application is beyond his or her skill.").

23

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

Alternatively, the combination of HTML 4.0 Standard and Pad++ Tour is nothing more than adding the known cascading style sheet of HTML 4.0 Standard with the known HTML browser of Pad++ Tour, to yield predictable results. *See id.* at 416 (2007) ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

Accordingly, the combination of Pad++ Tour and HTML 4.0 Standard teaches the limitation "wherein the HTML-based Web content includes cascading style sheet content defining layout and presentation attributes for the Web page."

Pursuant to our authority under 37 C.F.R. § 41.50(b), we reject claims 29 and 78 under 35 U.S.C. § 103(a) as unpatentable over Pad++ Tour and HTML 4.0 Standard.

# DECISION

We affirm the Examiner's decision to reject claims 64 and 66 under 35 U.S.C. § 103(a) as unpatentable over Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, and Pad++ Tour.

We reverse the Examiner's decision not to adopt the rejection of claims 29 and 78 under 35 U.S.C. § 103(a) as being unpatentable over Pad++ Tour and Patent Owner's admitted prior art and enter a new rejection based thereon.

We reject claims 29 and 78 under 35 U.S.C. § 103(a) as unpatentable over Pad++ Tour and HTML 4.0 Standard.

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

## DECISION SUMMARY

In summary:

| Claim Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 64, 66 | 103(a) | Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, and Pad++ Tour | 64, 66 | | |
| 29, 78 | 103(a) | Patent Owner's admitted prior art, Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, Pad++ Tour, JP 169, SVF, VML | | | 29, 78 |
| 29, 78 | 103(a) | Pad++ Tour, HTML 4.0 Standards | | | 29, 78 |
| 29, 78 | 103(a) | Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, Pad++ Tour, and Bray[6] | | | |
| 29 | 103(a) | Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, Pad++ | | | |

---

[6] Cumulative rejection.

25

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

| | | | | | |
|---|---|---|---|---|---|
| | | Tour, Bray, SVF, VML[7] | | | |
| 29 | 103(a) | JP 169, Bray, SVF, VML[8] | | | |
| 29, 78 | 103(a) | HTML 3.2 Standards, HTML 4.0 Standards, Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, Pad++ Tour, JP 169, SVF, VML[9] | | | |
| **Overall Outcome** | | | 64, 66 | | 29, 78 |

Pursuant to 37 C.F.R. § 41.77(a), the above-noted reversal of the Examiner's decision not adopting the proposed rejection of claims 29 and 78 constitutes a new ground of rejection and is hereby designated as such. Section 41.77(b) provides that "[a] new ground of rejection . . . shall not be considered final for judicial review." That section also provides that Patent Owner, WITHIN ONE MONTH FROM THE DATE OF THE DECISION, must exercise one of the following two options with respect to the new grounds of rejection to avoid termination of the appeal proceeding as to the rejected claims:

> (1) *Reopen prosecution.* The owner may file a response requesting reopening of prosecution before the examiner. Such a response must be either an amendment of the claims so

---

[7] Cumulative rejection.
[8] Cumulative rejection.
[9] Cumulative rejection.

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

> rejected or new evidence relating to the claims so rejected, or
> both.
>
> (2) *Request rehearing.* The owner may request that the
> proceeding be reheard under § 41.79 by the Board upon the
> same record. The request for rehearing must address any new
> ground of rejection and state with particularity the points
> believed to have been misapprehended or overlooked in
> entering the new ground of rejection and also state all other
> grounds upon which rehearing is sought.

In accordance with 37 C.F.R. § 41.79(a)(1), the "[p]arties to the appeal may file a request for rehearing of the decision within one month of the date of: . . . [t]he original decision of the Board under § 41.77(a)." A request for rehearing must be in compliance with 37 C.F.R. § 41.79(b). Comments in opposition to the request and additional requests for rehearing must be in accordance with 37 C.F.R. § 41.79(c) & (d), respectively. Under 37 C.F.R. § 41.79(e), the times for requesting rehearing under paragraph (a) of this section, for requesting further rehearing under paragraph (d) of this section, and for submitting comments under paragraph (c) of this section may not be extended.

An appeal to the United States Court of Appeals for the Federal Circuit under 35 U.S.C. §§ 141-144 and 315 and 37 C.F.R. § 1.983 for an *inter partes* reexamination proceeding "commenced" on or after November 2, 2002 may not be taken "until all parties' rights to request rehearing have been exhausted, at which time the decision of the Board is final and appealable by any party to the appeal to the Board." 37 C.F.R. § 41.81. *See also* MPEP § 2682 (8th ed., Rev. 8, July 2010).

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

Requests for extensions of time in this *inter partes* reexamination proceeding are governed by 37 C.F.R. § 1.956.  *See* 37 C.F.R. § 41.79.


### TIME PERIOD FOR RESPONSE

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a).  *See* 37 C.F.R. § 1.136(a)(1)(iv).


<u>AFFIRMED</u>
<u>37 C.F.R. § 41.77(b)</u>

28

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

PATENT OWNER:

LAW OFFICE OF R. ALAN BURNETT
4108 131ST AVE SE
BELLEVUE, WA 98006

THIRD PARTY REQUESTER:

JOHN S. PRATT, ESQ.
KILPATRICK TOWNSEND & STOCKTON LLP
1100 PEACHTREE STREET, SUITE 2800
ATLANTA, 30309

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

MOTOROLA MOBILITY, L.L.C.
Requester and Respondent

v.

SOFTVIEW L.L.C.
Patent Owner and Appellant

———————

Appeal 2022-000154
Reexamination Control 95/002,126
Technology Center 3900
Patent 7,831,926 B2

———————

Before ALLEN R. MacDONALD, ERIC B. CHEN, and
BRIAN J. McNAMARA, *Administrative Patent Judges*.

CHEN, *Administrative Patent Judge*.

DECISION ON REQUEST FOR REHEARING

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

On May 5, 2022, Patent Owner SoftView, L.L.C. ("Patent Owner")
requested rehearing under 37 C.F.R. § 41.77(a)(2) and 37 C.F.R.
§ 41.79(a)(2), of our Decision on Appeal entered April 6, 2022 ("Decision"
or "Dec."), in which we affirmed the Examiner's final decision to reject
independent claims 64 and 66, reversed Examiner's decision not to reject
dependent claims 29 and 78, and entered a new ground of rejection for
claims 29 and 78 under 35 U.S.C. § 103(a).

In response to Patent Owner's request for rehearing, Requester
Motorola Mobility, L.L.C. ("Requester") filed written comments, dated
June 6, 2022.

The Request for Rehearing is *denied*.

## ANALYSIS

### *Claims 29 and 78—Pad++ Tour and Admitted Prior Art*

First, Patent Owner argues "[u]nder 37 CFR 1.948(a)(2) and MPEP
§ 2617 the Examiner correctly did not adopt the [Requester's] new proposed
ground." (Req. Reh'g 1.)  However, a request for rehearing must "state with
particularity the points believed to have been misapprehended or
overlooked" by the Board.  37 C.F.R. § 41.79(b)(1).  Patent Owner has not
sufficiently explained how the panel's agreement with the Requester's
arguments amounts to misapprehending or overlooking Patent Owner's
previously presented arguments.  Instead, Patent Owner is merely reiterating
argument previously presented.

Second, Patent Owner agues "[t]he Mozilla rendering engine,
Applicant's Admitted Prior Art (AAPA), cannot be the basis for a ground in

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

an *Inter Partes* Reexamination." (Req. Reh'g. 3.)  In particular, Patent
Owner argues "[t]he Mozilla rendering engine comprises a framework of
software libraries and modules that are neither patents nor printed
publications, and thus cannot be used as a basis for a ground of rejection in
an *Inter Partes* Reexamination (whether in the initial request or a subsequent
proposal under a new ground)." (*Id.* at 5.)

    Contrary to Patent Owner's arguments, 37 C.F.R. § 1.104(c)(3), states
that "[i]n rejecting claims *the examiner may rely upon admissions by* the
applicant, or *the patent owner in a reexamination proceeding*, as to any
matter affecting patentability and, insofar as rejections in applications are
concerned" (emphasis added).  Accordingly, Patent Owner's argument that
Patent Owner's admissions cannot be used as a basis for an obviousness
rejection is legally incorrect.

    Third, Patent Owner argues the following:  (i) "[t]he publicly
documented evidence of the great difficulties both Microsoft and
Netscape/Mozilla had in implementing CSS in a rendering engine/Web
browser refutes any assertion that implementing CSS in a rendering engine
or Web browser was within the ordinary skill in that art" (Req. Reh'g 6);
(ii) "Wolf further states 'A PHOSITA [person having ordinary skill in the
art] in 2000-2001 would also not attempt to write original code to support
HTML 4, CSS 1, or CSS 2, and there would be no chance such an attempt
would have succeeded without undue experimentation'" (*id.* at 8); and (iii)
"it took 50+ man-years for highly skilled software developers and software
engineers at Mozilla to implement HTML 4, CSS 1 and parts of CSS 2"
(*id.*).

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

With respect to Patent Owner's admissions, pages 11–12 of our

Decision states:

> The '926 patent discloses the following:
>
>> As will be recognized by those skilled in the art, *the functions performed in blocks 150, 152, and 154* [of Figure 5] *are commonly performed by conventional browsers during a pre-rendering process.* In some browsers, *these functions are performed by the Mozilla rendering engine, which comprises open source software that is readily available for use by developers.* At present, the software for the Mozilla rendering engine may be accessed via the Internet at www.mozilla.org. Accordingly, in one embodiment, the present invention uses core functionality provided by the Mozilla rendering engine source code to perform the functions of block 150, 152, and 154.
>
> (Col. 17, ll. 31–41 (emphases added).)
>
>> The process is initiated when the proxy server receives the HTML corresponding to the parent document (and frame documents, if appropriate), whereupon *a pre-rendering parsing of the HTML is performed to determine where to place the various objects on the display page in a block 150.* For example, elements such as tables, column definitions, graphic images, paragraphs and line breaks are identified. If frames are included, each frame is examined in the sequential order it appears in the HTML document, or the order in which the HTML documents corresponding to the frames in a frameset are downloaded to the browser.
>
> (Col. 16, ll. 45–55 (emphasis added).)  The Wolf Declaration further states

the following:

>> The '926 . . . patent[] disclose[s] using the Mozilla (Gecko) rendering engine during *prerendering processing operations* to parse and process the HTML and CSS source code and generate HTML objects and associated page layout information, including bounding boxes.

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

(¶ 17 (emphasis added).)

In general, to be enabling under 35 U.S.C. § 112, a patent application must sufficiently disclose an invention to enable those skilled in the art to make and use it and the Specification need not disclose what is well known in the art. *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1463 (Fed. Cir. 1984). Moreover, although a prior art patent is presumed to be enabled, such presumption can be rebutted. *In re Sasse*, 629 F.2d 675, 681 (CCPA 1980). Thus, the '926 patent is presumed to be enabled and need not disclose what is well known in the art by those skilled in the art, including parsing and processing the HTML CSS source code and generate HTML objects in the Mozilla rendering engine. However, Patent Owner's arguments: (i) directly conflict with the admissions from column 16, lines 45–55 and column 17, lines 31–41 of the '926 patent; and (ii) apparently undermine the presumption of enablement for the '926 patent.

Fourth, Patent Owner argues the following: (i) "[i]t is irrefutable that Mozilla failed to implement a full-page zooming Web browser on a desktop browser that preserved the original page layout, functionality, and design of HTML-based Web Content until 2007, even though this desired functionality was identified as a feature (to be implemented) in 1999" (Req. Reh'g 8); (ii) "[t]he [Pad++] Tour suggestion provides no evidence a POSITA at the time of the invention would be motivated to even attempt to implement Pad++ on a PDA [personal digital assistant] and would have had a reasonable expectation of success in doing so without undue experimentation" and "Bederson *et al.* abandoned development of the Pad++

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

web browser in 1998 in view of 'great advancements in HTML'" (*id.* at 12);
(iii) "[a]t the time of the invention, there were no open-source browsers that
ran on mobile devices with touch-sensitive displays" (*id.* at 16); (iv)

> [t]his isolated and conclusory statement [from page 141 of
> Pad++ Tour, which states "[t]his seems especially attractive for
> systems which have small screens, such as handheld computers
> (i.e. PDA's)"] is a mere suggestion of a conceptual use of
> Pad++ that is insufficient to constitute a motivation to combine
> Pad++ with a PDA or any mobile device for that matter for the
> purpose of implementing a zoomable browser

(*id.* at 19); and (v) "Pad++ was not designed to run on a PDA" (*id.*).

However, "the test [for obviousness] is what the combined teachings
of the references would have suggested to those of ordinary skill in the art,"
and not "whether the features of a secondary reference may be bodily
incorporated into the structure of the primary reference." *In re Keller*, 642
F.2d 413, 425 (CCPA 1981). Although Patent Owner's evidence may
demonstrate that specific combinations of commercially available
products—HTML, Web browsers (e.g., Netscape Navigator or Microsoft
Internet Explorer), and PDAs (e.g., Nokia, Palm, or Apple Newton devices)
—were not physically compatible in 2000–2001, such evidence does not
overcome the *prima facie* case of obviousness. As recognized by the
Supreme Court, "[a] person of ordinary skill [in the art] is also a person of
ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550
U.S. 398, 421 (2007). Accordingly, one of ordinary skill in demonstrating
"ordinary creativity" would have reason to consider using or modifying the
technical features of commercially available products or develop
prototypical products, particularly in view of Pad++ Tour's explicit

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

suggestion that it "seems especially attractive for systems which have small screens" (p. 19).

Last, Patent Owner argues that "[a]s the '926 patent is now expired, the *Phillips* standard must be applied in construing the claims for which all rejections are asserted (Req. Reh'g 13) and "[t]o establish a *prima facie* case of obviousness all limitations must be addressed, and the entirety of the claim must be construed anew under the *Phillips* standard" (*id.* at 14.). However, Patent Owner does not propose any constructions or demonstrate how applying any other constructions under the *Phillips* standard would change the outcome.  In addition, the claim construction standard could not affect the outcome here because the Board's constructions in *Softview LLC v. Kyocera Corp. and Motorola Mobility LLC*, Nos. IPR2013-00004, Paper 53 (PTAB Mar. 27, 2014) and IPR2013-00257, Paper 12 (PTAB Mar. 27, 2014), both of which also involved the '926 patent, were based on Patent Owner's own explanation of the meaning of the claimed features during prosecution and on Patent Owner's proposed *Phillips* standard claim constructions submitted in connection with *SoftView LLC v. Apple Inc.*, No. l:10-cv-00389 (D. Del. May 10, 2010).  Finally, "[t]here has never been a requirement for an examiner to make an on-the-record claim construction of every term in every rejected claim . . . .  [A]ll that is required of the [Patent] [O]ffice to meet its prima facie burden of production is to set forth the statutory basis of the rejection and the reference or references relied upon in a sufficiently articulate and informative manner as to meet the notice requirement of [35 U.S.C.] § 132." *In re Jung*, 637 F.3d 1356, 1363 (Fed. Cir. 2011).

7

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

*Claims 29 and 78—Pad++ Tour and HTML 4.0 Standard*

First, Patent Owner argues "[t]he Examiner correctly did not adopt the proposed . . . new ground in the RAN [Right of Appeal Notice]." (Req. Reh'g 22.)  In particular, Patent Owner argues that "[t]he Appeal Decision does not address why the Examiner not adopting this proposed new ground was errant but rather just indicates the Examiner's decision is reversed without further explanation" and "[t]he Examiner's actions were proper under 37 CFR [§] 1.948(a)(2) and MPEP § 2617." (*Id.* at 23.)  However, as stated on pages 22–24 of our Decision (Dec. 22–24), and as acknowledged by Patent Owner (Req. Reh'g 22), claims 29 and 78 were rejected under 35 U.S.C. § 103(a) pursuant to our authority to enter a new ground of rejection under 37 C.F.R. § 41.50(b).  As such, 37 C.F.R. § 1.948(a)(2) is not applicable.

Second, Patent Owner argues the following:

> [T]he HTML 4.0 Standard does not specify how CSS is implemented, which is defined by separate CSS Standards . . . , nor specify "methods" for implementing HTML 4.0.  Third, development of complex software, such as a rendering engine supporting HTML 4.0, is anything but predictable.  The only thing predictable is that it would involve an extraordinary level of experimentation and failure along the way, as would be recognized by a POSITA at the time of the invention.

(Req. Reh'g 24.)  Similarly, Patent Owner argues that "Wolf testified (above) it took highly-skilled developers and software engineers 50+ man years to develop the first version of Gecko, which supported HTML 4.0, CSS 1, and parts of CSS 2" and "[c]onsidering implementation of HTML 4.0 alone (without CSS), there is no evidence a POSITA could have

8

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

implemented HTML 4.0 in anything remotely close to one and a half to two-man years." (*Id.* at 26.)

> Page 23 of our Decision states the following:

> HTML 4.0 Standard further explains that "[s]tyle sheets simplify HTML markup and largely relieve HTML of the responsibilities of presentation" and "give both authors and users control over the presentation of documents – font information, alignment, colors, etc." (§ 2.3.5.) Moreover, with respect to style sheets, HTML 4.0 Standard explains that "[s]tyle sheets represent a major breakthrough for Web page designers, expanding their ability to improve the appearance of their pages." (§ 14.1.) In particular, HTML Standards explains that a "cascading" style sheet "is the capability provided by some style sheet languages such as CSS to allow style information from several sources to be blended together." (*Id.*)

(Dec. 23.) Thus, in a single printed publication, HTML 4.0 Standard provides information with respect to both: (i) HTML documents; and (ii) the improvement of HTML document appearance using cascading style sheets.

In general, a prior art patent is presumed to be enabled, *Sasse*, 629 F.2d at 681, and such prior art patent need not disclose what is well known in the art, *Lindemann*, 730 F.2d at 1463. Similarly, prior art printed publications are presumptively enabling. *In re Antor Media Corp.*, 689 F.3d 1282, 1288 (Fed. Cir. 2012). Accordingly, HTML 4.0 Standard is presumptively enabled and need not disclose what is well known in the art—implementation of CSS in the HTML markup language.

Third, Patent Owner argues that "[the Board] provides no evidence of any consideration regarding the required 'reasonable expectation of success' prong." (Req. Reh'g 24.)

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

Pages 22–23 of our Decision states:

Pad++ Tour explains the following:

> The Pad++ HTML browser will lay out sub-documents in two columns next to the parent document. Because Pad++ is zoomable, there is always enough space between those two columns for placing further documents reached from those sub-documents!

> HTML 4.0 Standard relates to "[t]he publishing language used by the World Wide Web is HTML (from HyperText Markup Language)."

> . . . .

> HTML 4.0 Standard further explains that "[s]tyle sheets simplify HTML markup and largely relieve HTML of the responsibilities of presentation" and "give both authors and users control over the presentation of documents – font information, alignment, colors, etc." . . . . HTML Standards explains that a "cascading" style sheet "is the capability provided by some style sheet languages such as CSS to allow style information from several sources to be blended together."

(Dec. 22–23 (citations omitted).)  Thus, Pad++ discusses use of an HTML browser on a zooming user interface, and HTML 4.0 Standard discusses the features of the HTML publishing language, including a cascading style sheet.  Because both references relate to HTML, the identical publishing language used by the World Wide Web, the proposed modification of Pad++ with HTML 4.0 Standard would result a reasonable expectation of success.  *See In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (the teachings of the prior art provide a sufficient basis for a reasonable expectation of success).

Last, Patent Owner argues that: (i) "[i]n addition to implementing a zoomable browser supporting HTML 4 and at least CSS 1, the POSITA

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

would need to implement the combination on a mobile device with a touch-sensitive display" and "[n]one of the PDAs and mobile phones of record have sufficient memory to implement a browser supporting HTML 4 and CSS 1 alone" (Req. Reh'g 28); and (ii) "Pad++ had 24 contributors over approximately 4 years" and "all these contributors failed to implement a browser that came close to supporting even HTML 2.0" (*id.* at 30).

Again, "the test [for obviousness] is what the combined teachings of the references would have suggested to those of ordinary skill in the art," and not "whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference." *Keller*, 642 F.2d at 425. Although Patent Owner's evidence may demonstrate that specific combinations of commercially available products—HTML, Web browsers (e.g., Netscape Navigator or Microsoft Internet Explorer), and PDAs (e.g., Nokia, Palm, or Apple Newton devices)—were not physically compatible, such evidence does not overcome the *prima facie* case of obviousness. As recognized by the Supreme Court, "[a] person of ordinary skill [in the art] is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421. Accordingly, one of ordinary skill in demonstrating "ordinary creativity" would have reason to consider using or modifying the technical features of commercially available products or develop prototypical products.

*Claims 64 and 66—Pad++ Tour*

First, Patent Owner argues the following:

The Examiner's rejection is based on a clearly errant assertion that claims 64 and 66 permit manual/dynamic zooming to be

11

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

> performed following tapping on a column or paragraph. In affirming the Examiner's rejection, the Appeal Decision affirms the Examiner's errant claim construction. If this is not the case, Patent Owner respectfully request the Board draw a line in the sand and indicate whether any additional operations such as manual/dynamic zooming are permitted after the claimed tapping operations to obtain the resulting zoomed view on columns and paragraphs.

(Req. Reh'g 30.) In particular, in reference to page 15 of our Decision, Patent Owner argues that "[u]nder the Examiner's interpretation, manual zooming is permitted following the tapping to obtain the claimed zoom result." (*Id.* at 32–33; *see also id.* at 35.) However, Patent Owner's arguments apparently mischaracterize the Examiner's initial findings of fact, as summarized in our Decision.

Page 15 of our Decision states the following:

> The Examiner found that Pad++ Tour, which illustrates screen snapshots of both an HTML document and a zoomed-in view of the same HTML document, corresponds to the limitations: (i) "enabling a user to view a column of the Web content at a higher resolution than a current resolution by tapping on the column . . ." and (ii) "enabling a user to view a paragraph of the Web content at a higher resolution than a current resolution by tapping on the paragraph . . . ." In particular, the Examiner stated that "the Pad++ Tour reference meets the limitation by more specifically showing dynamically zooming in . . . on a paragraph of text (see: Pad++ Tour, p. 89) of an initially displayed HTML document (see: Pad++ Tour, p. 87), wherein said paragraph of text is displayed across the display."

(Dec. 15.) In other words, according to the Examiner, "zooming" is performed on the "initially displayed HTML document" in Pad++ Tour to obtain a "paragraph of text displayed across the display," and thus, Pad++

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

Tour teaches the limitations "enabling a user to view a column of the Web content at a higher resolution than a current resolution by tapping on the column" and "enabling a user to view a paragraph of the Web content at a higher resolution than a current resolution by tapping on the paragraph." Both of these statements from page 15 of our Decision cite to page 80 of the Right of Appeal Notice and describe the same single zooming operation performed on the same HTML document, and not two separate zooming operations—(i) "tapping on a column or paragraph" followed by (ii) "manual/dynamic zooming"—as argued by Patent Owner.

Second, Patent Owner argues that "now that the '926 patent has expired, the claims must be construed under the *Phillips* standard" and "the entirety of the claims, including independent claim 52 must be construed (all claim elements and limitations)." (Req. Reh'g 30.) As discussed previously, Patent Owner does not propose any constructions or demonstrate how applying any other constructions under the *Phillips* standard would change the outcome. The claim construction standard could not affect the outcome here because the Board's constructions in two related *inter partes* reviews, both of which also involved the '926 patent, were based on Patent Owner's own explanation of the meaning of the claimed features during prosecution and on Patent Owner's proposed *Phillips* standard claim constructions submitted in connection with a previously litigated case district court. Also, as discussed previously, "[t]here has never been a requirement for an examiner to make an on-the-record claim construction of every term in every rejected claim . . . . [A]ll that is required of the [Patent] [O]ffice to meet its prima facie burden of production is to set forth the

13

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

statutory basis of the rejection and the reference or references relied upon in a sufficiently articulate and informative manner as to meet the notice requirement of [35 U.S.C.] § 132." *Jung*, 637 F.3d at 1363.

Third, Patent Owner argues the following:

> The display [illustrated on page 93 of Pad++ Tour] is NOT re-rendered such that content corresponding to the selected paragraph is displayed across the touch-sensitive display. Manual/dynamic zooming doesn't select anything. Rather, it zooms the entire Pad++ substrate based on where the mouse cursor is. And the Web page content shown is clearly not displayed across the display.

(Req. Reh'g 36 (emphasis omitted); *see also id.* at 41–44.) Similarly, Patent Owner argues that:

> This assertion [from page 18 of our Decision] is false: "the sub-document "Abstract: Pad++: Advances in Multiscale Interfaces" is zoomable, such that the text fills the screen horizontally and displays a paragraph (e.g., title, authors, and keywords of a technical publication);". First, in this example the text clearly does not fill the screen horizontally. It might fill approximately 80% of the Window used for the Pad++ application, but it does not fill the screen horizontally.

(Req. Reh'g 36.)

From Pad++ Tour, the HTML document, entitled "Abstract: Pad++: Advances in Multiscale Interfaces" (p. 93), is reproduced below with additional annotations—an ellipse to indicate the "selected paragraph" and a double-sided arrow to indicate "width . . . of a display area":

14

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2



*The above figure illustrates Pad++ displaying an HTML document.*

As discussed on page 17 of our Decision, Pad++ Tour explains that "[w]hen you *click on a piece of text*, Pad++ zooms in so that [the] *text fills the screen horizontally and appears near the top of the screen vertically*" (p. 54 (emphasis added).) This description from Pad++ Tour is illustrated in the above figure, in which the "piece of text . . . appears near the top of the screen" is indicated by the ellipse (e.g., "Abstract: Pad++: Advances to Multiscale Interfaces") and the "text [that] fills the screen horizontally" is indicated by the double-sided arrow. Accordingly, Patent Owner's arguments are contradicted by Pad++ Tour. Moreover, while Patent Owner argues that "[text] might fill approximately 80% of the Window used for the Pad++ application, but it does not fill the screen horizontally," independent claims 64 and 66 recite "displayed across at least one of a width . . . of a display area" and does not require filling the width of "the touch-sensitive display."

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

Fourth, Patent Owner argues that "[t]he Pad++ outline, which is referred to as 'An outline viewer,' is discussed and illustrated three times in the Tour document." (Req. Reh'g 37.) In particular, Patent Owner argues the following:

> The outline viewer is not the Web browser. This functionality (when you click on a piece of text, Pad++ zooms in so that that text fills the screen horizontally and appears near the top of the screen vertically) is provided by the outline viewer. It is not supported in the Web browser.

(*Id.* at 38.)

However, Pad++ Tour explains that "[o]nce you add zooming to a user interface, new kinds of interactions are possible" and "[t]he following sections introduce three sample applications that we have developed which use zooming" (p. 49): (1) "[a]n outline viewer" (*id.*); (2) "[a] file browser" (p. 73); and (3) "[a]n HTML browser" (p. 86). Our Decision relies upon the third application of zooming, the "HTML browser," rather than the "outline viewer," as argued by Patent Owner.

Fifth, Patent Owner argues that "under a touchscreen graphical user interface (GUI) such as implemented on a mobile device, it is not possible to select any object within a Web page, regardless of type, without a bounding box for the object" (Req. Reh'g 44) and "Pad++ used the anchor tag bounding boxes to enable selection of hyperlinks (as do all Web browsers) and the bounding box for the HTML object to enable selection of the entire page" (*id.* at 44–45).

16

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

However, Patent Owner previously presented the same argument in its Rebuttal Brief, arguing the following:

> Pad++ also did not support frames. Pad++ already processes paragraph tags and Respondent has presented no evidence nor argument why a POSITA would modify how Pad++ processes paragraph tags, such as by adding a Pad++ object for a paragraph with an associated bounding box.

(PO Rebuttal Br. 17.)

> Also, as argued above, Pad++ does not include a Pad++ paragraph object nor generate a bounding box for a paragraph. Rather, the Pad++ parser, upon encountering a paragraph start tag (<p>) generates individual lines of text comprising Pad++ text objects spanning the width of the browser window until encountering a subsequent tag.

(*Id.* at 22–23.) Patent Owner's previously presented arguments were addressed on pages 19–20 of our Decision—"Patent Owner's arguments are not commensurate in scope with claims 64 or 66, because the claims do not recite 'paragraph tags' or a 'bounding box.'" Again, Patent Owner is reiterating arguments previously presented, and accordingly, Patent Owner has failed to "state with particularity the points believed to have been misapprehended or overlooked" by the Board as required by 37 C.F.R. § 41.79(b)(1).

Sixth, Patent Owner argues that "[w]ith respect to a column object or paragraph object it is not possible to display the content of any type of object across a display (via a programmatic change in zoom level via execution of instructions and in response to selection of the object) unless you have the width and/or height bounds of the object." (Req. Reh'g 45.)

However, Patent Owner previously presented the same argument in its Rebuttal Brief, arguing that "Pad++ does not include any column object (or

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

any type of container object other than for the entire page) or paragraph object" and "HTML items are compound objects composed of many characters, line segments, and images." (PO Rebuttal Br. 17.) Patent Owner's previously presented arguments were addressed on page 20 of our Decision—"Patent Owner's arguments are not commensurate in scope with claims 64 or 66, because the claims do not recite a 'column object' or a 'paragraph object.'" Again, Patent Owner is reiterating arguments previously presented, and accordingly, Patent Owner has failed to "state with particularity the points believed to have been misapprehended or overlooked" by the Board as required by 37 C.F.R. § 41.79(b)(1).

Seventh, Patent Owner argues the following:

> Pad++ teaches . . . holding down the middle mouse button zooms the Pad++ substrate such that all Pad++ objects are zoomed together – the zoom level of all content is changed as if you had a huge stretchable rubber-like sheet. This is not using a mouse click input or something that could be equated to tapping. The user interactively controls the amount of zoom via use of real-time animation as the zoom is performed; when the desired zoom level is displayed, the user releases the mouse button, and the zoom stops. Even if manual zooming was permitted, a user could not control the zoom level using manual zooming on a PDA with the fastest processor. The size of the step changes and unpredictability of the step changes (they were random) would render this approach unusable.

(Req. Reh'g 46; *see also id.* at 47.)

However, Patent Owner previously presented the same argument in its Rebuttal Brief, arguing the following:

> [E]ven if Pad++ could be implemented on a PDA with the fastest processor available at the time of the invention the user could not control the zoom level using "manual" zooming. The empirical test evidence simulating the zoom performance of

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

> Pad++ running on a PDA with the fastest processor available
> demonstrates the changes in zoom levels were large and
> unpredictable and continued after the mouse button was
> released.

(PO Rebuttal Br. 18 (emphasis omitted).) Patent Owner's previously

presented arguments were addressed on pages 20–21 of our Decision—

"Patent Owner's arguments are not commensurate in scope with claims 64

or 66, because the claims do not recite 'smooth zooming'" and "Patent

Owner has not adequately explained why such [zoom performance] results

. . . were characterized as 'unpredictable.'" Again, Patent Owner is

reiterating arguments previously presented, and accordingly, Patent Owner

has failed to "state with particularity the points believed to have been

misapprehended or overlooked" by the Board as required by 37 C.F.R.

§ 41.79(b)(1).

Last, Patent Owner argues that "[a]ppealed claim 29 recites identical

language as claim 29 in Reexamination Request No. 90/009,995, which was

determined to be patentable as indicated in the *Ex Parte* Reexamination

Certificate 11956th for 7,831,926 issued on December 6, 2021." (Req.

Reh'g 47.) Accordingly, Patent Owner argues that "rejecting claims that

have already been confirmed by the PTO in parallel reexamination over

substantially identical art and substantially identical rebuttal evidence is

arbitrary and capricious and in violation of 5 U.S.C. § 706." (*Id.* at 48.)

In a previous *ex parte* reexamination, referenced by Patent Owner,

*Ex parte Softview LLC*, No. 2019-001127, 2020 WL 2217051, at *15 (PTAB

May 1, 2020), *aff'd*, 847 F. App'x 930 (Fed. Cir. 2021), we reversed the

Examiner's decision to reject dependent claim 29 under 35 U.S.C. § 103(a)

over Pad++, SVF, and Bray. In particular, we concluded that although the

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

Examiner established a *prima facie* case of obviousness, the Examiner did not consider Patent Owner's rebuttal evidence. (*Id.*)

In our current Decision, we reversed the Examiner's decision not to adopt the rejection of claim 29 under 35 U.S.C. § 103(a) as being unpatentable over Pad++ Tour and Patent Owner's admitted prior art, and pursuant to our authority under 37 C.F.R. § 41.50(b), we rejected claim 29 under 35 U.S.C. § 103(a) as unpatentable over Pad++ Tour and HTML 4.0 Standard. Patent Owner's admitted prior art and HTML 4.0 Standard were not of record in the previous *ex parte* reexamination and thus, Patent Owner's characterization of "parallel reexamination[s] over substantially identical art" is inaccurate. Accordingly, a patentability determination of claim 29 from the previous *ex parte* reexamination is not inconsistent with the rejections in the current *inter partes* reexamination of claim 29 over various combinations of Pad++ Tour, Pad Patent Owner's admitted prior art, and HTML 4.0 Standard because the two reexamination proceedings apply different prior art references and are based on different records. *Stevenson v. Sears Roebuck Co.*, 713 F.2d 705, 710 (Fed. Cir. 1983) ("[T]he prior holding of validity is not necessarily inconsistent with the subsequent holding of invalidity" due to "different prior art references or different records.").

## CONCLUSIONS

The Request for Rehearing has been considered and is *denied.*

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

Outcome of Decision on Rehearing:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Denied | Granted |
|---|---|---|---|---|
| 64, 66 | 103(a) | Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, Pad++ Tour | 64, 66 | |
| 29, 78 | 103(a) | Patent Owner's admitted prior art, Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, Pad++ Tour, JP 169, SVF, VML | 29, 78 | |
| 29, 78 | 103(a) | Pad++ Tour, HTML 4.0 Standards | 29, 78 | |
| **Overall Outcome** | | | 29, 64, 66, 78 | |

Final Outcome of Appeal after Rehearing:

| Claim Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 64, 66 | 103(a) | Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, and Pad++ Tour | 64, 66 | | |

21

Appeal 2022-000154
Reexamination Control 95/002,126
Patent 7,831,926 B2

| 29, 78 | 103(a) | Patent Owner's admitted prior art, Bederson-1, Bederson-2, Bederson-3, Bederson-4, Bederson-5, Pad++ Tour, JP 169, SVF, VML | | | 29, 78 |
|---|---|---|---|---|---|
| 29, 78 | 103(a) | Pad++ Tour, HTML 4.0 Standards | | | 29, 78 |
| **Overall Outcome** | | | 64, 66 | | 29, 78 |

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a)(1)(iv).

## REHEARING DENIED

PATENT OWNER:

LAW OFFICE OF R. ALAN BURNETT
4108 131ST AVE SE
BELLEVUE, WA 98006

THIRD PARTY REQUESTER:

JOHN S. PRATT, ESQ.
KILPATRICK TOWNSEND & STOCKTON LLP
1100 PEACHTREE STREET, SUITE 2800
ATLANTA, 30309

US007831926B2

(12) **United States Patent** (10) Patent No.: **US 7,831,926 B2**
Rohrabaugh et al. (45) Date of Patent: *Nov. 9, 2010

| | | | |
|---|---|---|---|
| 5,897,644 | A | 4/1999 | Blumberg |
| 5,952,994 | A | 9/1999 | Ong et al. |
| 5,956,025 | A | 9/1999 | Goulden et al. |
| 5,966,135 | A | 10/1999 | Roy et al. |
| 6,011,905 | A | 1/2000 | Huttenlocher et al. |

(54) **SCALABLE DISPLAY OF INTERNET CONTENT ON MOBILE DEVICES**

(75) Inventors: **Gary B. Rohrabaugh**, Bellingham, WA (US); **Scott A. Sherman**, Seattle, WA (US)

(73) Assignee: **SoftView LLC**, Bellingham, WA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 799 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/738,486**

(22) Filed: **Apr. 21, 2007**

(65) **Prior Publication Data**

US 2007/0288841 A1    Dec. 13, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 09/878,097, filed on Jun. 8, 2001, now Pat. No. 7,210,099, which is a continuation-in-part of application No. 09/828,511, filed on Apr. 7, 2001, now abandoned.

(60) Provisional application No. 60/211,019, filed on Jun. 12, 2000, provisional application No. 60/217,345, filed on Jul. 11, 2000.

(51) **Int. Cl.**
*G06F 17/00* (2006.01)

(52) **U.S. Cl.** ...................... **715/800**; 715/234; 715/243; 715/853

(58) **Field of Classification Search** ................. 715/800, 715/238, 249, 204, 234
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,615,384 A    3/1997 Allard et al.

(Continued)

FOREIGN PATENT DOCUMENTS

| GB | 0009129.8 | 4/2000 |
|---|---|---|
| GB | 2344197 A | 5/2000 |
| JP | 10-334082 A | 12/1998 |

OTHER PUBLICATIONS

Scalable Vector Graphics (SVG) Specification W3C Working Draft Feb. 11, 1999 http://www.w3.org/TR/1999/WD-SVG-19990211/--Pub Feb. 11, 1999 by W3C pp. 1-7.
Fisher, B., G. Agelidis, J. Dill, P. Tan, G. Collaud and C. Jones. "CZWeb: Fish-Eye Views for Visualizing the World-Wide Web", Proc. Seventh Int. Conf. on Human-Computer Interaction (HCI International '97), pp. 719-722, 1997.

(Continued)

*Primary Examiner*—Doug Hutton
*Assistant Examiner*—Quoc A Tran
(74) *Attorney, Agent, or Firm*—Law Office of R. Alan Burnett

(57) **ABSTRACT**

Mobile devices enabled to support resolution-independent scalable display of Internet (Web) content to allow Web pages to be scaled (zoomed) and panned for better viewing on smaller screen sizes. The mobile devices employ software-based processing of original Web content, including HTML-based content, XML, cascade style sheets, etc. to generate scalable content. The scalable content and/or data derived therefrom are then employed to enable the Web content to be rapidly rendered, zoomed, and panned. Display lists may also be employed to provide further enhancements in rendering speed.

**88 Claims, 22 Drawing Sheets**



**US 7,831,926 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,057,854 | A | 5/2000 | Davis, Jr. et al. |
| 6,076,166 | A | 6/2000 | Moshfeghi et al. |
| 6,211,856 | B1 | 4/2001 | Choi et al. |
| 6,300,947 | B1 | 10/2001 | Kanevsky |
| 6,337,693 | B1 | 1/2002 | Roy et al. |
| 6,421,733 | B1 | 7/2002 | Tso et al. |
| 6,449,639 | B1 | 9/2002 | Blumberg |
| 6,456,305 | B1 | 9/2002 | Qureshi et al. |
| 6,456,308 | B1 | 9/2002 | Agranet et al. |
| 6,457,030 | B1 | 9/2002 | Adams et al. |
| 6,466,203 | B2 | 10/2002 | Van Ee |
| 6,546,397 | B1 | 4/2003 | Rempell |
| 6,553,410 | B2 | 4/2003 | Kikinis |
| 6,556,217 | B1 | 4/2003 | Mäkipää |
| 6,615,212 | B1 | 9/2003 | Dutta et al. |
| 6,674,445 | B1 | 1/2004 | Chithambaram et al. |
| 6,704,024 | B2 | 3/2004 | Robotham et al. |
| 6,781,600 | B2 | 8/2004 | Anwar |
| 6,829,746 | B1 | 12/2004 | Schwerdtfeger et al. |
| 6,857,102 | B1 | 2/2005 | Bickmore et al. |
| 6,886,034 | B2 | 4/2005 | Blumberg |
| 6,925,595 | B1 | 8/2005 | Whitledge et al. |
| 6,978,418 | B1 | 12/2005 | Bain et al. |
| 6,996,533 | B2 | 2/2006 | Ikeda et al. |
| 7,023,572 | B2 | 4/2006 | Tuli |
| 7,055,095 | B1 | 5/2006 | Anwar |
| 7,072,984 | B1 | 7/2006 | Polonsky et al. |
| 7,219,309 | B2 | 5/2007 | Kaasila et al. |
| 7,308,649 | B2 | 12/2007 | Ehrich et al. |
| 7,450,114 | B2 | 11/2008 | Anwar |
| 2001/0015719 | A1 | 8/2001 | Van Ee et al. |
| 2001/0047428 | A1 | 11/2001 | Hunter |
| 2002/0023110 | A1 | 2/2002 | Fortin et al. |
| 2002/0030699 | A1 | 3/2002 | Van Ee |
| 2002/0112237 | A1 | 8/2002 | Ketts |
| 2002/0158908 | A1 | 10/2002 | Vaajala et al. |
| 2004/0049598 | A1 | 3/2004 | Tucker et al. |
| 2005/0144256 | A1 | 6/2005 | Blumberg |

## OTHER PUBLICATIONS

Benjamin B. Bederson et al., Pad++: A Zoomable Graphical Sketchpad For Exploring Alternate Interface Physics, Sep. 19, 1995, pp. 1-30, http://www.cs.unm.edu/pad++.

Benjamin B. Bederson et al., A Zooming Web Browser, SPIE 1996, http://www.cs.umd.edu/hcil/jazz/learn/papers/spie-96-webbrowser.pdf, entirety (pages not numbered) .

Specification for Simple Vector Format (SVF) v1.1 Jan. 16, 1995, pp. 1-9.

Specification for Simple Vector Format (SFV) v2.0 Dec. 6, 2000, http://www.svf.org/spec.html, pp. 1-20.

SVF XML http://www.svf.org/svfxml.html, pp. 1-18.

Changes to SVF (Date unknown), pp. 1-2.

Scalable Vector Graphics (SVG) 1.0 Specification, W3C Candidate Recommendation Nov. 2, 2000, pp. 1-513.

Introduction to SVG, part of WD-SVG-19990211, http://www.w3.orgfTR/1999/ WD-SVG-19990211/intro.html#Document . . ., pp. 1-3.

W3C Scalable Vector Graphics (SVG)—History, http://www.w3.org/Graphics/SVG/History, pp. 1-18.

Janus Boye, SVG Brings Fast Vector Graphics to Web, Jul. 29, 1999 http://www.irt.org/articles/js176/, pp. 1-5.

Vector Markup Language (VML), World Wide Web Consortium Note May 13, 1998, Note-VML-19980513, http://www.w3.org/TR/1998/Note-VML__19980513, pp. 1-47.

Vector Markup Language, http://en.wikipedia.org/wiki/Vector__Markup__Language, pp. 1-2.

Precision Graphics Markup Language (PGML), World Wide Web Consortium Note Apr. 10, 1998, NOTE-PGML-19980410, http://www.w3.org/TR/1998/NOTE-PGML-19980410, pp. 1-31.

PCT International Search Report for International Application No. PCT/US01/40920, International Searching Authority, European Patent Office, Dec. 27, 2001, pp. 1-8.

PCT International Preliminary Exam Report for International Application No. PCT/US01/40920, International Preliminary Examining Authority, European Patent Office, Jun. 20, 2002, pp. 1-5.

Dennis, "Webraska Joins W3C for Next Generation Internet Graphics," Newsbytes, May 8, 2000, entirety (pages not numbered).

Fox et al. "Experience With Top Gun Wingman: A Proxy-Based Graphical Web Browser for the 3Com PalmPilot" Proceedings of Middleware '98, 1998, entirety (pages not numbered).

"Tadpole Technology: ILOG technology within Tadpole's Cartesia Redline system making repairs simpler," M2 Presswire, Jan. 1999, entirety (pages not numbered).

Thryft, "Wireless link ramped for 'always on' Internet," EETimes, Mar. 23, 1999, pp. 1-4.

Bharadvaj et al., "An Active Transcoding Proxy to Support Mobile Web Access," Proc. Of the IEEE Symposium on Reliable Distributed Systems, 1998, entirety (pages not numbered).

Björk, et al., "WEST: A Web Browser for Small Terminals," Proceedings of the 12 ACM symposium on User Interface Software and Technology (1999), entirety (pages not numbered).

Holmquist, "The Zoom Browser," Human IT Tridskrift för studier av IT ur ett humanvetenskaplight perspektive, Mar., 1998, pp. 1-18.

Chapple, "Rethinking the role of an embedded Internet client in digital set-top boxes," WebTV Workshop Submission Paper, Jun. 1998, http://www.w3.org/Architecture/1998/06/Workshop/paper11/, pp. 1-4.

Graham, "Mobile SVG at BitFlash Inc.", May 2001, http://www.w3.org/Talks/2002/1007-Di-Helsinki/bitflash/index.html, pp. 1-4.

Koncz, "Working with Autodesk Mapguide," Nov. 2000, http://www.directionsmag.com/article.php?article__id=77&trv=1, pp. 1-6.

Schaffer et al. "Navigating Hierarchically Cluster Networks through Fisheye and Full-Zoom Methods," Mar. 24, 1988— pp. 1-20.

Holmquist "Flip Zooming: Focus+Context Visualization of Linearly Ordered Discrete Visual Structures,"Published 2000, pp. 27-53.

Scalable Vector Graphics (SVG) Specification, W3C Working Draft Feb. 11, 1999 WD-SVG-19990211, http://www.w3.org/TR/1999/WD-SVG-19990211/ (HTML format—initial page).

Scalable Vector Graphics (SVG) Specification, W3C Working Draft Apr. 12, 1999 WD-SVG-19990412, http://www.w3.org/TR/1999/WD-SVG-19990412/ (HTML format—initial page).

Jones et al. "From the large screen to the small screen—retaining the designer's design for effective user interaction,"IEEE Colloquium on Issues for Networked Interpersonal Communicators, May 1997, pp. 3/1-3/4.

Pacchiano, "Adobe's New View," Computer Shopper, vol. 19, No. 4, Apr. 1999, p. 346.

Official USPTO Actions for U.S. Appl. No. 09/878,097. (Entirety—pages not numbered).

Official USPTO Actions for U.S. Appl. No. 11/045,649. (Entirety—pages not numbered).

Official USPTO Actions for U.S. Appl. No. 11/045,757. (Entirety—pages not numbered).

Official USPTO Actions for U.S. Appl. No. 11/738,932. (Entirety—pages not numbered).

Official USPTO Action for U.S. Appl. No. 11/868,124 Mailed Aug. 24, 2010 pp.1-15.



FIG. 1A



*FIG. 1B*



*FIG. 1C*



*FIG. 2A*

CLIENT SENDS CONTENT REQUEST INCLUDING LOCATION INDICIA (E.G., URL) TO PROXY SERVER — 100

PROXY SERVER RECEIVES REQUEST, CHECKS CACHE, AND SENDS REQUEST TO WEB SERVER CORRESPONDING TO URL ADDRESS — 102

WEB SERVER TRANSMITS PARENT HTML DOCUMENT BACK TO PROXY SERVER — 104

PROXY SERVER PARSES HTML SEARCHING FOR REFERENCES TO EXTERNAL OBJECTS — 106

REFERENCED OBJECT: HTML DOC OR IMAGE FILE — 44, 46, 48, 50

ANY REFS? — 108

YES

NO

PROXY SERVER REQUESTS REFERENCED OBJECT FROM APPROPRIATE SERVER — 110

HTML, XML, CSS CONTENT IS TRANSLATED INTO SCALABLE VECTOR REPRESENTATION — 114

IMAGE CONTENT TRANSLATED INTO COMPRESSED BITMAP FORMAT — 116

VECTORIZED CONTENT AND COMPRESSED BITMAPS ARE STREAMED FROM PROXY SERVER TO CLIENT — 118

VECTORIZED CONTENT AND BITMAP CONTENT PROCESSED AND SCALED USING THIN CLIENT TO RENDER CONTENT ON CLIENT DEVICE — 120



*FIG. 2B*

CLIENT SENDS CONTENT REQUEST
TO NETWORK SITE (E.G., WEB URL) — 101

HTTP NEGOTIATION PERFORMED TO
DETERMINE FORMAT CONTENT IS TO BE
DELIVERED IN; SERVER CACHE CHECKED — 103

WEB SERVER RETRIEVES
PARENT HTML DOCUMENT — 105

WEB SERVER PARSES HTML SEARCHING FOR
REFERENCES TO EXTERNAL OBJECTS — 107

REFERENCED
OBJECT: HTML
DOC OR
IMAGE FILE — 44, 46, 48, 50

ANY
REFS? — 109

YES

WEB SERVER RETRIEVES REFERENCED
OBJECT LOCALLY OR RETRIEVES REFERENCED
OBJECT FROM
AN APPROPRIATE SERVER — 111    NO

HTML, XML, CSS CONTENT IS TRANSLATED
INTO SCALABLE VECTOR REPRESENTATION — 114

IMAGE CONTENT TRANSLATED INTO
COMPRESSED BITMAP FORMAT — 116

VECTORIZED CONTENT AND COMPRESSED
BITMAPS ARE STREAMED FROM
WEB SERVER TO CLIENT — 119

VECTORIZED CONTENT AND BITMAP CONTENT
PROCESSED AND SCALED USING THIN CLIENT
TO RENDER CONTENT ON CLIENT DEVICE — 120



FIG. 2C

CLIENT SENDS CONTENT REQUEST TO NETWORK SITE (E.G., WEB URL) TO RETRIEVE CONTENT
113
NETWORK SITE SENDS PARENT HTML DOCUMENT
115
CLIENT PARSES HTML SEARCHING FOR REFERENCES TO EXTERNAL OBJECTS
117
REFERENCED OBJECT: HTML DOC OR IMAGE FILE
44, 46, 48, 50
ANY REFS?
119
YES
CLIENT RETRIEVES REFERENCED OBJECT FROM AN APPROPRIATE SERVER
121
NO
HTML, XML, CSS CONTENT IS TRANSLATED INTO SCALABLE VECTOR REPRESENTATION
114
IMAGE CONTENT TRANSLATED INTO COMPRESSED BITMAP FORMAT
116
VECTORIZED CONTENT AND BITMAP CONTENT PROCESSED AND SCALED USING THIN CLIENT TO RENDER CONTENT ON CLIENT DEVICE
120



*FIG. 3*



*FIG. 10*



MARKET HOME
FILE EDIT VIEW GO FAVORITES HELP
BACK FORWARD STOP REFRESH HOME SEARCH FAVORITES HISTORY
ADDRESS HTTP://<ADDRESS PATH> LINKS
238A
240A
QUOTES HOT PICKS CALENDARS NEWS
236A
242A
244A
WHERE THE PROS SEEK ADVICE
BULLMARKET.COM
246A
216A
218A
MARKETS
222A
DOW
NASDAQ
224A
OPTIONS
226A
CHARTS
228A
220A
INVESTMENTS
230A
MUTUAL FUNDS
IRA, 401K OPTIONS
32A
TAX INFORMATION
34A
NEWS SPARKS MARKET
248A
254A
ACCOUNT #
255A
ACCESS CODE
256A
LOGIN
257A
250A
252A
11am
1pm
3pm
NetVest's Mutual Fund Mart gives you access to over 250 fund companies and funds, including 1,265 no load funds.
258A
Our no-fee IRA* combined with Fund Mart is the vehicle that will get you where you want to go. Learn more ...
260A
212
210A
214

*FIG. 4A*

MARKET HOME
FILE EDIT VIEW GO FAVORITES HELP
BACK FORWARD STOP REFRESH HOME SEARCH FAVORITES HISTORY
ADDRESS HTTP://<ADDRESS PATH>
LINKS
238B
240B
LINK #8
LINK #9
LINK #10
LINK #11
244B
LOGO GRAPHIC OBJECT #1
ADD BANNER GRAPHIC OBJECT #9
236B
242B
216B
218B
246B
TEXT HEADER #1
HEADLINE OBJECT
248B
254B
GRAPHIC #2; LINK #1 222B
GRAPHIC OBJECT #11
INPUT 1 255B
GRAPHIC #3; LINK #2 224B
GRAPHIC OBJECT #10
INPUT 2 256B
LOGIN
GRAPHIC #4; LINK #3 226B
250B
257B
GRAPHIC #5; LINK #4
GRAPHIC OBJECT #12
252B
220B
228B
TEXT HEADER #2
GRAPHIC #6; LINK #5 230A
TEXT OBJECT #1
258B
GRAPHIC #7; LINK #6 232B
GRAPHIC # 8; LINK #7 234B
TEXT OBJECT #2
260B
212
210B
214

*FIG. 4B*



**FIG. 4C**



*FIG. 4D*



FIG. 4E

210E



**FIG. 4F**



**FIG. 4G**



PARSE HTML CONTENT TO IDENTIFY LAYOUT
INFORMATION TAGS          150

SEPARATE CONTENT INTO OBJECTS AND
DEFINE BOUNDING BOX FOR EACH OBJECT          152

DEFINE PAGE LAYOUT
BASED ON BOUNDING BOXES          154

DEFINE DATUM POINT FOR PAGE AND FOR
EACH OBJECT BOUNDING BOX          156

GENERATE VECTOR FROM PRIMARY DATUM TO
BOUNDING BOX DATUM FOR EACH OBJECT          158

CREATING A REFERENCE THAT LINKS EACH
OBJECT TO ITS VECTOR AND BOUNDING BOX          160

*FIG. 5*



GATHER VECTOR REPRESENTATION DATA CORRESPONDING TO WEB PAGE
160
BUILD DISPLAY LIST OF VECTORS
162
DETERMINE USER-SELECTABLE ZOOM SCALE AND OFFSET
164
PROCESS VECTORS AND BOUNDARY BOXES TO DETERMINE VIRTUAL LAYOUT OF DISPLAY; DETERMINE DISPLAY LIMIT BOUNDING BOX
166
RETRIEVE CONTENT CORRESPONDING TO OBJECTS HAVING AT LEAST A PORTION OF THEIR BOUNDING BOXES FALL WITHIN THE DISPLAY LIMIT BOUNDING BOX
168
SCALE CONTENT; SCALE BITMAPS, RETRIEVE/ BUILD APPROPRIATE FONTS; SCALE SEPARATOR LINES AND BORDERS
170
RENDER THOSE PORTIONS OF SCALED CONTENT FALLING WITHIN THE DISPLAY LIMIT BOUNDING BOX
172

*FIG. 6*



*FIG. 7A*



*FIG. 7B*



*FIG. 8A*



*FIG. 8B*



*FIG. 9A*



**FIG. 9B**

US 7,831,926 B2

1

# SCALABLE DISPLAY OF INTERNET CONTENT ON MOBILE DEVICES

## RELATED APPLICATIONS

This application is a Continuation of U.S. Non-provisional application Ser. No. 09/878,097, filed Jun. 8, 2001, (issued as U.S. Pat. No. 7,210,099) entitled "RESOLUTION INDEPENDENT VECTOR DISPLAY OF INTERNET CONTENT," which is a Continuation-in-Part of U.S. Non-provisional application Ser. No. 09/825,511, filed Apr. 7, 2001, (Abandoned) entitled "RESOLUTION INDEPENDENT VECTOR DISPLAY OF INTERNET CONTENT," the benefit of the filing dates of which is claimed under 35 U.S.C. §120. U.S. Non-provisional application Ser. No. 09/878,097 further claims the benefit of the filing dates of U.S. Provisional Application No. 60/211,019, filed Jun. 12, 2000, entitled "METHOD AND SYSTEM FOR RESOLUTION INDEPENDENT DISPLAY OF HTML AND XML CONTENT" and U.S. Provisional Application No. 60/217,345, filed Jul. 11, 2000, entitled "METHOD AND SYSTEM FOR SELECTION, RETRIEVAL, AND CONVERSION OF COMPUTER CONTENT TO VECTOR FORMAT FOR RESOLUTION INDEPENDENT DISPLAY," under 35 U.S.C. §119(e). The disclosure of each of the foregoing applications is incorporated by reference in its entirety herein for all purposes.

This application also contains subject matter related to Divisionals (of Ser. No. 09/878,097) U.S. Non-provisional application Ser. Nos. 11/045,649 (issued as U.S. Pat. No. 7,584,423) entitled METHOD, PROXY AND SYSTEM TO SUPPORT FULL-PAGE WEB BROWSING ON HANDHELD DEVICES, and 11/045,757 (issued as U.S. Pat. No. 7,461,353) entitled SCALABLE DISPLAY OF INTERNET CONTENT ON MOBILE DEVICES, both filed Jan. 28, 2005. This application also contains subject matter related to U.S. Non-provisional application Ser. Nos. 11/735,477 and 11/735,482, both filed on Apr. 15, 2007, 11/738,932 filed on Apr. 23, 2007, 11/868,124 filed on Oct. 5, 2007, and 12/326,092 filed on Dec. 1, 2008.

## COPYRIGHT NOTICE

Contained herein is material that is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction of the patent disclosure by any person as it appears in the Patent and Trademark Office patent files or records, but otherwise reserves all rights to the copyright whatsoever.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The invention relates generally to viewing of Internet content on mobile devices, and more particularly concerns to novel processing of Internet and World Wide Web content to scalable forms for resolution-independent rendering and zoom- and pan-enabling the display of content on mobile devices.

### 2. Description of the Related Art

Text only Internet information browsers began as a project at the CERN, European Organization for Nuclear Research, facility in Geneva Switzerland. From its inception the intent was to provide a mesh or web of access to data with a common user interface. Browsers moved from the academic environment when NCSA, the National Center for Supercomputing

2

Applications at the University of Illinois in Urbana-Champaign developed Mosaic, an Internet information browser and World Wide Web client.

Internet content is stored in multiple file formats. These formats include HTML (Hyper Text Markup Language) and XML (eXtended Markup Language) as well as graphic file format GIF (Graphics Interchange Format) and JPEG (Joint Photographic Experts Group). These four file formats constitute the majority of Internet content. Font size and resizing display area for content can alter the size of the display of Internet content in existing browsers. The majority of Internet content displays as a flat single resolution with no browser support for zoom.

Much of the Internet content has been designed for display on desktop computers with a single target resolution. Even though HTML has the ability to adapt to changes in screen resolution, major Internet content providers have chosen to create their Web pages using fixed resolution structures, such as tables. This gives them the ability to control the look and feel of their Web sites. This fixed resolution approach has evolved to the point that the fixed resolution layout of Web pages has become the most common method to brand or uniquely identify Web sites. While this fixed resolution approach is good for site branding and product differentiation it does present a daunting technical problem for display of Internet content (designed for desktop computers) on small screen, low resolution, or different aspect ratio devices, such as cell phones and hand held computers.

## BRIEF SUMMARY OF THE INVENTION

In accordance with aspects of the invention, mobile devices enabled to support resolution-independent scalable display of Internet (Web) content to allow Web pages to be scaled (zoomed) and panned for better viewing on smaller screen sizes are disclosed. The mobile devices employ novel processing of original Web content, including HTML-based content, XML, cascade style sheets, etc. to generate scalable content. The scalable content and/or data derived therefrom are then employed to enable the Web content to be rapidly rendered, zoomed, and panned. Display lists may also be employed to provide further enhancements in rendering speed.

According to further aspects, the mobile devices employ touch-sensitive display screens that enable users to provide various inputs to control display of content within Web pages. Exemplary user inputs include tap-based inputs to selectively zoom in on columns, images, and paragraphs. Users can also define a window to zoom in on via the touch-sensitive display.

Other features of the present invention will be apparent from the accompanying drawings and from the detailed description that follows.

## BRIEF DESCRIPTION OF THE DRAWINGS

The appended claims set forth the features of the invention with particularity. The invention, together with its advantages, may be best understood from the following detailed description taken in conjunction with the accompanying drawings of which:

FIG. 1A is a block schematic diagram illustrating a first exemplary system infrastructure in accordance with the present invention in which content translation services are performed by a third-party proxy service that translates content requested from a client that is retrieved from one or more network resources into a scalable vector representation and delivers the translated content to the client;

US 7,831,926 B2

3

FIG. **1**B is a block schematic diagram illustrating a second exemplary system infrastructure in which the translation of content is performed at a content provider's web site and delivered directly to the requesting client;

FIG. **1**C is a block schematic diagram illustrating a third exemplary system infrastructure in which content received from one or more network sources is translated into a scalable vector representation at the client;

FIG. **2**A is a flowchart illustrating how data is retrieved, processed and transferred in accordance with the system infrastructure of FIG. **1**A;

FIG. **2**B is a flowchart illustrating how data is retrieved, processed and transferred in accordance with the system infrastructure of FIG. **1**B;

FIG. **2**C is a flowchart illustrating how data is retrieved, processed and transferred in accordance with the system infrastructure of FIG. **1**C;

FIG. **3** is a block schematic diagram illustrating an exemplary architecture corresponding to the proxy server of FIG. **1**A;

FIG. **4**A is a representation of an exemplary web page has displayed on a conventional browser;

FIG. **4**B is a schematic diagram illustrates various objects that are generated based on the HTML code of the web page of FIG. **4**A;

FIG. **4**C is a schematic diagram illustrating a set of vectors and bounding boxes corresponding to the objects generated in FIG. **4**B;

FIG. **4**D is a schematic diagram illustrating how various vectors and bounding boxes may be defined in accordance with the invention;

FIG. **4**E is a representation of the web page of FIG. **4**A after it has been offset and scaled in accordance with the invention;

FIG. **4**F is a schematic diagram illustrating new datum points and bounding boxes corresponding to the scaled and offset web page;

FIG. **4**G is a schematic diagram illustrating new vectors and bounding box parameters for a pair of objects in the scaled and offset web page;

FIG. **5** is a flowchart illustrating the logic used by the invention when translating content into a scalable vector representation of that content;

FIG. **6** is a flowchart illustrating client-side operations that are performed to create a rendered display page based on the translated content the client receives and user-input;

FIGS. **7**A and **7**B are representations of a nominal and a zoomed in column view of an exemplary web page as they might appear on a Palm device;

FIGS. **8**A and **8**B are representation of nominal and zoomed in view of an exemplary graphic image as they might appear on the Palm device;

FIGS. **9**A and **9**B are representations of a nominal and zoomed in view of a text portion of a web page as they might appear on the Palm device; and

FIG. **10** illustrates an exemplary computer system that may be used for implementing various aspects of embodiments of the invention.

DETAILED DESCRIPTION OF THE INVENTION

Apparatus and methods are described for creating resolution independent vector display of Internet content to allow it to be scaled (zoomed) larger and smaller for better viewing or to fit any resolution or screen size. In addition, infrastructure and methods are provided for delivering such content to clients.

4

In the following description, for the purposes of explanation, numerous specific details are set forth in order to provide a thorough understanding of the present invention. It will be apparent, however, to one skilled in the art that the present invention may be practiced without some of these specific details. In other instances, well-known structures and devices are shown in block diagram form.

The present invention includes various operations, which will be described below. The operations of the present invention may be performed by hardware components or may be embodied in machine-executable instructions, which may be used to cause a general-purpose or special-purpose processor or logic circuits programmed with the instructions to perform the operations. Alternatively, the operations may be performed by a combination of hardware and software.

The present invention may be provided as a computer program product that may include one or more machine-readable mediums having stored thereon instructions, which may be used to program a computer (or other electronic devices) to perform a process according to the present invention. The machine-readable medium may include, but is not limited to, floppy diskettes, optical disks, CD-ROMs, and magneto-optical disks, ROMs, RAMs, EPROMs, EEPROMs, magnetic or optical cards, flash memory, or other type of media/machine-readable medium suitable for storing electronic instructions. Moreover, the present invention may also be downloaded as a computer program product, wherein the program may be transferred from a remote computer (e.g., a server) to a requesting computer (e.g., a client) by way of data signals embodied in a carrier wave or other propagation medium via a communication link (e.g., a modem or network connection). Accordingly, herein, a carrier wave shall be regarded as comprising a machine-readable medium.

Client Overview

According to one embodiment, an ultra-thin client-side viewer provides the graphics, linking, caching, and function handling capabilities necessary for extending the web to almost any platform. It is designed as a lightweight browser (micro-browser) running directly on device operating systems. In alternative embodiments, the client-side viewer may be deployed as a standard browser plug-in, or Java applet for extending browser functionality. In one embodiment, the client-side viewer attains its small size and efficiency by taking advantage of the power of SVF (Simple Vector Format) to describe almost any current web content. SVF files can be handled with a tiny fraction of the client code required by normal web browsers because current browsers must interpret a large and growing number of file types and their idiosyncrasies. SVF was originally designed to handle a superset of the most commonly used file formats in the complex world of CAD. It can accommodate not only new graphical functions, but the storage and transfer of almost any foreseeable new functional capability. SVF has been under consideration by the W3C (World Wide Web Consortium) for adoption as a standard for vector content on the World Wide Web.

By working tightly with a server-side content translator, web content and functionality can be passed seamlessly to the end user platform without any degradation in the look or feel of the output. In addition, because the resulting file graphics are handled as vectors, the end user can control real time changes in the size of text and graphics as well as what portion of the file is viewable in the display. This "zoom and pan" capability, familiar to CAD and other vector content software users, adds dramatically to the usability of non-standard display sizes. For very small displays, real time zooming and panning allows the user to see graphics and text at sizes that make them easily readable, and then "back up" to view an

US 7,831,926 B2

5

entire page for context or pan in any direction for navigation. Because the client-side viewer manipulates vectors, there is no loss in quality as the display is zoomed. The graphics rendering engine within the client is so efficient that file manipulation happens in a fraction of a second. There is no perceptible wait for the user as the file is resized, or the window is repositioned. Content created for one display resolution now can be sized, real time, for any other display without degradation. Besides making small displays eminently usable, this technology extends web content into some surprising new arenas. For example, it enables normal desktop displays to be effective for individuals with visual impairment, or for content designed for 640×480 standard PC monitors to be shown without degradation on web billboards now appearing in cities like Seattle and San Francisco.

With a client of such extraordinary power packed in a tiny footprint, end user device manufacturers can free up valuable memory space for pre-fetching, caching and pre-loading content, dramatically improving performance for use in low bandwidth and portable applications. In the example of a wireless handheld device where expensive flash memory must be used instead of more cost effective bulk storage technology, the difference between consuming 10's of megabytes of flash memory with a standard browser versus running the client-side viewer described herein is dramatic.

Those "saved" megabytes of memory are now available for impressive interfaces, caching of often used content, and pre-fetching of intelligently selected linked files or pre-loading of content for targeted applications. For example, in a mapping application, the map tiles surrounding the viewed map could be downloaded and stored while the user was working with the initial tile, enabling an experience remarkably free from the current frustrations of waiting for a new map to be transferred for even the smallest change in magnification or coverage. If the user knows ahead of time what city they will visit on a business trip, maps and additional travel information in great detail could also be pre-loaded using a high bandwidth connection at home or in the office before heading out to shop or conduct business in the city. Additionally, SVF is a more efficient way to store web content. Resulting content files are reduced in size by anywhere from 20 to 80 percent over their source. SVF is also very compressible. With target file size reduction in the range of 90%, SVF files can take up as little as $\frac{1}{10}$th the space of the web files in current use. This means that pre-translated content can be moved up to 10 times the rate of current web pages, and as much as 10 times as many pages, maps, stock charts, etc. can be stored for instant retrieval on the hand held platform as can be handled with current web technology.

When used on content created natively in SVF, additional capability can be extended to the client-side viewer.

Graphing the performance of stocks over time is only one use of SVF's ability to handle streams of data. Handling the output from financial systems, transactional systems, ERP packages, and CRM systems becomes easier and more flexible. Of course, systems integrators don't have to use these powerful capabilities to start with. If the target system provides web interfaces, these can be viewed, as designed, with no additional software to write, and no changes to the design or layout of the interface.

Server Overview

Enabling the client-side viewer to be so small and powerful is the server-side content translator. The server-side content translator rapidly translates Web content to SVF, compresses and encrypts the SVF results if desired, and transfers the vector formatted results to the client-side viewer. Alternatively, SVF files can be cached or stored in a file system for

6

fetching and transfer at a later time. Pre-translated or cached content transfers are significantly faster as no conversion overhead is incurred, and file sizes are reduced using the more efficient SVF. Combine that with standard compression algorithms selectable for use with the client-side viewer for additional performance improvements.

During the translation process, and in the process of serving cached, pre-translated, or native SVF content, output files are "streamed" to the client-side viewer. Although this does not decrease the total time for file transfer, it can significantly improve the effective system performance for the end user. Content can be selectively streamed, with text and links coming through first, followed by graphic images and other content, for example. Should the user be accessing a link, rather than having interest in the entire file served, links can be selected early in the transfer and the next file download started immediately. In addition to streaming, the server-side content converter may also layer the content by type. This means that text can be put in one layer, links in another, GIF images in another, Javascript in another and so on. Layers can be turned on or off depending upon client capabilities, making files for less capable clients, or for users interested in a reduced functionality, higher transfer performance mode to be handled automatically.

All operational modes may be controlled through an administrative interface or accessible through a straightforward API (Application Program Interface). Furthermore, the system works with existing firewalls and within standard security protocols. In more secure modes, the server-side content converter and the client-side viewer may operate using Public/Private key authentication and encryption.

Exemplary System Infrastructures

In the following paragraphs, a description of three exemplary system infrastructures is provided. Schematic illustrations of these system infrastructures are shown in FIGS. 1A, 1B, and 1C. It is noted that like-numbered components in these Figures perform substantially the same function. Therefore, any discussion of the functions of a component with reference to one or more of the infrastructures generally may apply to the other infrastructures as well, unless specifically noted otherwise.

A first of exemplary system infrastructure 10A for implementing the invention is shown in FIG. 1A. Infrastructure 10A enables various clients, including wireless devices such as a cellular phone 12, a wireless-enabled PDA 14, and a wireless-enabled laptop computer 16, as well as landline computers 18, 20, and 22, to request content that is accessible via a network such as the Internet 24 to be retrieved from selected network resources, including web servers 26 and 28 and an FTP site 30, wherein the content is translated into a scalable vector representation (e.g., SVF, also referred to herein as "vectorized content") through use of a proxy server 32 and sent to the requesting client. Upon being received by the client, the vectorized content is processed and rendered using a thin client to enable a user to view the content on the client device.

With reference to the flowchart of FIG. 2A, the foregoing process is initiated by a client in a block 100, wherein the client submits a request to proxy server 32 to retrieve and convert selected content. As depicted by a transfer path 34, this comprises sending data 36, which includes content network location indicia from which the content can be retrieved and proxy server network location information by which the content request may be delivered to over Internet 24 to proxy server 32. Typically, it will be desired to retrieve a particular web page. Accordingly, the content network location indicia will comprise a URL (uniform resource locator) for the web

US 7,831,926 B2

7

page. Similarly, the proxy server network location information may also comprise a URL corresponding to a network access point for the proxy server. Optionally, the location information may comprise a network IP address for one or both of the content location and the proxy server location. If the content is to be retrieved from an Internet resource, the request will typically be sent using the HyperText Transfer Protocol (HTTP) over the TCP/IP transport.

Next, in a block **102**, the request is received by the proxy server and the proxy server checks its cache to see if it already has the request content in its cache. If it does, it sends this cached content back to the client. If it does not have the requested content cached, the proxy server sends out a request to retrieve the content from the network resource. For illustrative purposes, it will be assumed for the present example that the desired content comprises a web page that is stored on web server **26**. Typically, when the requested content comprises a web page, the content may be retrieved using conventional web content retrieval techniques, such as that employed by various modern browser clients, including Netscape Navigator and Internet Explorer. This generally comprises providing routing information, such as the URL for the web page (URL **38**) to routing services provided by Internet **24**, which routes the request to an appropriate network resource (e.g., web server **26**), as depicted by a transfer path **40**.

Typically, the URL will correspond to a web page whose content is stored by the web server in an HTML (HyperText Markup Language) document comprising HTML code and embedded text content, in addition to other optional content languages, that may contain references to other objects (e.g., HTML documents and graphic image files) stored locally to the server or stored on a remote server. For example, the HTML content corresponding to a single-frame web page is often stored in a single file, while multiple-frame web pages may comprise content that is stored in a single file or in multiple files. These files may be stored locally on the web server (e.g., on one of the server's hard disks), or on a local storage device connected to the web server via a local area network (LAN), such as a network attached storage (NAS) filer. Optionally, some of the web page's content may comprise one or more documents that are stored at remote locations that may be accessed via a WAN (wide area network) or the Internet.

HTML is a standardized language that describes the layout of content on a web page, and attributes of that content. This layout and attribute information is defined by sets of tags contained in HTML code corresponding to the page. The tags define various HTML layout and display information, including tables, paragraph boundaries, graphic image positions and bounding box sizes, typeface styles, sizes, and colors, borders, and other presentation attributes. A portion or all of a web page's text content may be contained in the parent HTML document corresponding to the URL. In addition to basic HTML, web page documents may contain XML (eXtensible markup language) code, as well as scripting language code, such as javascript. However, for simplicity, any documents containing web page content other than only graphic content that are discussed herein will be referred to as HTML documents.

In addition to HTML and other markup and scripting language content, it is very common for web pages to include graphical content. In general, graphical content is usually stored in an image file or files that are external from the parent HTML document for the web page. For example, the parent HTML document may contain one or more embedded image tags that reference the location where those images are stored.

8

As before, the graphic images may be stored locally, or may be stored on remote servers that are accessed by the web server via a WAN, or the Internet. These files will typically comprise data stored in one of several well-known graphic formats, including bitmap files (BMP), GIF (Graphics Interchange Format) files, and JPEG (Joint Photographic Experts Group) files.

In response to receiving the request for content, web server **26** begins sending a parent HTML document **42** back to proxy server **32**. In a block **106**, the HTML content of the parent HTML document is parsed to search for references to external objects such as HTML frames and graphics. In a decision block **108**, a determination is made to whether any references are found. For each reference to an external object that is found, proxy server **32** requests to have the object retrieved from an appropriate network resource (e.g., a web server) in a block **110**, and data corresponding to the object is transmitted back to the proxy server, as depicted by locally accessible HTML documents **44** and graphic images **46**, as well as remotely accessible HTML documents **48** and graphic images **50**, which may be accessed via web server **28**. If the external object is a graphic image, there is no further processing of the object at this point. If the object is an HTML document, the functions provided by blocks **106** and **108** are repeated. Generally, this set of processing functions is repeated iteratively until all of the external objects are retrieved. However, as described below, there will be some instances in which certain objects will be retrieved at a later point in time. In addition to content stored on web servers that are accessed using HTTP, content may also be retrieved from various network sites using the File Transfer Protocol (FTP), such as FTP documents **51**, which are accessed via FTP server **30**.

In general, HTML documents and graphic files will be sent as packetized data streams using HTTP over one or more TCP/IP network connections, wherein the data streams will usually be asynchronous. Retrieval of HTML documents and graphic files corresponding to the embedded references will usually require additional transfer time. Furthermore, graphic content oftentimes comprises significantly larger file sizes than HTML content, leading to significant transfer times in some instances. For simplicity, the transfer of the various HTML documents and graphic files for the content request are depicted by HTML documents **52** and graphic documents **54**, which are transferred over a transfer path **56**.

When the HTML documents and graphic content are received by proxy server **32**, a scalable vector representation of the web page is generated in a block **114** by an HTML translator **58**. In brief, HTML translator **58** translates HTML, XML, and cascaded style sheet (CSS) layout content into a scalable vector representation, such as SVF. Details of the HTML translation process are contained below. In addition, the graphic images are converted into a compressed bitmap format in a block **116** by a graphics translator **60**. The vectorized content **62** and compressed bitmaps **64** are then streamed back to the client (i.e., computer **18**) in a block **118**, as depicted by a transfer path **66**. In one embodiment, the content portions are sent in separate streams using multiple connections. In another embodiment, the content portions are sent via a multiplexed stream using a single connection. As the vectorized content and compressed bitmap data are received by the client device, they are processed by a thin client **68** running on the client device, whereby a representation of the original web page content may be rendered on the client device's display screen at various user-selectable scaled resolutions and pan offsets in a block **120**, thereby

9
10

enabling a user to more clearly see an overview or details in the web page. Further details of the client side processing are provided below.

As discussed above, wireless clients may also access the vectorized network (e.g., web site) content provided via proxy server **24**. The majority of this process is identical to that described above for land-line clients (e.g., computers **18**, **20**, and **22**), except for provisions required for sending data to and receiving data from wireless devices. In general, most wireless devices will access the Internet via a wireless service provider (i.e., a wireless telecommunications carrier) that is particular to that wireless device. Accordingly, a portion of the transmission path to and from proxy server **24** will comprise infrastructure provided by that service provider and/or shared with other service providers. For simplicity, this infrastructure is shown as a cellular tower **70** and a service provider data center **72**, although it will be understood by those skilled in the art that the connection path may comprise additional infrastructure components, including appropriate gateways and routers, that enable wireless devices to access proxy server **24**.

In some implementations, there will be no special formatting/protocol services that need to be performed by proxy service **24**—from the viewpoint of the proxy service, it will be immaterial whether the client is a land-based or wireless client; the special handling provisions for wireless devices will be handled entirely by the service providers infrastructure transparently at both ends of the communications path. In other instances, it may be desired or necessary to reformat the data content delivered to the wireless device at the proxy service. This will generally be dependent on the particular wireless protocol used, and what services are provided by the service provider for the wireless client.

Currently, in the United States, wireless clients generally access Internet **24** by using the Wireless Application Protocol (WAP). In Japan, the most popular access means is NTT DoCoMo's i-Mode wireless protocol. In addition to these wireless standards, new standards are anticipated to be in force in the near future, including NTT DoCoMo's FOMA (Freedom of Mobile Multimedia Access), which is transported over W-CDMA (Wideband Code Division Multiple Access), and CDMA-2000. For the purposes of the invention herein, it will be understood that those skilled in the mobile telecommunications arts will be knowledgeable about any particular format and/or transport protocol requirements that pertain to the particular protocol that is to be used.

A second exemplary system infrastructure **10**B for implementing the invention is shown in FIG. **1**B. As will be readily recognized, much of infrastructure **10**B is similar to infrastructure **10**A; however, rather than have a separate proxy server perform the proxy functions (retrieve and translate content), these functions are performed on machines operated by the web site in infrastructure **10**B.

The logic implemented by the invention when providing content to a client using infrastructure **10**B is illustrated in the flowchart of FIG. **2**B, wherein the process begins in a block **101** in which the client sends a content request **39** directly to the network site (e.g., web server **26**), as depicted by a transfer path **41**. In a block **103**, HTTP negotiations are performed to determine the format the content is to be delivered in. For example, the request may contain indicia identifying the type of content requested, such as an SVF MIME type (e.g., image/vnd.svf). This is to inform the web server that the request is for specially-formatted content rather than conventional content. The server first checks to see if it already has cached the requested content. If it has, it sends the content to the requesting client; otherwise, it retrieves the parent HTML document

in a block **107**. It then performs processing steps in blocks **107**, **109**, and **111** to retrieve content referenced through embedded tags in a manner substantially similar to that discussed above with reference to respective blocks **106**, **108**, and **110**. The primary difference in this instance is that the web server does not receive requests from or send documents to a proxy server—rather, the content is retrieved and processed at the web server, wherein the retrieved content may be stored local to the web server or retrieved from a remote server in a manner similar to that described above.

As before, the retrieved HTML documents are translated into scalable vector representations by HTML translator **58** in a block **114**, while the graphic images are translated into a compressed bitmap format by image translator **60** in a block **116**, as depicted by vectorized content **62** and bitmap content **64**. The vectorized content and bitmap content are then streamed from the web server to the client in a block **119**, as depicted by a transfer path **67**. Upon arriving at the client, the vectorized content and bitmap content are processed, scaled, and rendered on the client in a block **120**.

A third exemplary system infrastructure **10**C for implementing the invention is shown in FIG. **1**C. In this configuration, the proxy functions are performed at the client. As shown by a block **113** in FIG. **2**C, the process for providing vectorized content to a client in accordance with infrastructure **10**C begins in a block **113**, in which the client sends a content request **37** to a network site, such as web server **26**, via Internet **24**. In response, the network site retrieves the parent HTML document and sends it to the requesting client in a block **115**. In a manner similar to that discussed above with reference to blocks **106**, **108**, and **110** of FIG. **1**A, the client first parses the parent HTML document searching for embedded references to external objects and retrieves these objects, whereupon the embedded reference search is performed on the newly retrieved document until all of the content corresponding to the original content request has been retrieved. This content is depicted by HTML documents **52** and image files **54**, which are sent from the network site to the client via a transfer path **69**. At this point, the client performs translations on the HTML content and the graphic image content that are substantially similar to that performed by the proxy server in FIG. **1**A or at the web site in FIG. **1**B, as provided by blocks **114** and **116**. The vectorized and image content is then processed and scaled by thin client **68** in a block **120**, as depicted by device output **71**.

Attention now is focused on the functionality provided by proxy server **24** in system infrastructure **10**A of FIG. **1**. Fundamentally, the proxy server functions as a proxy. It accepts requests for content from client devices as full URLs using standard HTTP mechanisms carried over a multiplexed TCP connection. Standard HTTP content negotiations features specify the formats in which content is to be delivered (SVF, bitmap, and possibly others, which can be handed off to cooperating client-side display software). As described in further details below, in some embodiments the proxy server appears for the client as a normal proxy (that is, the client knows it is retrieving content via the proxy), while in other embodiments the proxy is transparent to the client.

The proxy server responds to client content requests by delivering content in one of the requested formats, by retrieving the content in an appropriate format from its cache, or from an upstream content source (again using standard HTTP content negotiation features), or by translating upstream content from a supported original format to SVF or the client bitmap format.

Requests from the server installation to its cache and from the cache to upstream content sources are made in HTTP

US 7,831,926 B2

11

carried over TCP using simple straightforward Web content requests. For example, requests from clients to the proxy server comprise HTTP proxy requests (e.g., "GET http://www/xyz.com/some_page.html HTTP/1.0 . . .") carried over TCP or over a lightweight multiplexing protocol over TCP. The multiplexing protocol allows the server to push image thumbnails to the client before the SVF stream is available, as well as offering a channel for control and status information, more simultaneous channels than the client operating system may support, and a mechanism for prioritizing information flow from server to client under loose client control. In addition to HTTP requests, the proxy server architecture supports other user-level protocols, such as FTP and Gopher.

Details of some of the primary components of the proxy server architecture are shown in FIG. 3. Internally, the proxy server comprises a suite of coordinated processes connecting to upstream content through an HTTP cache 74. In one embodiment all functions except caching are performed in a single process, wherein multiple threads are used to effect asynchronous I/O. Separate processes communicated via persistent multiplexed connections carried over the most efficient reliable transport available (e.g., Unix sockets over single processor and symmetric multiprocessor (SMP) computers; TCP sockets between separate computers). All processes are capable of servicing multiple requests simultaneously. No process maintains client state outside the context of a single request, so all components can be repeated and load balanced across multiple CPU's of an SMP computer or across separate computers on a LAN.

The various content translators used by the proxy server accept (via HTTP PUT) or request (driven by HTTP proxy GET/POST) content in supported, but client-unsupported, formats; and return (via HTTP PUT or GET/POST response) one or more representations of that content in a client-supported format. In the embodiments illustrated in FIGS. 1A-C, two translators are used: HTML translator 58 and image translator 60. Future content types may be accommodated by new translators, by extending existing translators to cover the new content types, or by extending the client's capabilities. Standard HTTP content negotiation mechanisms are used to inform the proxy server of the client's capabilities and expectations on each request.

Managers at the proxy server coordinate the operations of other components. Two managers are presently defined; a client manager 73 that handles client proxy requests, and a request manager 75 that handles unproxied HTTP requests from other services. The managers accept requests, attempt to service them from HTTP cache 74, and drive HTML translator 58 and image translator 60 when content does not match

12

the clients' requirements. Managers also handle translator requests for inline content (e.g., image dimensions for page layout), and push translated content into HTTP cache 74. Additionally, the client manager coordinates delivery of primary and inlined content, and provides process and status information to the clients.

As discussed above, HTML translator 58 creates a scalable vector representation of the original HTML content of a requested web page. In order to better explain how translation of HTML content is performed, one embodiment of a translation process is described below as applied to an exemplary web page. In addition, details of conventional web page client and server-side processing are provided so as to clarify how web content is laid out during a pre-rendering process on the client.

FIG. 4 shows a representation of a web page 210 served from an exemplary stock brokerage Internet web site as it would appear when rendered on a modern Internet browser, such as Microsoft's Internet Explorer or Netscape's Navigator. Web page 210 is exemplary of many web pages that implement frames, and includes two adjacent frames 212 and 214. A logo graphic object 216A is displayed at the top of frame 212, which additionally includes a "MARKETS" text header 218A, an "INVESTMENTS" text header 220A, and a plurality of links with overlaying graphic objects, including a "DOW" link 222A, a "NASDAQ" link 224A, an "OPTIONS" link 226A, a "CHARTS" link 228A, a "MUTUAL FUNDS" link 230A, a "IRA, 401K OPTIONS" link 232A, and a "TAX INFORMATION" link 234.

A horizontal group of links 236 is disposed at the top of frame 214, and includes a "QUOTES" link 238A, a "HOT PICKS" link 240A, a "CALENDARS" link 242A, and a "NEWS" link 244A. An advertisement banner 246A is displayed just below the horizontal group of links and just above a "NEWS SPARKS MARKET" headline 248A. Frame 214 also includes a pair of graphic image objects, including a DOW chart 250A and a NASDAQ chart 252A. A set of user input objects is disposed adjacent to DOW chart 250A within a graphic object 254A, including an "ACCOUNT #" input box 255A, an "ACCESS CODE" input box 256A, and a "LOGIN" button 257A. In addition to the foregoing objects, frame 214 also includes text objects 258A and 260A.

An HTML listing corresponding to web page 210 is presented below as LISTING 1. Note that LISTING 1 sometimes refers to object descriptions and link paths rather than the text or path location of actual objects for simplicity, and that other elements commonly found in HTML pages, such as META entries, are omitted for clarity.

| LISTING 1 |
|---|

```
1.    <html>
2.    <head><title>"MARKET HOME"</title></head>
3.
4.    <body bgcolor="#FFFFFF" link="0033CC" vlink="0033CC">
5.
6.    <frameset cols="25%,75% frameborder=0 border=0>
7.    <frame>
8.    <align=left><align=top>
9.    <img src="/directory path/logo.gif" align = left border="0" height="80" width="100">
10.   <br><br>
11.   <t3>TEXT HEADER #1 align=left</t3><br>
12.
13.   <table width="90%" border=0 cellspacing=10 cellpadding=0 bgcolor="#000000"
14.   align=center>
15.        <tr>
```

US 7,831,926 B2

13                                                          14

-continued

LISTING 1

```
16.                    <a href="URL or path for LINK #5" <img src="/directory
17.                    path/GRAPHIC#2" height="50" width ="150"></a>
18.        <tr>
19.                    <a href="URL or path for LINK #6" <img src="/directory
20.                    path/GRAPHIC#3" height="50" width ="150"></a>
21.        <tr>
22.                    <a href="URL or path for LINK #7" <img src="/directory
23.                    path/GRAPHIC#4" height="50" width ="150"></a>
24.        <tr>
25.                    <a href="URL or path for LINK #8" <img src="/directory
26.                    path/GRAPHIC#5" height="50" width ="150"></a>
27.    </table>
28.        <br>
29.                    <t3>TEXT HEADER #1 align=left</t3>
30.        <br>
31.    <table width="90%" border=0 cellspacing=10 cellpadding=0 bgcolor="#000000"
32.      align=center>
33.        <tr>
34.                    <a href="URL or path for LINK #9" <img src="/directory
35.                    path/GRAPHIC#6" height="50" width ="150"></a>
36.        <tr>
37.                    <a href="URL or path for LINK #10" <img src="/directory
38.                    path/GRAPHIC#7" height="50" width ="150"></a>
39.        <tr>
40.                    <a href="URL or path for LINK #11" <img src="/directory
41.                    path/GRAPHIC#8" height="50" width ="150"></a>
42.
43.    </table>
44.    </frame>
45.
46.    <frame>
47.
48.    <table>
49.        <tr>
50.                    <table width="100%" border=0 cellspacing=15 cellpadding=0
51.                      bgcolor="#000000" align=center>
52.            <tr>
53.                    <td><a href="URL or path for link#1"> alt="QUOTES"</a>
54.                    <td><a href="URL or path for link#2"> alt="HOT PICKS"</a>
55.                    <td><a href="URL or path for link#3"> alt="CALENDERS"</a>
56.                    <td><a href="URL or path for link#4>alt="NEWS"</a>
57.    </table><br>
58.        <br>
59.                    <img src="URL for GRAPHIC #9" align=center
60.                      border="0" height="80" width="325">
61.        <br><t1>HEADLINE TEXT</t1>
62.        <table>
63.                    <Colgroup span="2">
64.                        <Col width = "400" align="center">
65.                        <Col width = "200" align="center">
66.                        <tr><td>
67.                            <img src="/directory path/GRAPHIC #10" align = center
68.                            border="0" height="180" width="350">
69.                        <td>
70.    /* INPUT FOR ACCOUNT NUMBER AND ACCESS CODE */
71.        <SCRIPT LANGUAGE ="Javascript">
72.    <!---
73.                    [Javascript variable declarations]
74.                    [Javascript functions to enable login] ---!>
75.    </SCRIPT>
76.        <table>
77.                    <td>
78.                    <img src="/directory path/GRAPHIC #11" align = center>
79.                    <table width="150" height="25">
80.                    <td>
81.                    <font size=-2 face="arial,helvetica,verdana">Account #</font>
82.                    <tr><input type=text name="USERID" maxlength=9 size=20>
83.                    <tr><font size=-2 face="arial, helvetica">Access Code:</font>
84.                    <tr><input type=password name="PASSWORD" maxlength=10 size=20
85.                        onKeyDown="SuppressEnterBell(event)"
86.                        onKeyPress="SuppressEnterBell(event)"
87.                        onKeyUp="SubmitOnEnter(event)">
88.                    <br> 
89.                    <br><input type="button" value="Login"
90.                    OnClick="ProcessForm( )">  <input type="reset">
```

US 7,831,926 B2

15                                                                              16

-continued

LISTING 1

```
 91.                    <br> 
 92.                    </td>
 93.                    </table>
 94.            </table>
 95.       <tr>
 96.                    <img src="/directory path/GRAPHIC #12" border="0
 97.                    height="200" width="350">
 98.       <tr>
 99.                        <p>TEXT FOR TEXT OBJECT #1</p><br>
100.                        <p>TEXT FOR TEXT OBJECT #2</p>
101.            </table>
102.            </frame>
103.      </frameset>
104.      </html>
```

Web page documents comprise HTML code that is parsed, interpreted, and rendered by a browser. An HTML document comprises a plurality of HTML "markup" elements (tags) with corresponding attributes, that are used to describe the layout and formatting of various objects, including plain text and graphic objects, embedded between tag pairs. Exemplary elements include text tags (e.g., <b></b> for bolding text), links (e.g., <a href="URL"></a>), formatting (e.g., <p></p> for creating a new paragraph, graphical (e.g., <img src="name">), wherein "name" defines an absolute or relative location at where an image is stored, tables (e.g., <table></table>) creates a table, and forms (e.g., <form></form> creates all forms).

As of Netscape Navigator 3.0 (and other later browsers), web pages could include frames. When using frames, the display page is divided into multiple framed areas. Framing enables a single display page to include source code from several HTML documents (one for each frame) or optionally, enables a single document to include more complicated grouping of contents whereby different content groups are contained in separate frames. Frames are commonly found on the web pages at sites that display a great deal of text and graphical content, such as MSN.com, ESPN.com, and USA-Today.com.

With reference to the flowchart of FIG. 5, the process for translating the HTML content into a scalable vector representation proceeds as follows. The process is initiated when the proxy server receives the HTML corresponding to the parent document (and frame documents, if appropriate), whereupon a pre-rendering parsing of the HTML is performed to determine where to place the various objects on the display page in a block 150. For example, elements such as tables, column definitions, graphic images, paragraphs and line breaks are identified. If frames are included, each frame is examined in the sequential order it appears in the HTML document, or the order in which the HTML documents corresponding to the frames in a frameset are downloaded to the browser. During further processing, the actual objects are rendered in their respective positions. Some of these objects are rendered almost immediately, such as plain text, while other objects, such as graphic objects, must first be retrieved prior to being fully-rendered. With respect to tables, there are some instances in which all of the objects corresponding to the cells in the table must be retrieved prior to rendering any of the table, while a well-designed table can be rendered incrementally. For example, by using Column grouping, the format of the corresponding table can be quickly determined by the browser. In some instances, one or more bitmaps may actually need to be fetched before the page layout can be determined.

Next, in a block 152, the content is separated into objects based on logical groupings of content portions and a page layout is built using bounding boxes that are produced for each object. As the primary HTML document is parsed, logical groupings of content will emerge. For instance, text content contained within paragraph tags <p></p> forms a logical grouping of text content. In essence, a logical grouping means the content should appear together as a logical group, such as within a substantially rectangular outline, in the rendered page. Other logical groupings include frames, table content, row content, single line entries such as headlines and headers, and user-interface objects, as well as graphic layout objects, such as separator bars, and graphic images. In addition to logically grouping content into objects, a "bounding box" is defined for each object. In general, the bounding box defines an outlined shape within which the content (text or graphic image) will appear. In most instances, the bounding box will be substantially rectangular in shape. However, bounding boxes comprising more complex shapes may also be produced.

In further detail, the following explains how objects corresponding to graphic images are produced. In HTML, objects comprising graphic content are identified by an <img src="/local directory path/graphic image file" (for a local graphic image) or "URL" (for a remote graphic image)> or <object> or other tags. In the foregoing tag, local graphic images are typically stored on the same server as the web page, or another computer that is local to the site's server, and generally are located through a local directory path (absolute or relative to the location of the present page) that points to the graphic image file. Remote images are those images that are stored on servers at sites that are remote to the web server. For example, with reference to LISTING 1, when the parser encounters line 9, the browser identifies that data comprising a graphic image corresponding to logo graphic object 1 will be arriving (or may have already been received), and the displayed image is to have a height of 80 pixels and a width of 100 pixels. The location of each object on a display page will be dependent on previous HTML layout elements, such as tables, paragraphs, line breaks, and other graphic objects. The size and location of the other graphic objects (i.e., graphic objects #2-12) on the page are determined in a similar manner. The HTML code for these objects are shown in lines 16, 19, 22, 25, 34, 37, 40, 59, 67, 78 and 96, respectively. As identified in the HTML code, data corresponding to graphic objects #9 (advertisement banner 46A) is forwarded to the browser from an external site (as indicated by the URL to GRAPHIC #9), while graphic objects 1-8 and 10-12 are sent from the web site the parent HTML document is sent from.

US 7,831,926 B2

**17**

In a similar manner, the foregoing technique is applied to the HTML code in the primary document to identify other types of objects as well. In addition to parsing the primary HTML document, similar processing is performed on referenced documents, such as documents that include frame content that is defined and stored separate from the primary HTML document.

A representation of the results of the functions performed in block **152** are shown in FIG. **4**B. In the Figure, objects corresponding to the original content of FIG. **4**A are shown with an appended "B" that is added to each object's root reference number, wherein the root reference number for an object is that same as the logically grouped content in FIG. **4**A that it corresponds to, e.g., an object **248**B is generated for "NEWS SPARKS MARKET" headline **248**A, etc.

Next, in a block **154**, the page layout is defined based on the bounding boxes. In actuality, generation of the page layout information is performed in conjunction with defining the boundary boxes for the objects, wherein the location of a given object is based on the location of other related (e.g., if within a table) or non-related objects corresponding to HTML content that have been previously parsed. For example, the location of a given paragraph will depend on the other content for the page that are listed prior to the definition for the paragraph in the primary HTML document or referenced document, if applicable. As the HTML content of the primary and any referenced HTML documents are parsed, the page layout is generated based on the various HTML tags and the content embedded between tag pairs and/or referenced by a tag pair statement (e.g., graphic images).

As will be recognized by those skilled in the art, the functions performed in blocks **150**, **152**, and **154** are commonly performed by conventional browsers during a pre-rendering process. In some browsers, these functions are performed by the Mozilla rendering engine, which comprises open source software that is readily available for use by developers. At present, the software for the Mozilla rendering engine may be accessed via the Internet at www.mozilla.org. Accordingly, in one embodiment, the present invention uses core functionality provided by the Mozilla rendering engine source code to perform the functions of block **150**, **152**, and **154**.

At this point, the present invention deviates substantially from the prior art by using the various object layout data generated during the pre-rendering process to generate a scalable vector representation of the original page content. First, in a block **156**, a datum point is defined for the page and the bounding box for each object. For example, as shown in FIG. **4**C, a rendered page datum **262** is defined to be coincident with the upper left hand corner of the display frame of the rendered page for the web page. Generally, any point on the page may be used as the page datum—the only requirement is that the page datum that is selected is used consistently throughout the process. The use of the upper left hand corner of the display frame is advantageous since the location of the first object encountered in the HTML code for a page is typically located relative to this corner.

In general, the datum points for each object may also be located any place on the object, as long as the object datum points are used in a predictable manner. For example, as depicted in FIG. **4**C, various datum points for corresponding objects are defined to be coincident with the upper left hand corner of the bounding box for that object, wherein the object's datum point shares the root reference number of the object with an appended "C."

Once the page's datum point and an object's datum point are known, a vector between these points is generated for each object in a block **158**. With reference to FIG. **4**D, in one

**18**

embodiment, wherein the page datum point corresponds to the upper left and corner of the display frame and is assigned an XY value 266 of 0,0, the vector for a given object may be stored as the XY value of the datum point of that object relative to 0,0, such as a value of 150, 225 (ref. num. **268**) for a vector **250**D pointing to an object datum **250**C, and a value of 150, 425 (ref. num. **270**) for a vector **252**D pointing to an object datum **252**C. In another embodiment, each vector may be stored as XY data relative to a 0,0 datum point corresponding to the upper left hand corner of the frame the object belongs to. For example, a vector **250**D' from a frame datum **214**D to object datum **250**C is stored as 20, 200 (ref. num. **268**'), while a vector **252**D from frame datum **214**D to object datum **252**C is stored as 20, 425. In this embodiment, offset information for each frame relative to a known datum will also be stored, as depicted by a vector **214**D.

The scalable vector representation is completed in a block **160**, wherein a reference is created for each object that includes or links an object's content and attributes, such as object type (e.g., text, image), object typeface, and boundary box parameters, to the object's vector. For example, object **250**B is a graphic image having a vector **250**D and a bounding box that is 180 pixels high and 350 pixels wide, while object **252**B is a graphic image having a vector **252**D and a bounding box that includes a height of 200 pixels and a width of 350 pixels. This enables client-side operations to be performed that only initially consider the vectors, wherein if it is determined that a vector's endpoint (and/or the bounding box corresponding to the object the vector points to) would appear off of a display, there is no need to retrieve the content and attribute data linked to the vector. This concept is explained in further detail in the following section.

It is noted that a portion of the display content produced on a client device will never contain any rendered content, as this portion is reserved for the browser's user interface. In WINDOWS™ environments, this portion will include the browser's window frame, as well as the pulldown and icon menus provided in the browser's user interface, which are depicted by a box **264** in the Figures herein.

Client-Side Software and Processing

As discussed above, the present invention supports a wide variety of clients, including land-based clients and wireless clients. Each client requires some client-side software that enables the scalable vector content data provided to it to be rendered at a user-selectable scale factor and offset on the client's display, such as a monitor or built-in LCD screen.

By enabling original content from a web site to be displayed in such a resolution-independent manner, users will be able to view content in a manner that did not previously exist, greatly enhancing the user experience. For example, in some implementations the client may be a personal computer (PC). Using a least-common denominator approach, many web pages are designed for a smaller resolution (for example 640×480 pixels, a minimum resolution commonly supported by nearly all PC's, including legacy PC's) than the resolution provided by the video output capabilities available with many of today's PC's, such as 1024×768 pixels, 1280×1024 pixels, and even 1600×1200 pixels. As a result, when these web pages are displayed on a high-resolution display, they occupy only a portion of the display, making portions of the pages, especially those portions containing small text, difficult to read. By enabling users to selectively magnify the entire page, these design flaws are easily overcome. Alternatively, the client may be a small device, such as a hand held computer or a cell phone, which has a smaller display resolution than common Web pages are designed for. As explained below, through use of the invention's scalable vector representation

US 7,831,926 B2

**19**                                                    **20**

and client-side processing, users are enabled to view the entire content of billions of existing Web pages using handheld devices in a simple and reasonable way.

In one embodiment, the client software may be a plug-in to a Web browser, such as Netscape Navigator or Microsoft Internet Explorer. Such a plug-in might have the browser download the data and display it in a sub-window of the browser. Alternatively, the client software may be a Java applet running in a browser. As another option, the client software may be a stand-alone program that interfaces with the proxy server or proxy software directly. The client software may bypass the proxy when requesting information that won't be translated to vectors, such as bitmaps.

With reference to FIG. 6, client-side processing proceeds in the following manner. In a block 160, the vector representation data (i.e., vectorized HTML content and compressed bitmap content) for the web page is gathered at the client. Typically, this data will be stored in a cache at the client as it is being received, and the client simply retrieved the data from the cache. In a block 162, a display list of vectors is built. This process is well known in the CAD arts, and is enabling rapid zooming of vector-based objects. In a block 164, user selectable scale and offset (pan) values are determined. Based on various user interactions with the user-interface of the client, the user is enabled to control the zoom (size) and offset of the rendered page. For example, suppose the user provides zoom and offset inputs to produce a rendered page 210E, as shown in FIG. 4E. In this rendered page, the original origin is now off of the screen (the page image is shifted upward and toward the left—see FIG. 4F), and the view has been scaled approximately 1.3 times.

Next, in a block 166, the vectors and boundary boxes are processed based on the scale and offset, and a bounding box defining the limits of the display content is determined. The results of this step are shown in FIG. 4F, while FIG. 4G shows specific details on how the vectors and bounding boxes corresponding to image objects 250B and 252B (now 250B' and 252B', respectively) are processed. Logically, there are generally two ways to scale and offset the rendered content. In one embodiment, vectors and bounding boxes are mapped to a virtual display area in memory that has much greater resolution (e.g., 100,000×100,000 pixels) than any real display, and a virtual display limit bounding box is scaled and moved around over the virtual display area. Accordingly, during subsequent processing described below, objects falling within the display bounding box are rendered by reducing the scaling of those objects in the virtual display to how the objects will appear on the client device display relative to the virtual display bounding box. In the alternate, a fixed reference frame corresponding to the display resolution of the client device screen is maintained, wherein all vectors and bounding boxes are scaled and offset relative to the fixed reference frame. Each scheme has its advantages and disadvantages. One advantage of the second method is that the display bounding box is always maintained to have a size that matches the resolution of the content display area on the client device.

As shown in FIG. 4G, respective offsets in X and Y, ($-\Delta X$ and $-\Delta Y$ in the Figure) are applied to the starting point of each of the vectors. The vectors are then scaled by a scale factor "SF." The results of the new vectors are depicted by vectors 250D" and 252D". This produces a new datum for each object's bounding box that is relative to rendered page datum 262, which remains fixed. As discussed above, only a portion of the display screen will actually be used to display content (as defined by a display limit bounding box 266 in this embodiment), while other portions of the screen, including

box 264, will comprise a generally fixed-size user interface. Accordingly, rendered page datum 262 is not located at the upper left hand corner of the display area, although it possibly could be located at this point when either the current user interface is inactive (i.e., the display portion of the user interface is temporary disabled) or the user interface is contained in other portions of the display.

This foregoing process establishes a starting point (the new datum) for where the content in each object's bounding box will be rendered. At this point, each object's bounding box is then drawn from its new datum using the scaling factor. For example, in the original web page 210D (FIG. 4D), bounding box 250B had an X-axes datum of 150 pixels, a Y-axis datum of 225 pixels, and a height and width of 180×350 pixels. In contrast, after being offset and scaled, bounding box 250B' has an X-axis datum of $150*SF-\Delta X$, a Y-axis datum of $225*SF-\Delta Y$, and a height and width of $180*SF×350*SF$.

Returning to the flowchart of FIG. 6, once the vectors and bounding boxes are offset and scaled, content corresponding to objects having at least a portion of their bounding boxes falling within the display limit bounding box is retrieved from the client device's display list in a block 168. For examples, as shown in FIG. 4F, content corresponding to all of the objects except for those falling entirely outside of display limit bounding box 266 (objects 216, 238, 240, 242 and 244) is retrieved from the display list. That content is then scaled in a block 170. For image content, this comprises decompressing and scaling the compressed bitmaps corresponding to those images. For text content, this comprises scaling the font (i.e., typeface) that the text content portions of the web page are written in the parent HTML document and any referenced documents. There are various techniques for typeface scaling that may be implemented here, depending on the available resources provided by the operating system of the client device. For example, for WINDOWS™ operating systems, many TRUETYPE™ fonts are available, which use a common scalable definition for each font, enabling those fonts to be scaled to just about any size. In other cases, such as current PDA (e.g., Palm Pilots) operating systems, there is no existing feature that supports scaling fonts. As a result, bitmapped fonts of different font sizes and styles may be used. In addition to scaling image and text content, other types of content, such as separator lines and borders may also be scaled by block 170.

The process is completed in a block 172, wherein those portions of the scaled content falling within the display limit bounding box are rendered on the client device's display.

As discussed above, it is foreseen that the invention will be used with client devices having small, low resolution displays, such as PDAs and pocket PCs. Examples of various views of an exemplary web pages obtained from the YAHOO™ web site are shown in FIGS. 7A-B, 8A-B and 9A-B. For instance, FIG. 7A represents how the YAHOO™ home page might appear on a Palm IIIc color PDA.

In addition to directly scaling and offsetting content, the client user-interface software for PDA's provides additional functionality. For instance, a user may select to view a column (results represented in FIG. 7B by tapping that column with a stylus, a shown in FIG. 7A. Similarly, the user may select to zoom in on an image by tapping the image with the stylus, as shown in FIGS. 8A and 8B, or select to view a paragraph in an article by tapping on the paragraph, as shown in FIGS. 9A and 9B. It is noted that in some instances, the display of the paragraph may be reformatted to fit the characteristics of the display, rather than following the original format in the zoom-out view.

US 7,831,926 B2

21

22

It is further noted that that different scaling factors can be applied to the X and Y axis so as to change the aspect ratio of the display. For example, a Web page may be designed to be displayed on a computer having a resolution of 800×600 pixels, or a 4X to 3Y aspect ratio. In this case, the display corresponds to a "landscape" layout, wherein there are more pixels along the X axis than along the Y axis. Conversely, many handheld devices display images having a "portrait" layout, wherein there are more pixels along the Y axis than the X axis. By enabling different scaling factors to be applied to the X and Y axes, the present invention enables the aspect ratio of a rendered display image to be adjusted to better fit the aspect ratio of the client device.

An Exemplary Computer Architecture

An exemplary machine in the form of a computer system **500** in which features of the present invention may be implemented will now be described with reference to FIG. **10**. Computer system **500** may represent a workstation, host, server, print server, or printer controller. Computer system **500** comprises a bus or other communication means **501** for communicating information, and a processing means such as processor **502** coupled with bus **501** for processing information. Computer system **500** further comprises a random access memory (RAM) or other dynamic storage device **504** (referred to as main memory), coupled to bus **501** for storing information and instructions to be executed by processor **502**. Main memory **504** also may be used for storing temporary variables or other intermediate information during execution of instructions by processor **502**. Computer system **500** also comprises a read only memory (ROM) and/or other static storage device **506** coupled to bus **501** for storing static information and instructions for processor **502**.

A data storage device **507** such as a magnetic disk or optical disc and its corresponding drive may also be coupled to bus **501** for storing information and instructions. Computer system **500** can also be coupled via bus **501** to a display device **521**, such as a cathode ray tube (CRT) or Liquid Crystal Display (LCD), for displaying information to an end user. Typically, an alphanumeric input device **522**, including alphanumeric and other keys, may be coupled to bus **501** for communicating information and/or command selections to processor **502**. Another type of user input device is cursor control **523**, such as a mouse, a trackball, or cursor direction keys for communicating direction information and command selections to processor **502** and for controlling cursor movement on display **521**.

A communication device **525** is also coupled to bus **501**. Depending upon the particular presentation environment implementation, the communication device **525** may include a modem, a network interface card, or other well-known interface devices, such as those used for coupling to Ethernet, token ring, or other types of physical attachment for purposes of providing a communication link to support a local or wide area network, for example. In any event, in this manner, the computer system **500** may be coupled to a number of clients and/or servers via a conventional network infrastructure, such as a company's Intranet and/or the Internet, for example.

Importantly, the present invention is not limited to having all of the routines located on the same computer system. Rather, individual objects, program elements, or portions thereof may be spread over a distributed network of computer systems. Additionally, it is appreciated that a lesser or more equipped computer system than the example described above may be desirable for certain implementations. Therefore, the configuration of computer system **500** will vary from imple-

mentation to implementation depending upon numerous factors, such as price constraints, performance requirements, and/or other circumstances. For example, according to one embodiment of the present invention, a cell phone or a hand held computer may comprise only a processor or a micro controller and a memory, such as a micro code ROM or RAM, for storing static or dynamically loaded instructions and/or data.

In the foregoing specification, the invention has been described with reference to specific embodiments thereof. It will, however, be evident that various modifications and changes may be made thereto without departing from the broader spirit and scope of the invention. The specification and drawings are, accordingly, to be regarded in an illustrative rather than a restrictive sense.

What is claimed is:

1. A mobile device, comprising:

a processor,

a wireless communications device operatively coupled to the processor, to facilitate communication with a network via which Web content may be accessed;

a touch-sensitive display;

a memory, operatively coupled to the processor; and

storage means, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile phone to perform operations including,

  enabling a user to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

  retrieving HTML-based Web content associated with the Web page;

  translating the HTML-based Web content to produce scalable vector-based page layout information;

  employing the scalable vector-based page layout information and/or data derived therefrom to,

    render a view of at least a portion of the Web page on the touch-sensitive display using a first scale factor; and

    re-render the Web page in response to associated user inputs to enable a user to iteratively zoom in and out views of the Web page on the display while preserving the original page layout, functionality, and design of the content on the Web page defined by the HTML-based Web content,

  wherein preservation of the functionality defined by the HTML-based content includes preservation of hyperlink functionality.

2. The mobile device of claim 1, wherein the device comprises a mobile phone.

3. The mobile device of claim 1, wherein the device comprises one of a hand-held device or a palm-held device.

4. The mobile device of claim 1, wherein execution of the instructions performs further operations comprising enabling the user to zoom in on a user-selectable portion of a display of the Web page in response to a user interface input made via the touch-sensitive display.

5. The mobile device of claim 1, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

6. The mobile device of claim 1, wherein the Web content includes at least one hyperlink, and wherein execution of the instructions performs further operations comprising:

  enabling the user to select the hyperlink via the touch-sensitive display; and, in response thereto,

US 7,831,926 B2

23                                                    24

retrieving and translating HMTL-based Web content associated with the hyperlink to produce additional scalable vector-based page layout information; and

employing the additional scalable vector-based page layout information and/or data derived therefrom to render the Web content associated with the hyperlink on the touch-sensitive display.

**7**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising enabling the Web content to be displayed at different resolutions by scaling the scalable vector-based page layout information to resize a view of the Web page on the display in response to associated user inputs.

**8**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising returning the display of the Web content to a previous view in response to a corresponding user input made via the touch-sensitive display.

**9**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising enabling a user to pan a display of the Web content in response to a corresponding user input made via the touch-sensitive display.

**10**. The mobile device of claim **9**, wherein execution of the instructions performs further operations comprising enabling the display of the Web content to be panned in real-time.

**11**. The mobile device of claim **1**, wherein the page layout of the Web page is defined to have an original aspect ratio, and wherein the scalable vector-based page layout information and/or data derived therefrom is scaled to render a display having a different aspect ratio.

**12**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising enabling a user to view a column of the Web content at a higher resolution than a current resolution by tapping on the column via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is displayed to fit across the touch-sensitive display.

**13**. The mobile device of claim **1**, wherein the Web content includes at least one image, and wherein execution of the instructions performs further operations comprising enabling a user to view an image at a higher resolution than a current resolution by tapping on the image via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that the image is displayed to fit across a width of a display area of the touch-sensitive display.

**14**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising enabling a user to view a paragraph of the Web content at a higher resolution than a current resolution by tapping on the paragraph via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that content corresponding to the selected paragraph is displayed to fit across a width of a display area of the touch-sensitive display.

**15**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising:

generating a display list derived, at least in part, via use of the vector-based page layout information; and

employing the display list to re-render the display of the Web page.

**16**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising:

parsing HTML-based code corresponding to the received Web content to logically group content into objects, the objects including a plurality of display objects;

defining a primary datum corresponding to a page layout; and,

for each display object,

defining an object datum corresponding to a layout location datum for the object's associated display content;

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to its corresponding vector.

**17**. The mobile device of claim **16**, wherein execution of the instructions performs further operations comprising:

mapping the object vectors to a virtual display area in memory.

**18**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising:

parsing the HTML-based content to logically group content into objects;

generating page layout information including a bounding box for each object, the bounding box defining width and height dimensions for the object; and

storing information that links each object with its corresponding page layout information;

wherein the page layout information further includes information from which a page layout location of each of the bounding boxes can be determined.

**19**. The mobile device of claim **1**, wherein the scalable vector-based content includes scalable text content, and wherein execution of the instructions performs further operations comprising scaling a scalable font to render the scalable text content.

**20**. The mobile device of claim **1**, wherein at least a portion of the instructions comprise Java-based instructions configured to be executed on a Java virtual machine.

**21**. The mobile device of claim **1**, wherein translating the HTML-based Web content to produce scalable vector-based page layout information comprises:

processing the HTML-based Web content with a rendering engine to generate page layout information corresponding to the original page layout as interpreted by the rendering engine; and

employing the page layout information to produce scalable vector-based page layout information.

**22**. The mobile device of claim **21**, wherein the page layout information defines a layout location for a plurality of objects, including text objects, graphic layout objects, and/or image objects included on the Web page, and wherein producing vector-based page layout information comprises:

defining a primary datum corresponding to a page layout; and,

for each object,

defining an object datum corresponding to the layout location for the object on the page layout;

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to its corresponding vector.

**23**. The mobile device of claim **22**, wherein execution of the instructions performs further operations comprising effecting a zoom operation combined with a pan operation by,

for each of the plurality of display objects to be included in a panned view of the Web page to be rendered on the display,

scaling page layout information associated with the display object using a scale factor corresponding to a zoom level associated with the zoom operation to determine a scaled datum;

US 7,831,926 B2

25

determining an offset corresponding to the pan operation and combining the scaled datum with the offset to produce a scaled and offset datum that defines a location where the display object is to be rendered on the panned view of the Web page;

scaling content associated with the display object using the scale factor; and

rendering the scaled content at the location defined by the scaled and offset datum to render the display object on the panned view of the Web page.

**24**. The mobile device of claim **23**, wherein rendering scaled content associated with a text object comprises:

retrieving presentation attributes for the text object, the presentation attributes including a font typeface, size and color;

employing a scalable font associated with the font typeface to render text associated with the text object in a color associated with the color attribute, wherein the text is rendered relative to a location associated with the scaled and offset datum for the text object, and wherein the scale applied to the scalable font is a function of the scale factor and the font size.

**25**. The mobile device of claim **21**, wherein the original format of the Web page defines a width for the Web page, as interpreted by the rendering engine, and wherein execution of the instructions performs further operations comprising:

determining an applicable scale factor to fit the width of the Web page across a display area of the touch-sensitive display; and

employing the scale factor that is determined as the first scale factor.

**26**. The mobile device of claim **1**, wherein zooming operations are effected by applying a mathematical transformation to a plurality of points in a two-dimensional coordinate system comprising X and Y axes, including points comprising datum points having corresponding vectors included in the scalable vector-based page layout information defining page layout locations of corresponding text and image objects mapped to the two-dimensional coordinate system, wherein the mathematical transformation comprises,

$X'=X*SF;$

$Y'=Y*SF;$

wherein X, Y is the location of a point prior to transformation, X', Y' is the location of the point after transformation, and SF is the scale factor.

**27**. The mobile device of claim **26**, wherein the mathematical transformation is applied to points in a first coordinate system comprising a virtual coordinate system associated with a virtual display area onto which page layout information is mapped to a second coordinate system comprising a device coordinate system corresponding to a pixel resolution of the display of the mobile device, wherein points are mapped from the first coordinate system to the second coordinate system using the mathematical transformation.

**28**. The mobile device of claim **1**, wherein execution of the instructions performs further operations comprising maintaining at least one instance of the page layout information in a manner that is independent of the zoom levels used to view the web page on the display.

**29**. The mobile device of claim **1**, wherein the HTML-based Web content includes cascading style sheet content defining layout and presentation attributes for the Web page.

26

**30**. A mobile phone, comprising:

a processor,

wireless communications means operatively coupled to the processor, to facilitate communication with a mobile service provider network via which Web content may be accessed;

a touch-sensitive display;

a memory, operatively coupled to the processor; and

storage means, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile phone to perform operations including,

rendering a browser interface via which a user is enabled to request to access to a Web page having an original format comprising HTML-based content defining an original page layout, functionality, and design of content on the Web page;

retrieving HTML-based content associated with the Web page;

translating at least a portion of the HTML-based content from its original format to produce translated content including scalable vector-based content that supports a scalable resolution-independent representation of the HTML-based content that preserves an original page layout, functionality and design of the at least a portion of the HTML-based content when scaled and rendered; and

employing the scalable vector-based content to render a view of at least a portion of the Web page on the display using a first scale factor,

wherein preservation of the functionality defined by the HTML-based content includes preservation of hyperlink functionality.

**31**. The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising enabling the user to zoom in on a user-selectable portion of a display of the Web page in response to a user interface input made via the touch-sensitive display.

**32**. The mobile phone of claim **31**, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

**33**. The mobile phone of claim **30**, wherein the Web content includes at least one hyperlink, and wherein execution of the instructions performs further operations comprising:

enabling the user to select the hyperlink via the touch-sensitive display; and, in response thereto,

retrieving and translating the Web content associated with the hyperlink to produce additional scalable vector-based content; and

employing the additional scalable vector-based content to render the Web content associated with the hyperlink on the touch-sensitive display.

**34**. The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising:

parsing and processing markup language code associated with the Web page to determine the original page layout of display content within the Web page, wherein the original page layout defines a layout location for a plurality of objects, including text objects, graphic layout objects, and/or graphic image objects included in the Web page;

defining a primary datum corresponding to the original page layout; and,

for each object,

defining an object datum corresponding to the layout location for the object;

US 7,831,926 B2

27

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to its corresponding vector.

**35**. The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising enabling the Web content to be displayed at different resolutions by scaling the scalable vector-based content to re-render the display in response to associated user inputs.

**36**. The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising returning the display of the Web content to a previous view in response to a corresponding user input made via the touch-sensitive display.

**37**. The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising enabling a user to pan a display of the Web content in response to a corresponding user input made via the touch-sensitive display.

**38**. The mobile phone of claim **37**, wherein execution of the instructions performs further operations comprising enabling the display of the Web content to be panned in real-time.

**39**. The mobile phone of claim **30**, wherein the page layout of the Web page is defined to have an original aspect ratio, and wherein the scalable vector-based content is scaled when rendered so as to produce a display having a different aspect ratio.

**40**. The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising enabling a user to view a column of the Web content at a higher resolution than a current resolution by tapping on the column via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is displayed to fit across the touch-sensitive display.

**41**. The mobile phone of claim **30**, wherein the Web content includes at least one image, and wherein execution of the instructions performs further operations comprising enabling a user to view an image at a higher resolution than a current resolution by tapping on the image via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that the image is displayed to fit across at least one of a width and height of a display area of the touch-sensitive display.

**42**. The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising enabling a user to view a paragraph of the Web content at a higher resolution than a current resolution by tapping on the paragraph via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that content corresponding to the selected paragraph is displayed across at least one of a width and height of a display area of the touch-sensitive display.

**43**. The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising:

generating a display list associated with the scalable vector-based content; and

employing the display list to re-render the display at different scale factors to enable rapid zooming of the Web page.

**44**. The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising:

parsing and processing markup language code corresponding to the received Web content to determine page layout information corresponding to a page layout of the content on the Web page;

28

logically grouping selected content into objects;

defining a primary datum corresponding to the page layout; and,

for each object,

defining an object datum corresponding to a layout location datum for the object's associated display content;

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to its corresponding vector.

**45**. The mobile phone of claim **44**, wherein execution of the instructions performs further operations comprising:

mapping the object vectors to a virtual display area in memory.

**46**. The mobile phone of claim **45**, wherein execution of the instructions performs further operations comprising:

determining a first scale factor and offset in response to one or more corresponding user inputs defining a user-selectable zoom level and pan corresponding to a rendered view of the Web content desired by a user;

determining a virtual display limit bounding box for the virtual display area associated with the first scale factor and offset;

identifying objects having at least a portion of their content falling within the virtual display limit bounding box; and,

for each of such objects,

retrieving content associated with that object; and

applying an appropriate scale factor and offset to the content to render the view of the Web content.

**47**. The mobile phone of claim **30**, wherein execution of the instructions performs further operations comprising:

parsing markup language code corresponding to the received Web content to logically group selected content into objects;

generating page layout information including a bounding box for each object, the bounding box defining width and height dimensions for the object; and

storing information that links each object with its corresponding page layout information;

wherein the page layout information further includes information from which a page layout location of each of the bounding boxes can be determined.

**48**. The mobile phone of claim **30**, wherein the scalable vector-based content includes scalable text content, and wherein execution of the instructions performs further operations comprising scaling a scalable font to render the scalable text content.

**49**. The mobile phone of claim **30**, wherein the original format of the Web page defines a width for the Web page, and wherein execution of the instructions performs further operations comprising:

determining an applicable scale factor to fit the width of the Web page across a display area of the touch-sensitive display; and

employing the scale factor that is determined as the first scale factor.

**50**. The mobile phone of claim **30**, wherein at least a portion of the instructions comprise Java-based instructions configured to be executed on a Java virtual machine.

**51**. The mobile device of claim **30**, wherein the original format of the Web page comprises HTML-based Web content and the vector-based scalable content comprises scalable vector-based page layout information, and wherein execution of the instructions performs further operations comprising:

US 7,831,926 B2

**29**

processing the HTML-based Web content with a rendering engine to generate page layout information corresponding to the original page layout as interpreted by the rendering engine;

employing the page layout information to generate the scalable vector-based page layout information.

**52**. A mobile device, comprising:

a processor,

wireless communications means, to facilitate wireless communication with a network via which Web content may be accessed;

a touch-sensitive display;

flash memory, operatively coupled to the processor, in which a plurality of instructions are stored that when executed by the processor enable the mobile device to perform operations including,

    rendering a browser interface via which a user is enabled to request access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

    retrieving and processing the HTML-based Web content to produce scalable content; and

    employing the scalable content and/or data derived therefrom to,

        render a view of the Web page on the touch-sensitive display; and

        re-render the Web page in response to associated user inputs to enable the user to iteratively zoom in and out views of the Web page while preserving an original page layout, functionality, and design defined by the HTML-based Web content as interpreted by a rendering engine,

    wherein preservation of the functionality defined by the HTML-based Web content includes preservation of hyperlink functionality.

**53**. The mobile device of claim **52**, wherein the device comprises a mobile phone.

**54**. The mobile device of claim **52**, wherein the device comprises one of a Personal Digital Assistant (PDA) or pocket PC.

**55**. The mobile device of claim **52**, wherein execution of the instructions performs further operations comprising enabling the user to zoom in on a user-selectable portion of a display of the Web page in response to a user interface input made via the touch-sensitive display.

**56**. The mobile device of claim **55**, wherein the user interface input enables the user to define a window of a current view of the Web page on which to zoom in on.

**57**. The mobile device of claim **52**, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

**58**. The mobile device of claim **52**, wherein the Web page includes at least one hyperlink, and wherein execution of the instructions performs further operations comprising:

    enabling the user to select the hyperlink via the touch-sensitive display; and, in response thereto,

    retrieving and processing HMTL-based Web content associated with the hyperlink to produce additional scalable content; and

    employing the additional scalable content and/or data derived therefrom to render the Web content associated with the hyperlink on the touch-sensitive display.

**59**. The mobile device of claim **52**, wherein at least a portion of the scalable content comprises scalable vector-based content.

**60**. The mobile device of claim **52**, wherein execution of the instructions performs further operations comprising

**30**

returning the display of the Web page to a previous view in response to a corresponding user input made via the touch-sensitive display.

**61**. The mobile device of claim **52**, wherein execution of the instructions performs further operations comprising enabling a user to pan a display of the Web content in response to a corresponding user input made via the touch-sensitive display.

**62**. The mobile device of claim **61**, wherein execution of the instructions performs further operations comprising enabling the display of the Web content to be panned in real-time.

**63**. The mobile device of claim **52**, wherein the page layout of the Web page is defined to have an original aspect ratio, and wherein the scalable content and/or data derived therefrom is scaled to render a display having a different aspect ratio.

**64**. The mobile device of claim **52**, wherein execution of the instructions performs further operations comprising enabling a user to view a column of the Web content at a higher resolution than a current resolution by tapping on the column via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that content corresponding to the selected column is displayed across the touch-sensitive display.

**65**. The mobile device of claim **52**, wherein the Web content includes at least one image, and wherein execution of the instructions performs further operations comprising enabling a user to view an image at a higher resolution than a current resolution by tapping on the image via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that the image is displayed to fit a width of a display area of the touch-sensitive display.

**66**. The mobile device of claim **52**, wherein execution of the instructions performs further operations comprising enabling a user to view a paragraph of the Web content at a higher resolution than a current resolution by tapping on the paragraph via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that content corresponding to the selected paragraph is displayed across at least one of a width and height of a display area of the touch-sensitive display.

**67**. The mobile device of claim **66**, wherein the content of the paragraph is reformatted to fit characteristics of the display area when the display is re-rendered.

**68**. The mobile device of claim **52**, wherein the Web page includes text, layout attributes, and images, and wherein execution of the instructions performs further operations comprising:

    receiving content corresponding to the text and layout attributes via a first connection; and

    receiving content corresponding to at least one image via a second connection.

**69**. The mobile device of claim **68**, further comprising dynamic memory having at least a portion employed for rendering purposes, wherein execution of the instructions performs further operations comprising:

    mapping the object vectors and associated bounding boxes to a virtual display area in the dynamic memory.

**70**. The mobile device of claim **69**, wherein execution of the instructions performs further operations comprising:

    determining a first scale factor and offset in response to one or more corresponding user inputs defining a user-selectable zoom level and pan corresponding to a rendered display of the Web page desired by a user;

    determining a virtual display limit bounding box for the virtual display associated with the first scale factor and offset;

US 7,831,926 B2

**31**

identifying object bounding boxes having at least a portion falling within the virtual display limit bounding box; and,

for each of such object bounding boxes,

retrieving content associated with that object bounding box; and

applying an appropriate scale factor to the content to render the display.

**71**. The mobile device of claim **52**, further comprising dynamic memory having at least a portion employed for rendering purposes, wherein execution of the instructions performs further operations comprising:

building a display list via use of the scalable content and rendering the display list on a virtual display area in the dynamic memory; and

scaling the display list to re-render the display of the Web page.

**72**. The mobile device of claim **52**, wherein execution of the instructions performs further operations comprising:

parsing HTML-based code corresponding to the received Web content to identify content on the Web page;

logically grouping selected content into objects;

defining a primary datum corresponding to the original page layout; and,

for each object,

defining an object datum corresponding to a layout location datum for the object's associated display content;

generating a vector from the primary datum to the object datum for the object; and

creating a reference that links the object to its corresponding vector.

**73**. The mobile device of claim **72**, wherein execution of the instructions performs further operations comprising:

generating a bounding box for each object, the bounding box representing a portion of a rendered display page occupied by the object's associated group of content.

**74**. The mobile device of claim **52**, wherein the scalable content includes scalable text content, and wherein execution of the instructions performs further operations comprising scaling a scalable font to render the scalable text content.

**75**. The mobile device of claim **52**, wherein the original format of the Web page defines a width for the Web page, and wherein execution of the instructions performs further operations comprising:

determining an applicable scale factor to fit the width of the Web page across a display area of the touch-sensitive display; and

employing the scale factor to render the display area.

**76**. The mobile device of claim **52**, wherein at least a portion of the instructions comprise Java-based instructions configured to be executed on a Java virtual machine.

**77**. The mobile device of claim **52**, wherein a portion of the HTML-based Web content comprises XML-based content.

**78**. The mobile device of claim **52**, wherein a portion of the HTML-based Web content comprises cascading style sheet data.

**79**. A mobile device, comprising:

processing means;

wireless communications means, to facilitate wireless communication with a network via which Web content may be accessed;

touch-sensitive display means, to facilitate user input and display rendered content;

programmed circuit means; and

storage means, in which a plurality of instructions are stored,

**32**

wherein, upon execution of the instructions by at least one of the processing means and programmed circuit means, the mobile device is enabled to perform operations, including,

rendering a browser interface via which a user is enabled to request to access to a Web page comprising HTML-based Web content defining an original page layout, functionality, and design of content on the Web page;

retrieving and processing the HTML-based Web content to produce scalable content; and

employing the scalable content and/or data derived therefrom to,

render a view of the Web page on the touch-sensitive display; and

re-render the Web page in response to associated user inputs made via the touch-sensitive display means to enable the user to iteratively zoom in and out views of the Web page while preserving an original page layout, functionality, and design defined by the HTML-based Web content as interpreted by a rendering engine,

wherein preservation of the functionality defined by the HTML-based Web content includes preservation of hyperlink functionality.

**80**. The mobile device of claim **79**, wherein the processing means includes a general-purpose processor.

**81**. The mobile device of claim **79**, wherein at least a portion of the programmed circuit means is embodied as a special-purpose processor.

**82**. The mobile device of claim **79**, wherein execution of the instructions performs further operations comprising enabling the user to zoom in on a user-selectable portion of a display of the Web page in response to a user interface input made via the touch-sensitive display.

**83**. The mobile device of claim **82**, wherein the user interface input enables the user to define a window of a current view of the Web page on which to zoom in on.

**84**. The mobile device of claim **79**, wherein the display of the Web page is re-rendered in real-time to effect zooming operations.

**85**. The mobile device of claim **79**, wherein execution of the instructions performs further operations comprising enabling a user to pan a display of the Web content in response to a corresponding user input made via the touch-sensitive display.

**86**. The mobile device of claim **85**, wherein execution of the instructions performs further operations comprising enabling the display of the Web content to be panned in real-time.

**87**. The mobile device of claim **79**, wherein the Web content includes at least one image, and wherein execution of the instructions performs further operations comprising enabling a user to view an image at a higher resolution than a current resolution by tapping on the image via the touch-sensitive display, wherein in response thereto, the display is re-rendered such that the image is displayed to fit across a width of a display area of the touch-sensitive display.

**88**. The mobile device of claim **79**, further comprising dynamic memory having at least a portion employed for rendering purposes, wherein execution of the instructions performs further operations comprising:

building a display list of scalable content via use of the scalable content and rendering the display list on a virtual display area in the dynamic memory; and

scaling the scalable content in the display list to re-render the display of the Web page.

\*   \*   \*   \*   \*

(12) **INTER PARTES REVIEW CERTIFICATE** (119th)

# United States Patent
### Rohrabaugh et al.

(10) **Number:**  **US 7,831,926 K1**

(45) **Certificate Issued:**  **Jan. 15, 2016**

(54) **SCALABLE DISPLAY OF INTERNET CONTENT ON MOBILE DEVICES**

(75) Inventors: **Gary B. Rohrabaugh**; **Scott A. Sherman**

(73) Assignee: **Softview L.L.C.**

**Trial Numbers:**

IPR2013-00004 filed Oct. 2, 2012
IPR2013-00257 filed Apr. 29, 2013

**Petitioners:**  Kyocera Corporation; Motorola Mobility LLC

**Patent Owner:** Softview LLC

**Inter Partes Review Certificate for:**

Patent No.: **7,831,926**
Issued: **Nov. 9, 2010**
Appl. No.: **11/738,486**
Filed: **Apr. 21, 2007**

The results of joined IPR2013-00004 and IPR2013-00257 are reflected in this inter partes review certificate under 35 U.S.C. 318(b).

**INTER PARTES REVIEW CERTIFICATE**
**U.S. Patent 7,831,926 K1**
**Trial No. IPR2013-00004**
**Certificate Issued Jan. 15, 2016**

**1**

AS A RESULT OF THE INTER PARTES REVIEW
PROCEEDING, IT HAS BEEN DETERMINED
THAT:

Claims **30**, **31**, **40**, **41**, **43**, **52**, **55**, **59**, **72** and **75** are cancelled.

\* \* \* \* \*

**2**

(12) **EX PARTE REEXAMINATION CERTIFICATE** (11956th)

# United States Patent

Rohrabaugh et al.

(10) **Number:** US 7,831,926 C1

(45) **Certificate Issued:** *Dec. 6, 2021

(54) **SCALABLE DISPLAY OF INTERNET CONTENT ON MOBILE DEVICES**

(75) Inventors: **Gary B. Rohrabaugh**, Bellingham, WA (US); **Scott A. Sherman**, Seattle, WA (US)

(73) Assignee: **Softview L.L.C.**

**Reexamination Request:**
No. 90/009,995, May 29, 2012

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **7,831,926** |
| Issued: | **Nov. 9, 2010** |
| Appl. No.: | **11/738,486** |
| Filed: | **Apr. 21, 2007** |

( * ) Notice: This patent is subject to a terminal disclaimer.

**Related U.S. Application Data**

(63) Continuation of application No. 09/878,097, filed on Jun. 8, 2001, now Pat. No. 7,210,099, which is a

(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 17/00* | (2019.01) |
| *G06F 40/143* | (2020.01) |
| *G06F 9/451* | (2018.01) |
| *G06F 16/958* | (2019.01) |
| *G06F 16/957* | (2019.01) |
| *G06F 40/134* | (2020.01) |
| *G06F 40/103* | (2020.01) |
| *G06F 3/0488* | (2013.01) |
| *H04L 29/08* | (2006.01) |
| *G06F 16/95* | (2019.01) |

(Continued)

(52) **U.S. Cl.**
CPC .......... *G06F 40/143* (2020.01); *G06F 3/0488* (2013.01); *G06F 9/451* (2018.02); *G06F 16/9577* (2019.01); *G06F 16/986* (2019.01); *G06F 40/103* (2020.01); *G06F 40/134*

(2020.01); *H04L 67/04* (2013.01); *H04L 67/2823* (2013.01); *G06F 3/0481* (2013.01); *G06F 16/95* (2019.01); *G06F 16/957* (2019.01); *G06F 16/958* (2019.01); *G06F 16/9537* (2019.01); *G06F 16/9574* (2019.01); *G06F 2203/04806* (2013.01); *G06F 2212/1048* (2013.01); *G06Q 30/02* (2013.01); *G09G 5/24* (2013.01); *G09G 2340/0407* (2013.01); *G09G 2340/0492* (2013.01); *H04L 67/02* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/009,995, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Adam L Basehoar

(57) **ABSTRACT**

Mobile devices enabled to support resolution-independent scalable display of Internet (Web) content to allow Web pages to be scaled (zoomed) and panned for better viewing on smaller screen sizes. The mobile devices employ software-based processing of original Web content, including HTML-based content, XML, cascade style sheets, etc. to generate scalable content. The scalable content and/or data derived therefrom are then employed to enable the Web content to be rapidly rendered, zoomed, and panned. Display lists may also be employed to provide further enhancements in rendering speed.

**At the time of issuance and publication of this certificate, the patent remains subject to pending reexamination control numbers 95/000,635 and 95/002,126 filed May 23, 2011 and Aug. 31, 2012 respectively. The claim content of the patent may be subsequently revised if a reexamination certificate issues from the reexamination proceedings.**



US 7,831,926 C1

Page 2

**Related U.S. Application Data**

continuation-in-part of application No. 09/828,511, filed on Apr. 7, 2001, now abandoned.

(60) Provisional application No. 60/217,345, filed on Jul. 11, 2000, provisional application No. 60/211,019, filed on Jun. 12, 2000.

(51) **Int. Cl.**
| | |
|---|---|
| G06F 16/9537 | (2019.01) |
| G06F 3/0481 | (2013.01) |
| G06Q 30/02 | (2012.01) |
| G09G 5/24 | (2006.01) |

US 7,831,926 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claim **29** is confirmed.

Claims **30**, **31**, **40**, **41**, **43**, **52**, **55**, **59**, **72** and **75** were
previously cancelled.

Claims **1-28**, **32-39**, **42**, **44-51** and **69** are cancelled.

Claims **53-54**, **56-58**, **60-68**, **70-71**, **73-74** and **76-88** were
not reexamined.

**2**

\* \* \* \* \*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** <u>2023-1006 and 2023-1008</u>

**Short Case Caption:** <u>SoftView LLC v. Apple Inc.</u>

---

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

---

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes <u>14,000</u> words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: <u>01/27/2023</u>

Signature: <u>/s/ R. Alan Burnett</u>

Name: <u>R. Alan Burnett</u>